**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

| | |
|---|---|
| In re: ) | |
| ) | |
| SPRINGFIELD HOSPITAL, INC.[1] ) | Chapter 11 |
| ) | Case No. 19-_____ |
| Debtor. ) | |
| ) | |

**EMERGENCY MOTION FOR AUTHORITY TO USE CASH COLLATERAL ON AN INTERIM BASIS AND SCHEDULING A HEARING AUTHORIZING THE USE OF CASH COLLATERAL ON A FINAL BASIS**

Springfield Hospital, Inc. ("Springfield" or the "Debtor") requests that the Court enter an order authorizing it to use property that may be claimed as cash collateral to allow it to continue to operate its business. The Debtor makes this request on an emergency, interim basis until such time as the Court holds a final hearing on this Motion and then, at that time, on a final basis, subject to extensions of the "Relevant Period," as that term is defined in this Motion and the Proposed Order, by consent of any affected parties, or pursuant to a further order of the Court.

The Debtor provided the United States Trustee (the "UST") with a copy of this Motion prior to its filing.

---

[1] The last four digits of the taxpayer identification number of Springfield Hospital, Inc., are 9437. 11 U.S.C. § 342(c)(1).

1

**Statement of Relief Requested Pursuant to Rule 4001(b)(1)(B) of the Federal Rules of Bankruptcy Procedure**

Pursuant to Rule 4001(b)(1)(B) of the Federal Rules of Bankruptcy Procedure, the Debtor provides the following statement of the relief requested:

| Rule | Information Required | Response |
| --- | --- | --- |
| 4001(b)(1)(B)(i) | "the name of each entity with an interest in the cash collateral" | Berkshire Bank |
| 4001(b)(1)(B)(ii) | "the purposes for the use of the cash collateral" | Continued business operations, payment of ordinary operating expenses, provision of health care services, payment of professionals. |
| 4001(b)(1)(B)(iii) | "the material terms, including duration, of the use of the cash collateral" | Continued use of revenues for ordinary operations and chapter 11 costs in accordance with the cash plan attached to this Motion as **Exhibit A** for the time period of June 26, 2019, through October 6, 2019, and then continuing thereafter, with the consent of affected parties or as permitted by the Court. |
| 4001(b)(1)(B)(iv) | "any liens, cash payments, or other adequate protection that will be provided to each entity with an interest in the cash collateral or, if no additional adequate protection is proposed, an explanation of why each entity's interest is adequately protected" | The cash plan demonstrates that there is no diminution in value of claimed cash collateral for the applicable time period. Alternatively, additional collateral will be provided to the extent there is a diminution in cash collateral over the course of usage of cash collateral. |

**Jurisdiction and Venue**

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory basis for relief are § 363(c)(2)(B) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-4 of The Vermont Local Bankruptcy Rules (the "Local Rules" or each a "Local Rule").

**Background**

I. **Overview**

3. The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on June 26, 2019 (the "Petition Date"). The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made, and no committee has been appointed or designated.

4. A description of the Debtor, its business, the facts and circumstances supporting this Motion, and the reason for commencing this case are set forth in greater detail in the *Declaration Of Michael Halstead In Support Of Springfield Hospital, Inc.'s Chapter 11 Petition And First Day Motions* (the "Halstead Declaration").

5. The Halstead Declaration was filed with this Motion and is incorporated by reference herein. Capitalized terms not defined in this Motion shall have the meaning ascribed to them in the Halstead Declaration.

6. The following paragraphs of the Halstead Declaration directly support the factual allegations contained in this Motion: 26-36, 53-59, and 77.

II. **General Allegations Related To This Motion**

7. Granting this Motion is a critical part of the Debtor's reorganization. Without authority to use property that may be claimed as cash collateral, the Debtor will be unable to operate in chapter 11, which will not only jeopardize its reorganization effort and recoveries for

creditors, but it will also have an adverse impact on patients in the Service Area, some of whom would be forced to drive significant distances to obtain hospital services. Halstead Declaration, ¶¶ 16, 50, 52, 59.

### A. Parties Who May Claim An Interest In the Debtor's Cash Collateral And A Description Of Property That Might Be Cash Collateral

8. The Debtor conducted a search of its records and financing statements filed with the Vermont Secretary of State's Office immediately prior to filing its chapter 11 petition. Based on that search, and with one exception,[2] Berkshire Bank ("Berkshire") is the only party the Debtor is aware of who may claim a security interest in some or all of the Debtor's "cash collateral," as that term is used in § 363(a) of the Bankruptcy Code (the "Cash Collateral").

