## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

_____
                                             )
In re:                                       )
                                             )
SPRINGFIELD HOSPITAL, INC.[1]                )          Chapter 11
                                             )          Case No. 19-_____
                      Debtor.                )
_____)

### EMERGENCY MOTION FOR AUTHORITY TO PAY PRE-PETITION WAGES, TO MAINTAIN EXISTING INSURANCE COVERAGE, AND FOR RELATED RELIEF

Springfield Hospital, Inc. ("Springfield" or the "Debtor") requests that the Court enter an order authorizing payment of pre-petition wages, salaries, and related payroll obligations; payment and maintenance of employee benefit programs, including related insurance policies; and for related relief. Payment to Debtor's employees of wages and other benefits in the ordinary course is necessary to ensure the Debtor's continuing business operations and the success of this reorganization. The Debtor would suffer irreparable harm if this Motion is not granted.

The Debtor provided the United States Trustee (the "UST") with a copy of this Motion prior to its filing.

### JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for relief are §§ 105(a), 363(b), 364, 503(b), 507, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1] The last four digits of the taxpayer identification number of Springfield Hospital, Inc., are 9437. 11 U.S.C. § 342(c)(1).

**BACKGROUND**

I.     **This Chapter 11 Case**

3.      On June 26, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made, and no committee has been appointed or designated.

4.      A description of the Debtor, its business, and the facts and circumstances supporting this Motion and the reason for commencing this case are set forth in greater detail in the *Declaration Of Michael Halstead In Support Of Springfield Hospital, Inc.'s Chapter 11 Petition And First Day Motions* (the "Halstead Declaration").

5.      The Halstead Declaration was filed with this Motion and is incorporated by reference herein.  Capitalized terms not defined in this Motion shall have the meaning ascribed to them in the Halstead Declaration.

6.      The following paragraphs of the Halstead Declaration directly support the factual allegations contained in this Motion: 11, 50, 61-66, 78.

II.     **Facts Related To This Motion**

A.      **The Debtor's Workforce**

7.      The Debtor has approximately 355 employees and approximately 272 full-time equivalent positions.  Halstead Declaration, ¶ 66.  These employees include: physicians, physician assistants, and nurse practitioners; nurses, certified nursing assistants, and other medical staff; speech, physical, and occupational therapists; and other employees, including administrative staff (collectively, the "Employees").  Halstead Declaration, ¶ 66.  Some of the Employees are full-

time, others work part-time and are regularly scheduled, and some work on a per diem or "as needed" basis. Halstead Declaration, ¶ 66.

8.       As a medical facility, the Debtor's operations require skilled, carefully trained, and often highly educated employees to maintain the requisite levels of medical care and other services provided to patients. Halstead Declaration, ¶¶ 63, 66. The services of these Employees are needed to ensure that Springfield can deliver high quality medical care to patients. Halstead Declaration, ¶¶ 63, 66.

9.       Given the Debtor's location, it expends significant effort training and retaining current employees, as well as recruiting physicians, nurses, and other medical professionals. Halstead Declaration, ¶¶ 63, 66. If such employees were to terminate their employment with Springfield—because, for example, they are not promptly paid and their benefits programs are not maintained—it would be difficult to find replacement employees. Halstead Declaration, ¶¶ 63, 66. This could jeopardize patient health and Springfield's reorganization. Halstead Declaration, ¶¶ 63, 66. Thus the Employees' skills, knowledge, and understanding of Springfield's business and operations are essential to the effective operation of Springfield's business and to a successful reorganization of that business in a fashion that maximizes the return to creditors and other parties-in-interest while also allowing the Debtor to continue its non-profit mission of delivering high-quality health care to the people of the region. Halstead Declaration, ¶¶ 63, 66.

10.     Not only does the Debtor depend on its Employees, but they also depend on Springfield too for wages and related benefits as well as health care. Moreover, many of Employees rely exclusively on payments from Springfield for their basic living necessities.

## B.    Pre-Petition Wages And Related Payments

11.    The Debtor pays its Employees 26 times per calendar year.  Halstead Declaration,

¶ 66.  All Employees are paid every other Thursday for the two weeks ending the previous Saturday

at 11:59 p.m.  Halstead Declaration, ¶ 66.

12.    The Debtor commenced this case on June 26, 2019, a Wednesday.  The Debtor last

paid payroll to Employees on June 20, 2019, for the pay period ending June 15, 2019, at 11:59

p.m.  Halstead Declaration, ¶ 66.  The next regularly scheduled payroll date is July 3, 2019.[2]

Halstead Declaration, ¶ 66.  While most Employees receive payment by electronic transfer for

payroll and expense reimbursements, two Employees are paid by check, and such checks may be

outstanding as of the Petition Date.  Halstead Declaration, ¶ 66.