9. In its UCC financing statement naming Springfield as its debtor, Berkshire described its collateral as including the following:

> All personal property of Debtor of every kind and nature, wherever located, whether now owned or hereafter acquired, including without limitation, the following categories of property as defined in Revised Article 9 of the Uniform Commercial Code: goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), supporting obligations and any and all proceeds of the foregoing.

10. In essence, Berkshire claims a security interest in all forms of personal property of the Debtor, including all income-producing property and proceeds of the same. This includes accounts receivable and their proceeds, deposit accounts (as original collateral and proceeds of accounts receivable), and investment property.

---

[2] The Debtor opened a new bank account at Peoples United Bank in May 2019 and deposited $8,000.00 to secure several credit cards with low credit limits that are used for necessary expenses. Peoples likely claims an interest in this account up to $8,000.00. The Debtor has requested permission to continue to these credit cards in its pending motion for authority to maintain its existing bank accounts and cash management system.

4

11. The Debtor estimates that the net book value of its accounts receivable is approximately **$7,442,773.00** (as of the Petition Date). Halstead Declaration, ¶ 59. This is net of amounts that the Debtor believes are uncollectible. Halstead Declaration, ¶ 59. The Debtor projects that the net book value of its accounts receivable will be approximately **$7,692,926.00** by October 6, 2019. Halstead Declaration, ¶ 59.

12. The Debtor reserves the right to argue that the value of Berkshire's interest its accounts receivable is different from the net book value.

13. As of the Petition Date, the Debtor had a number of deposit accounts with funds in them and a marketable securities account. Halstead Declaration, ¶ 59. These accounts and the sources of funds in them are summarized in Exhibit A to the Halstead Declaration. Halstead Declaration, ¶ 59. Several of these accounts are comprised of commingled payments from Medicare, Medicaid, commercial insurance, and private pay patient funds. Halstead Declaration, ¶ 59. Payments from certain payors include prospective interim payments that the Debtor receives in advance of services being provided and which are subject to "true up" payments after annual audits, including "cost reports" filed with Medicare and Medicaid. Halstead Declaration, ¶ 59. Thus a portion of the Debtor's receipts may not be earned when paid—or ever—and may never become revenue. Halstead Declaration, ¶ 59. These prospective payments may not be collateral of any party. Halstead Declaration, ¶ 59.

14. Berkshire cannot have control over any deposit account into which government receivables are initially deposited. This is because regulations promulgated by the Centers for Medicare and Medicaid Services require that all proceeds of Medicare and Medicaid receivables must be paid into a deposit account with respect to which only a medical provider can give instructions. *See Medicare Claims Processing Manual*, Chapter 1, § 20.2.5, available at

5

https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c01.pdf (last visited June 4, 2019). Financial institutions must provide offset waivers for such accounts. *Id.* These regulations also provide that "[i]rrespective of the language in any agreement a provider/supplier has with a third party that is providing financing, that third party cannot purchase the provider/supplier's Medicare receivables." *Id. See also* 42 U.S.C. § 1395g(c).

15. The Debtor has not completed its investigation as to the validity and enforceability of Berkshire's claimed security interest or whether funds in its deposit accounts constitute Cash Collateral, including because such funds may include prospective interim payments that may never be earned. Halstead Declaration, ¶ 59. The Debtor reserves all of its rights, including to take the position that Berkshire does not have a valid, perfected, and enforceable security interest in Cash Collateral.

**B.    The Debtor's Working Capital Needs, Sources Of Funds, And Proposed Expenditures**

16. The Debtor requires sufficient working capital to fund necessary operating expenses in order to remain in business during this case, thereby fulfilling its health care mission, maximizing the value of its assets for creditors, and ensuring continued access to hospital care in the Service Area. Halstead Declaration, ¶¶ 53, 59. These expenses include payroll for medical and administrative staff, purchases of medical supplies and other necessary goods, maintenance of the Debtor's facilities in good working order, professional fees, quarterly fees for the United States Trustee, and generally to meet the Debtor's ordinary and necessary business expenses arising after the Petition Date. Halstead Declaration, ¶¶ 53, 59. The Debtor's proposed budget for the 14-week period commencing on the Petition Date is filed with this Motion as **Exhibit A** (the "Cash Plan"). Halstead Declaration, ¶ 59. It includes monthly (4-week) summaries, weekly projections, and detailed projected disbursements. Halstead Declaration, ¶ 59.

17.     If the Debtor is unable to continue to operate, then the viability of its business will be jeopardized, the Debtor's creditors would be worse off, and, of critical importance, patient health care outcomes could be jeopardized. Halstead Declaration, ¶¶ 50, 52, 59.