13.    On July 3, 2019, the Employees are due to receive payroll transfers, payroll checks,

and related expense reimbursement checks for the period from and after June 16, 2019, at 12 a.m.,

through and including June 29, 2019, at 11:59 p.m. (the "Payroll Period"), which includes payment

for the pre-petition time period of June 16, 2019, at 12 a.m., through and including the time that

the Debtor filed its petition on the Petition Date (the "Pre-Petition Period").  Halstead Declaration,

¶ 66.

14.    The Debtor estimates that the net payroll to Employees issued on July 3 will be in

the approximate amount of **$560,000.00**, which is the typical payroll amount for the Debtor.

Halstead Declaration, ¶ 66.  Of this total amount, about **$400,000.00** will be attributable to claims

arising from the Pre-Petition Period.  Halstead Declaration, ¶¶ 62, 66.  The following day, the

Debtor expects to pay approximately **$250,000.00** in payroll taxes for the Payroll Period, which

---

[2]    Payroll is ordinarily run on Thursdays, but that day is a holiday the week of July 1.

includes the employer- and employee-paid portions of payroll taxes. Of this total amount, about **$179,000.00** is attributable to the Pre-Petition Period. Halstead Declaration, ¶¶ 62, 66.

15.     Attached to this Motion as **Exhibit A** is a spreadsheet containing a projection of the gross amount to be paid to each of Springfield's employees for services provided during the Pre-Petition Period (see column B of **Exhibit A**). Halstead Declaration, ¶ 66. The amounts in column B are projected compensation amounts for actual services performed by the Employees during the Pre-Petition Period.[3] Halstead Declaration, ¶ 66. This amount does not include any employer-paid contributions for other benefits, such as medical, disability, or retirement programs. Halstead, ¶ 66. These programs are discussed below. The amount in column B **does** include employee-paid withholdings, including employment taxes. Halstead Declaration, ¶ 66.

16.     The Debtor requests authority to pay Employees payroll for the Pre-Petition Period, as reflected in column B of **Exhibit A**, when and as it ordinarily would do so on the next payroll date during the week commencing July 1. No Employee will receive more than $13,650.00 for payroll attributable to the Pre-Petition Period.[4] *See* 11 U.S.C. § 507(a)(4).

17.     In connection with processing payroll, the Debtor regularly withholds from Employee's wages certain amounts that Springfield is required to transmit to third parties such as for Social Security and Medicare, federal and state income taxes, contributions to the Debtor's benefits plans, retirement plan contributions, garnishments, child support or other similar obligations pursuant to court order or law (collectively, the "Withholding Obligations"). Halstead Declaration, ¶ 66.

---

[3]     Due to the timing of the Debtor's chapter 11 filing, it was not possible to provide actual amounts with the filing of this Motion. These projections are based upon the June 1 payroll.

[4]     Pre-petition payroll for Employees with employee identification numbers of 01942, 02412, and 02595 may exceed $13,650.00. The Debtor will cap the payments made to these Employees at that amount if actual payroll amounts require, except as may otherwise be ordered by the Court.

18.     The Debtor also seeks authority to transmit all funds required under the Withholding Obligations in the ordinary course of business.  These funds may not constitute property of Springfield's estate.

### C.     Business Expense Reimbursements

19.     The Debtor customarily reimburses Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtor.  Halstead Declaration, ¶ 66. These expenses typically include, but are not limited to, mileage, department expenses, travel expenses, and the like ("Reimbursement Obligations").  Halstead Declaration, ¶ 66.  Expense reports detailing the Reimbursement Obligations must be submitted by the Employees and generally must be supported by copies of receipts.  Halstead Declaration, ¶ 66.

20.     While it is difficult for the Debtor to determine the exact amount of Reimbursement Obligations outstanding as of the Petition date, as they vary from month to month, the Debtor seeks permission to honor any usual and customary pre-petition Reimbursement Obligations in the ordinary course of business.

### D.     Paid Time Off

21.     The Debtor provides its full- and part-time Employees with paid time off ("PTO").[5] PTO is available for holidays, personal days, or sick days.  Halstead Declaration, ¶ 66.  PTO forms an integral part of the Debtor's employment package.  Halstead Declaration, ¶ 66.  Failure to provide these benefits would likely harm morale and prompt the premature departure of some valued Employees, thereby jeopardizing Springfield's reorganization efforts.      Halstead Declaration, ¶¶ 63-64.