18.     As set forth in the Cash Plan, during the period from the Petition Date through October 6, 2019 (the "Relevant Period"), the Debtor, in the ordinary course of its business, will receive cash revenues from its payor sources, including Medicare, Medicaid, third-party commercial insurance, and private payors. Halstead Declaration, ¶ 59. During this same time period, the Debtor will provide necessary health care services to its patients and pay operating expenses. Halstead Declaration, ¶ 59. All of these expenditures, which may vary in accordance with actual patient needs,[3] are reasonable and necessary in order to continue the provision of appropriate health care services to the patients of the Debtor without harming the value of the Debtor as a going concern. Halstead Declaration, ¶¶ 55, 56, 59.

19.     In order for the Debtor to meet its obligations during the Relevant Period, the Debtor must have the benefit of all of its Cash Collateral. The Debtor would suffer immediate and irreparable harm without authority to use Cash Collateral. Halstead Declaration. ¶¶ 50, 54, 59. It would almost immediately be unable to fund payroll and purchase necessary medical supplies. Halstead Declaration, ¶¶ 50, 52, 59. The Debtor would be unable to operate without employees and necessary medical supplies. Halstead Declaration, ¶ 59.

20.     As a result, the Debtor first seeks *interim* authority to utilize what *may* be Cash Collateral during the time period from the Petition Date through the date of a final hearing on this Motion. For this time period, the Debtor proposes to use Cash Collateral in accordance with the Cash Plan, though actual expenses may vary from the projections because patient needs may

---

[3]     For example, patient volume may impact staffing levels and payments to vendors as different quantities and types of medical supplies are required.

dictate individual vendor payments that differ from what is projected. These expenses are reasonable and necessary to maintain hospital operations and avoid irreparable harm to the Debtor during a period of time when Cash Collateral usage is authorized on an *interim* basis. Halstead Declaration, ¶ 59. The Debtor would suffer irreparable harm if it is unable to use its Cash Collateral until the date of a final hearing on the relief requested in this Motion. Halstead Declaration, ¶¶ 50, 54, 59.

21. The Debtor further requests that the Court authorize continued use of what may be Cash Collateral at a final hearing for the balance of the Relevant Period and continuing thereafter in accordance with the terms of the Proposed Order, either by consent of affected parties or pursuant to a further orders of the Court.

22. As indicated in the Cash Plan, the Debtor does not project any diminution in the value of its Cash Collateral over the course of the Relevant Period. The Debtor projects that it will end the Relevant Period with more Cash Collateral—including cash on hand—than at the beginning of the Relevant Period. This increase derives from business operations dependent upon the use of cash receipts that may be Cash Collateral. Thus the projections demonstrate the viability of the Debtor, the ability of the Debtor to provide utilize cash receipts without any diminution in cash as between the starting and ending dates of the Relevant Period, and that the relief requested is in the best interests of the Debtor's estate.

23. In light of the fact that the Debtor expects to be able to conduct its operations without impairing the value of its Cash Collateral, no further adequate protection is required. In the event this Court determines that additional adequate protection is needed, and as an alternative form of relief, the Debtor proposes to grant a mortgage lien on certain unencumbered real property, limited to the extent of a diminution of Cash Collateral during the Relevant Period.

## Relief Requested

24. The Debtor seeks authority to use Cash Collateral on an interim basis until such time as the Court holds a final hearing on this Motion and then, at that time, on a final basis, pursuant to the terms of the Proposed Order, subject to extensions of the Relevant Period agreed to by any party with an interest in Cash Collateral that must be adequately protected or by order of the Court.

## Basis for Relief

25. The Debtor seeks authority to use property that may be Cash Collateral pursuant to § 363 of the Bankruptcy Code. Section 363(a) defines cash collateral to mean:

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. 363(a).

26. Under § 363(c) of the Bankruptcy Code, a debtor is authorized to use property of the estate in the ordinary course of business. 11 U.S.C. § 363(c)(1). This right of a debtor to use property in the ordinary course of business, however, does not extend to "cash collateral" of a debtor unless either (i) the party with an interest in the cash collateral consents to its use; or (ii) the Court, after notice and a hearing, authorizes its use. 11 U.S.C. § 363(c)(a)(A-B).

27. In order for the Court to authorize the use of cash collateral, it must be demonstrated that the interest of the creditor claiming a right in the cash collateral at issue can be "adequately protected." 11 U.S.C. § 363(e). Section 363(e) provides, in pertinent part:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used,

9

sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).

28. Section 361 of the Bankruptcy Code provides a non-exhaustive list of the ways adequate protection can be provided. However, no payments or additional adequate protection is required when cash collateral will not be diminished by its use for the time period in question. *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D. N.H. 1993).