---

[5]      Per diem Employees are not eligible for PTO.

22.     The amount of paid time off for each of the Employees is listed in column C of **Exhibit A**.  Halstead Declaration, ¶ 66.  Column D in **Exhibit A** contains the sum of outstanding pre-petition payroll for the Pre-Petition Period and the amount of PTO for each of the Debtor's Employees.  Halstead Declaration, ¶ 66.

23.     The Debtor requests authority to honor all PTO obligations by allowing Employees to use accrued PTO when and as it is available in the ordinary course of business.  The Debtor is **not** seeking permission to "cash out" any accrued and unused PTO of continuing Employees but does seek authority, in its business judgment, to pay Employees for unused vacation time that accrued within the 180 days prior to the Petition Date when such Employee's service with the Debtor is terminated, provided that the total of such payments plus the payments already made to the Employee on account of payroll for the Pre-Petition Period does not exceed **$13,650.00**.[6]

### E.     Overview Of Employee Benefits

24.     As discussed in the Halstead Declaration, the Debtor delivers health care as part of a system in conjunction with Springfield Medical Care Systems, Inc. ("SMCS"), the sole Class B and only voting member of the Debtor.  Halstead Declaration, ¶ 4.  In the ordinary course of business, the Debtor's Employees participate in various benefit plans provided by SMCS on behalf of all employees of the Debtor and SMCS (collectively, the "System Employees").  Halstead Declaration, ¶ 66.  This includes approximately employees of SMCS (the "SMCS Employees").  Halstead Declaration, ¶ 66.

25.     Attached to this Motion as **Exhibit B** is a document providing summary information with respect to the System's Employee Benefits.  Halstead Declaration, ¶ 66.  Attached

---

[6]     Relief similar to what is requested in this paragraph has been granted in other health care cases.  *E.g.*, *In re Astria Health*, Case No. 19-01189-11, Docket Entry 83 (Bankr. E.D. Wash. May 9, 2019); *In re Verity Health System*, Case No. 2:16-bk-17463-ER, Docket Entry 612 (Bankr. C.D. Calif. Oct. 22, 2018); *In re Gardens Regional Hospital And Medical Center Inc.*, Case No. 2:16-bk-17463-ER, Docket Entry 68 (Bankr. C.D. Calif. June 10, 2016).

to this Motion as **Exhibit C** is a document providing System Employee (and some employer) contributions and rates.  Halstead Declaration, ¶ 66.  The Debtor seeks authority to continue all such programs in the ordinary course of business and to make all required employer-paid contributions described on **Exhibit C**.

26.     The continued provision of these benefits is essential to post-petition retention and morale of the Employees.  Halstead Declaration, ¶¶ 63, 64, 66.  If the Debtor reduces or eliminates these benefits, the Debtor believes that the likelihood of losing Employees increases.  Halstead Declaration, ¶¶ 63, 66.

27.     Prior to the Petition Date, the Debtor paid all employer contributions for System Employees under the System's various employee benefits plans except for 401(k) and vision programs for SMCS Employees.  Halstead Declaration, ¶ 66.  Subject to the Court's approval, this payment structure will remain in place post-petition until such time as the liabilities of SMCS for the benefits can be transitioned to SMCS.   Thus the Debtor seeks authority to continue these payments post-petition and understands that SMCS will record a liability to the Debtor in the amounts actually paid in accordance with the ratio of the Debtor's Employees to SMCS Employees (57% to 43%) as compared to the total number of System Employees.  The Debtor reserves the right to seek to characterize any claim it may have against SMCS arising from payment of these expenses as an administrative expense claim against SMCS's estate, pursuant to § 503(b)(1) of the Bankruptcy Code.[7]  The Debtor understands that SMCS reserves the right to oppose such claims.

### (i)     Medical Coverage (Health Plan and Pharmacy Benefits)

28.     Full- and part-time Employees are eligible to obtain medical coverage through a self-funded health program (the "Health Plan") offering two different programs, a "PPO Medical

---

[7]     To the extent necessary, § 364 provides a basis for authorizing these intercompany transactions as loans and granting the Debtor an administrative expense claim.

Plan" and a "HSA Medical Plan." Halstead Declaration, ¶ 66. Each requires bi-weekly premiums paid by System Employees in the amounts set forth in **Exhibit C**. Halstead Declaration, ¶ 66.