> With regard to a lien of this nature, i.e., a "floating lien" of a blanket nature on changing and cycling soft collateral, *the appropriate adequate protection*, and the concomitant valuation of collateral appropriate for a determination of adequate protection, *is a showing that the level* of such a fluctuating base of items of collateral that are constantly cycling through different shapes and forms, as the business operation continues, *will in fact remain at the same magnitude* (in terms of ongoing operational values) *during the relevant period* of debtor-in-possession business operation in the chapter 11 reorganization proceedings.

*Id.* (emphasis added; internal footnote deleted). *Accord In re Arriens*, 25 B.R. 79, 81 (Bankr. D. Or. 1982); *McCombs Properties VI, Ltd. V. First Texas Savings Ass'n (In re McCombs Properties, Ltd.)*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988).

29. The Cash Plan demonstrates that the *Dynaco* standard is met in this case. The Debtor seeks authority to use Cash Collateral for the next 14 weeks, and the ending balance of all sources of property that may be Cash Collateral exceeds the beginning balance. This is the result of continued business operations. Thus the Debtor's proposed use of Cash Collateral will preserve the value of Cash Collateral and avoid cessation of business that would require incurring closure costs necessary to safely wind down hospital operations.

30. In light of this, to the extent Berkshire holds a valid, perfected, and enforceable interest in Cash Collateral, Berkshire's interests are adequately protected without providing any additional form of relief.

31. Alternatively, in the event this Court determines that additional adequate protection is necessary in order to protect the interests of Berkshire, the Debtor proposes to grant Berkshire additional collateral in the form of a mortgage on real property owned by the Debtor. This mortgage lien should be limited to the extent there is a diminution in the Cash Collateral of Berkshire during the Relevant Period. Additional information concerning the real property owned by the Debtor is set forth in the Halstead Declaration. However, the Debtor proposes initially to grant a mortgage on property owned by the Debtor and generally located at 55 Vermont Route 11, Chester, Vermont (the "Chester Property"). The Chester Property has a tax assessed value of approximately $774,200.00 and is unencumbered. Halstead Declaration, ¶ 31.

32. Authorization of the use of Cash Collateral is necessary in order to avoid immediate and irreparable harm to the Debtor. Halstead Declaration, ¶ 77. The inability to use cash collateral would mean that the Debtor's business operations would have to cease, be subject to liquidation in a bankruptcy case[4] or a state court proceeding, or the business would need to be placed into a receivership under applicable state law. Halstead Declaration, ¶ 77. Any of these outcomes would cause substantial harm to the Debtor, limit potential recoveries to creditors, and harm the entire Service Area by eliminating an important source of health care. This would cause irreparable harm not only to Berkshire, but also to the value of the Debtor's business, including as a going concern.

## Service and Notice

33. Notice of this Motion and all related papers were served on the following parties on the date and manner set forth in the certificate of service related to this Motion: (a) the UST; (b) the Debtor's secured creditors or, if applicable, to counsel representing them; (c) the non-insider holders of the 20 largest unsecured claims against the Debtor or, if applicable, to counsel

---

[4] The Debtor does not consent to conversion to chapter 7 or liquidation of its assets.

11

representing such holders; (d) applicable federal and state taxing authorities; (e) SMCS; and (f) to the extent not included in the foregoing, applicable state and federal regulatory agencies.

### Waiver Of Notice Requirements And Stay Under Bankruptcy Rule 6004

34. Based on the nature of the relief requested and the reasons for the relief, the Debtor requests a waiver of the fourteen (14) day stay under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure and the notice requirements of Rule 6004(a).

35. Further, to the extent applicable, the Debtor requests that the Court find that the provisions of Rule 6003 of the Federal Rules of Bankruptcy Procedure are satisfied because the relief requested in this Motion is immediately necessary for the Debtor to be able to continue to operate its business and preserve the value of its estate for the purpose of reorganization. The Debtor submits that this is a sufficient basis for the Court to find that there would be immediate and irreparable harm to the Debtor in requiring it to wait until twenty-one (21) days after the Petition Date before honoring its payroll and related obligations.

### Conclusion

The Debtor requests that the Court enter an order:

A. Finding that service of this Motion and all related documents is adequate under the circumstances of this matter;

B. Authorizing the Debtor to use Cash Collateral pursuant to the terms of the Cash Plan until such time as a final hearing can be held on this Motion;

C. Establishing a date for a final hearing on this Motion; and

D. Granting such additional relief as the Court deems proper.

Date: June 26, 2019 /s/ Andrew C. Helman
Andrew C. Helman
Kelly W. McDonald (*pro hac vice* pending)
Sage Friedman (*pro hac vice* pending)
MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, Maine 04104-5085
(207) 773-5651

Proposed Attorneys For Springfield Hospital, Inc.