29.      SMCS is the plan sponsor and plan administrator of the Health Plan. Halstead Declaration, ¶ 66. The contract administrator—the party processing claims—is Comprehensive Benefits Administrator, Inc. d/b/a CBA Blue, a licensee of the Blue Cross and Blue Shield Association ("CBA Blue"). Halstead Declaration, ¶ 66. In the ordinary course of business, CBA Blue receives claims submitted by employees or their health providers, reviews those claims for payment under the terms of the Health Plan, and then provides the System with weekly reports of claims for payment. Halstead Declaration, ¶ 66. The System has a shared human resources department, which then reviews the claims prior to sending them to accounts payable for payment. Halstead Declaration, ¶ 66.

30.      As of the Petition Date, known unpaid pre-petition claims under the Health Plan totaled **$507,084.33**, of which **$289,038.07** is attributable to the Debtor's Employees (the "SH Health Claims") and **$218,046.26** is attributable to SMCS Employees (the "SMCS Health Claims" and together with SH Health Claims, "All Health Claims").[8] Halstead Declaration, ¶ 66.

31.      Prescription Drug Coverage is managed by a ProAct, which serves as a third-party administrator ("Pharmacy Plan"). Halstead Declaration, ¶ 66. As of the Petition Date, known unpaid pre-petition claims under program ("Prescription Claims") totaled **$642,306.88**, of which **$366,114.92** is attributable to the Debtor's Employees ("SH RX Claims") and **$276,191.96** is attributable to SMCS Employees (the "SMCS RX Claims") based on a 57%-to-43% apportionment. Halstead Declaration, ¶ 66.

---

[8]      There is a 193-day lag between the date a claim is incurred, and the date it is finally reported and paid. There are likely outstanding claims in an amount that is not known.

32.     The Debtor seeks permission to pay the SH Health Claims and any SH RX Claims in the ordinary course of business.  Doing so would not result in payment of any amounts in excess of what is authorized under § 507(a)(5) of the Bankruptcy Code.

33.     As Employees or their medical providers submit additional medical claims and additional SH RX Claims, the Debtor seeks permission to pay those claims, whether pre- or post-petition, in the ordinary course of business.

34.     As discussed above, pre-petition, the Debtor paid the employer contribution for certain employee benefits for all System Employees.  The largest portion of this was for contributions for health and pharmacy claims.  Halstead Declaration, ¶ 66.  The Debtor seeks specific authority to continue these payments post-petition and to pay for the SMCS Health Claims, SMCS RX Claims, and any post-petition claims that may arise for SMCS Employees, subject to the understanding that SMCS will record a liability equal to 43% of the total amount of payments made on account of all Health Claims and Prescription Claims and the reservations of rights discussed herein.

35.     The maximum amount available under § 507(a)(5) of the Bankruptcy Code for payment of SH Health Claims is likely **$2,480,969.00**.[9]  The same amount is likely available for payment of SH RX Claims.  The proposed disbursements for SH Health Claims and SH RX Claims are less than the amounts allowed under § 507(a)(5) of the Bankruptcy Code, even when considering proposed disbursements for other employee benefit plans.

---

[9]      The maximum priority amount for All Health Claims for both companies is likely **$4,941,300.00**, based on the total number of employees covered by the plan (362) multiplied by **$13,650.00**.  When the 57-to-43% split is applied, the maximum amount the Debtor could be required to pay for SH Health Claims is **$2,816,541.00**.  Sticking with percentages, about 58% of the Debtor's Employees participate in the Health Plan, and 58% of the pre-petition payroll and payroll taxes that the Debtor proposes to pay totals **$335,572.00** (**$578,573.00** x 58% = **$335,572.00**).  When that amount is subtracted from **$2,816,541.00**, it means that the maximum amount available to pay SH Health Claims is likely **$2,480,969.00**.  There are the same number of participants in the Pharmacy Plan, which is subject to the same limitations.  The Debtor reserves all rights in the event that these priority limits become relevant later in the case.

36.     The System also maintains "stop loss" coverage through Voya Financial ("<u>Voya</u>") to provide insurance to the System in the event of catastrophic health claims of employees ("<u>Stop Loss Coverage</u>").  Halstead Declaration, ¶ 66.  The annual amount to be paid for this coverage is **$618,681.00**, with monthly premiums paid in advance of the month for which Stop Loss Coverage is provided.  Halstead Declaration, ¶ 66.  SH seeks authority, in its discretion, to make any post-petition payments required to maintain Stop-Loss Coverage post-petition.  This includes a post-petition payment on July 1 in the amount of **$59,359.36** for post-petition coverage in July.  A failure to do so could leave the Debtor's estate uninsured if Employees have catastrophic health claims post-petition.  Halstead Declaration, ¶ 66.

### (ii)     Vision And Dental Insurance

37.     Full- and part-time Employees are eligible to obtain vision and dental coverage through plans provided by SMCS to System Employees.  Halstead Declaration, ¶ 66.

38.     Vision insurance is available to eligible System Employees through VSP, and dental insurance is available to eligible System Employees through Northeast Delta Dental.  Halstead Declaration, ¶ 66.  The amount of employee-paid premiums is described in **Exhibit C** and is included in the Withholding Obligations discussed above.  Halstead Declaration, ¶ 66.

39.     As of the Petition Date, total unpaid employer- and employee-paid contributions for vision insurance for System Employees was **$4,616.67**, of which **$2,631.50** is attributable to SH Employees.  Halstead Declaration, ¶ 66.  Pre-petition, SMCS paid for this benefit for SMCS Employees.  Halstead Declaration, ¶ 66.  As of the Petition Date, total unpaid employer- and employee-paid contributions for dental insurance was **$8,777.00**, of which about **$5,003.00** is attributable to SH Employees.  Halstead Declaration, ¶ 66.  SH seeks authority to pay the employer-paid amounts under these two plans in the ordinary course of business.  To the extent

that the Debtor has historically funded these obligations for SMCS Employees, the Debtor seeks to maintain the historical payment structure until such time as the obligations can be transitioned to the Debtor. Employee-paid portions of these premiums are included in the Withholding Obligations.

### (iii)   **COBRA**

40.     The Debtor also seeks to continue to perform any obligations it may have under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") (*see* 26 U.S.C. § 4980B) with respect to any former employees. SH believes that pre-petition costs related to COBRA coverage are *de minimis*, but, nevertheless, to maintain Employee morale and to ensure the orderly administrative of the Debtor's estate, the Debtor requests authority, in its discretion, to pay such pre-petition costs. Halstead Declaration, ¶ 66.

### (iv)   **Employee Life, Disability, And Workers' Compensation Benefits**

41.     **Life Insurance.** The System also offers Employees premium-based group life and accidental death and disability insurance (the "Life Insurance") through Cigna. Halstead Declaration, ¶ 66. Basic Life Insurance is entirely employer-paid ("Basic Life Insurance"). Halstead Declaration, ¶ 66. System Employees can choose to pay for expanded coverage ("Expanded Life Insurance"). Halstead Declaration, ¶ 66. As of the Petition Date, the total unpaid amount for Basic Life Insurance attributable to System Employees, as well as other benefits described in the next two paragraphs, is **$40,834.03**. Halstead Declaration, ¶ 66. The portion attributable to the Debtor's Employees is **$23,275.40**, and the portion attributable to SMCS Employees is **$17,558.63**, again on a 57%-to-43% split. Halstead Declaration, ¶ 66. The Debtor seeks authority to pay the amount attributable to its Employees. Employee contributions for

Expanded Life Insurance, which is an employee-paid benefit, are included in the Withholding Obligations.

42.     **Short-Term Disability Insurance.** All System Employees may purchase short-term disability insurance provided by Cigna (the "Short-Term Disability Insurance"). Halstead Declaration, ¶ 66. In light of the fact that Cigna provides this coverage, any amounts due for the employer-paid portion of this benefit are included in the totals in the immediately prior paragraph. Halstead Declaration, ¶ 66. The Debtor seeks authority to pay the employer-paid portion for Short-Term Disability Insurance. Authority to transfer funds of the Debtor's Employees to pay for Short-Term Disability Insurance is included in the request regarding Withholding Obligations discussed above.

43.     **Long-Term Disability Insurance.** System Employees may obtain long-term disability insurance provided through Cigna ("Long-Term Disability Insurance"). Halstead Declaration, ¶ 66. This benefit is employer-paid and any outstanding amounts are also included in the total due to Cigna above. Halstead Declaration, ¶ 66. The Debtor seeks authority to continue to make any required payments to maintain this program.

44.     **Workers' Compensation.** System Employees are provided with workers' compensation insurance through A.I.M. Mutual Insurance Companies and NFP Property & Casualty Services, Inc. ("AIM"), a fully-insured program ("Workers' Compensation Insurance"). Halstead Declaration, ¶ 66. The amount of the annual premium payment is approximately **$250,597.00**, which is paid monthly. There are no unpaid premiums due as of the Petition Date. Halstead Declaration, ¶ 66. To the extent necessary, the Debtor seeks authority to continue to pay any portion of the premium attributable to its Employees. The next payment is due on or about July 1 for coverage in the month of July. This payment is in the approximate about of **$25,059.00**.

### (v)      401(k) Retirement Plan

45.      Eligible System Employees are able to participate in a retirement plan with AIG-Valic pursuant to § 401(k) of title 26 of the United States Code (the "Retirement Plan").  Halstead Declaration, ¶ 66.   Through automatic payroll deductions, Employees can contribute to the Retirement Plan and receive matching contributions equal to 50% of the amount contributed by Employees—up to the first 4% of each Employee's salary.  Halstead Declaration, ¶ 66.  The Debtor estimates that the unpaid pre-petition employer contributions for the Debtor's Employees to be **$6,541.07**.  Halstead Declaration, ¶ 66.

46.      The Retirement Plan is an integral part of the employment package for Employees, and a failure to maintain this program could result in the premature departure of valued Employees.  Halstead Declaration, ¶¶ 64, 66.  Therefore, the Debtor requests authority to honor its obligations and to transfer any amounts that it may be holding in trust for Employees on account of contributions to the Retirement Plan, including pre-petition amounts, as well as employer-paid contributions in the ordinary course of business.

### (vi)      Pension Plan

47.      The Debtor maintains a defined-benefit pension plan named the "Springfield Hospital Pension Plan" (the "Pension Plan").  Halstead Declaration, ¶ 66.  There are 201 participants in the Pension Plan who are currently receiving benefits, and there are approximately 166 Employees who may be eligible for benefits under the Pension Plan upon retirement.  Halstead Declaration, ¶ 66.  No new employees were eligible to enter the Pension Plan after February 28, 2006.  Halstead Declaration, ¶ 66.  Pursuant to a valuation of the Pension Plan as of October 1, 2018, the minimum required contribution for the 2018-19 plan year was **$31,251.00**—or slightly more if paid at a later time.  Halstead Declaration, ¶ 66.

48.     The Debtor seeks authority to maintain the Pension Plan and perform its obligations thereunder in the ordinary course of business.  The Debtor seeks the authority, within its discretion, to make the payment described in the prior paragraph.

### (vii)     457 Plan

49.     There are eight current or former System Employees who participate in a 457 retirement plan that allows certain eligible System Employees to devote a portion of their compensation to savings for retirement (the "457 Plan").  Halstead Declaration, ¶ 66.  Three of these participants are Employees of the Debtor.   Halstead Declaration, ¶ 66.   There are no employer-paid contributions to this program.  Halstead Declaration, ¶ 66.  SMCS is the sponsor and administrator of the 457 Plan. Halstead Declaration, ¶ 66.   The 457 Plan is managed by NFP Executive Benefits.  Halstead Declaration, ¶ 66.  NFP Executive Benefits manages accounts under the 457 Plan for participating System Employees.  Halstead Declaration, ¶ 66.  The funds are not located in deposit accounts of the Debtor.  Halstead Declaration, ¶ 66.

### (viii)     Flexible Spending and Health Savings Accounts

50.     Employees who choose the HSA Plan under the Health Plan are eligible to receive employer-paid contributions to a health savings account ("HSA") managed by Health Equity in the following amounts: **$1,000.00** for an employee only plan, **$1,500.00** for an employee/spouse or employee/child(ren) plan, and **$2,000.00** for a family plan.   Halstead Declaration, ¶ 66.  Employees may also make their own contributions to a HSA, which are included in the Withholding Obligations discussed above.  Halstead Declaration, ¶ 66.  The Debtor estimates that the employer contribution for all System Employees for May and June is approximately **$13,400.00**has, with about **$7,600.00** attributable to the Debtor's Employees.   Halstead Declaration, ¶ 66.  Employee portions are included in the Withholding Obligations.

51.     Eligible Employees may also establish and fund flexible spending accounts ("FSAs") with IPG Flex to be used to fund certain health care- and dependent care-related expenses.   Halstead Declaration, ¶ 66.  IPG Flex serves as a third party administrator of the FSAs, keeps track of employee FSA account balances, and administers all payments of Employee claims made against the FSAs.  Halstead Declaration, ¶ 66.

52.     FSAs are funded entirely with Employee funds included in the Withholding Obligations described above.  Halstead Declaration, ¶ 66.  These Employee funds are held in a "sweep" bank account of the Debtor maintained at People's United Bank with an account number ending in the last four digits of 6214 (the "Sweep Account").  Halstead Declaration, ¶ 66.  Other types of funds, including patient payments and other miscellaneous payments, are also "swept" into the Sweep Account automatically.  Halstead Declaration, ¶ 66.  Disbursements are made on account of claims submitted to FSAs from an account at People's United Bank with an account number ending in the last four digits of 2450 (the "Master FSA Account").  Halstead Declaration, ¶ 66.  Funds from the Sweep Account automatically transfer to the Master FSA Account as needed to fund disbursements of allowed claims presented on account of FSAs.  Halstead Declaration, ¶ 66.  Employees may access funds in their respective FSAs by using, among other things, debit cards that request payment of claims from the FSAs.  Halstead Declaration, ¶ 66.

### (ix)     Miscellaneous Employee Benefits

53.     The Debtor also offers its eligible Employees the opportunity to participate in numerous other programs and plans described more fully in **Exhibit B**, including supplemental benefit plans with Aflac, an employee assistance plan with UniCare EAP, and employee wellness programs.  Halstead Declaration, ¶ 66.

54.     To the extent that the Debtor has any payment obligations under any such plans, they are *de minimis*, and the Debtor seeks permission to pay pre-petition amounts that may be outstanding.  Halstead Declaration, ¶ 66.

**F.      Temporary Staffing**

55.     In addition to full-time, part-time, and per diem Employees, the System also relies upon staffing and contract agencies ("Contract Agencies") and certain independent contractor health care providers for certain staffing needs on an as needed basis when the System, or Springfield or SMCS, are unable to staff a position with regular staff or when services can be provided more cost-effectively this way.  Halstead Declaration, ¶ 66.

56.     The Debtor intends to continue its practice of using Contract Agencies post-petition as needed and believes that it has authority to do so under § 363(c) of the Bankruptcy Code.

**RELIEF REQUESTED**

57.     Pursuant to §§ 105, 363(c), 364, 503(b), 507, 1107, and 1108 of the Bankruptcy Code, the Debtor seeks authority, in its sole discretion, to maintain the programs described above and to honor any obligations that it may have under these programs as they come due, including any pre-petition expenses related to them.  More specifically, the Debtor seeks authority, but not the obligation, in its discretion:

A.      To honor and pay all unpaid amounts for wages arising from the Pre-Petition Period;

B.      To honor and pay all accrued and unpaid pre-petition Withholding Obligations;

C.      To honor and pay all pre-petition Reimbursement Obligations, in the ordinary course of business;

17

D.      To honor and pay PTO obligations that accrued pre-petition, allowing Employees to utilize PTO post-petition in the ordinary course of the Debtor's business—but limiting "pay outs" to the amount permitted under § 507(a)(4) of the Bankruptcy Code;

E.      To maintain the Health Plan, to the extent it is the Debtor's responsibility;

F.      To honor and pay SH Health Claims and SH RX Claims in the ordinary course of business;

G.      To honor and pay unknown pre-petition health claims of Employees, once they are known, in the ordinary course of business;

H.      To honor and pay all post-petition health claims of Employees under the Health Plan and, to the extent not included therein, the Pharmacy Plan;

I.      To honor and pay all pre- and post-petition SMCS Health Claims and SMCS RX Claims, as well as any other employer contributions historically paid by the Debtor for SMCS Employees, subject to a reservation of rights with respect to the characterization of any claim that the Debtor may have against SMCS in SMCS's chapter 11 case with respect to these payments and with SMCS reserving the right to oppose such claims;

J.      To maintain Stop Loss Coverage in the ordinary course of business;

K.      To honor and pay any pre-petition obligations that the Debtor may have for its Employees with respect to vision insurance provided by VSP;

L.      To honor and pay any pre-petition obligations that the Debtor may have for its Employees with respect to dental insurance provided by Northeast Delta Dental;

M.      To honor and pay any pre-petition obligations that the Debtor may have under COBRA;

N.      To honor and pay any obligations the Debtor may have to provide Life Insurance, including payments to Cigna;

O.      To honor and pay any obligations the Debtor may have to provide Short-Term Disability Insurance, including payments to Cigna;

P.      To honor and pay any obligations the Debtor may have to provide Long-Term Disability Insurance, including payments to Cigna;

Q.      To honor and pay any obligations the Debtor may have to provide Workers' Compensation Insurance;

R.      To honor and pay any obligations that the Debtor may have with respect to its Employees to make employer contributions to the Retirement Plan;

S.      To the extent of the Debtor's obligations, to maintain the Retirement Plan;

T.      To honor and pay any obligations that the Debtor may have with respect to the Pension Plan;

U.      To the extent of the Debtor's obligations, to maintain the Pension Plan;

V.      To the extent of the Debtor's obligations, to maintain the 457 Plan;

W.      To honor and pay any employer contributions required under the HSA; and

X.      To maintain any and all employee benefits plans described in **Exhibit B** and not discussed herein.

58.      The Debtor would suffer irreparable harm if the relief requested in this Motion is not granted.  Halstead Declaration, ¶¶ 55-61.

## RELIEF REQUESTED AND BASIS FOR RELIEF

59.     Pursuant to § 507(a)(4)(A) of the Bankruptcy Code, claims for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status.

60.     Similarly, § 507(a)(5) of the Bankruptcy Code provides that claims for contributions to an employee benefit plan also are afforded priority unsecured status.

61.     As priority claims, these two types of claims must be paid in full before any general unsecured claims.

62.     Accordingly, the relief requested in this Motion will generally affect the **timing** but not the **obligation** to pay these claims and will not prejudice the rights of any general unsecured creditor.

63.     As a health care business, the Debtor has many highly-skilled and highly-paid Employees—in particular, certain medical providers.  Given the location of the Debtor's business and the now widely-known nature of its finances, replacing these Employees would be difficult, and the consequences of their departure to patients and going concern value would be significant. In the Debtor's business judgment, the benefits of paying any of these claims far outweighs any adverse impact the departure of Employees could have on Springfield's reorganization efforts.

64.     In summary, it is in the best interest of the Debtor's estate that the Court grant this Motion because the Employees are highly-trained, necessary for the operation of the Debtor's business, and, a valuable and irreplaceable asset without which the going-concern value of the Debtor and its estate would be substantially diminished.  Moreover, these Employees provide a vital service to the community in the form of needed medical services.  Meeting the pre-petition payroll, payroll-related expenses, and other compensation obligations will help to assure the

continued services of the Debtor's employees while also maintaining and preserving the value of the Debtor's operations and assets for the benefit of its estate, the health and safety of patients, and the benefit of the Springfield community. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (S.D.N.Y. 1989) (affirming order authorizing payment of pre-petition wages under § 363(b) of the Bankruptcy Code); *In re Boston & Maine Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existing of authority to authorize trustees in reorganization cases to pay claims where payment is necessary for reorganization); *In re Payless Cashless, Inc.*, 268 B.R. 542, 546 (Bankr. W.D. Mo. 2001) (noting that several courts have permitted debtors-in-possession to pay pre-petition debts on the grounds that payment of such claims was needed for reorganization).

### Waiver Of Notice Requirements And Stay Under Bankruptcy Rule 6004

65.    To the extent that the relief requested in this Motion constitutes a use of property of the Debtor's estate under § 363(b) of the Bankruptcy Code, then Springfield requests that a waiver of the fourteen (14) day stay under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure and the notice requirements of Rule 6004(a).

66.    Further, to the extent applicable, the Debtor requests that the Court find that the provisions of Rule 6003 of the Federal Rules of Bankruptcy Procedure are satisfied because the relief requested in this Motion is immediately necessary for the Debtor to be able to continue to operate its business and preserve the value of its estate for the purpose of reorganization.  The Debtor submits that this is a sufficient basis for the Court to find that there would be immediate and irreparable harm from waiting until twenty-one (21) days after the Petition Date before honoring payroll and related obligations.

## Reservation Of Rights

67.     Nothing in this Motion is intended to be or should be construed as an admission as to the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim, or an approval of any agreement, contract, or lease under § 365 of the Bankruptcy Code.

## Notice and Service

68.     Notice of this Motion and all related papers were served on the following parties on the date and manner set forth in the certificate of service related to this Motion: (a) the United States Trustee; (b) the Debtor's secured creditors or, if applicable, to counsel representing them; (c) the non-insider holders of the 20 largest unsecured claims against the Debtor or, if applicable, to counsel representing such holders; (d) SMCS; (e) applicable federal and state taxing authorities; and (f) to the extent not included in the foregoing, applicable state and federal regulatory agencies.

## Conclusion

The Debtor requests that the Court enter an order in the form filed with this Motion and grant such further and additional relief as the Court deems appropriate.


Date: June 26, 2019                          /s/ Andrew C. Helman
                                             Andrew C. Helman
                                             Kelly W. McDonald (*pro hac vice* pending)
                                             Sage Friedman (*pro hac vice* pending)
                                             MURRAY, PLUMB & MURRAY
                                             75 Pearl Street, P.O. Box 9785
                                             Portland, Maine  04104-5085
                                             (207) 773-5651

                                             Proposed Attorneys For Springfield Hospital, Inc.