## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

_____

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| SPRINGFIELD HOSPITAL, INC.[1] | ) | Chapter 11 |
| | ) | Case No. 19-_____ |
| Debtor. | ) | |

_____

## DECLARATION OF MICHAEL HALSTEAD IN SUPPORT OF SPRINGFIELD HOSPITAL, INC.'S CHAPTER 11 PETITION AND VARIOUS FIRST DAY MOTIONS

I, Michael Halstead, declare, pursuant to § 1746 of title 28 of the United States Code, that:

1.      I am the interim chief executive officer ("CEO") of Springfield Hospital, Inc. ("Springfield" or the "Debtor").  I am employed by Quorum Health Resources, LLC ("QHR"), which first entered into a management and consulting agreement to provide, among other things, chief executive officer services to the Debtor on or about January 17, 2019.  I have 47 years of experience in hospital administration, with 10 years of experience as a chief executive officer of a hospital.  For the past 18 years, I have held positions within QHR in which I had responsibilities for the operations of 45 hospitals in my division.  Many of these were critical access hospitals, like the Debtor, as discussed below.  I have also served as a chief financial officer previously.

2.      I am familiar with the Debtor's day-to-day business operations, business, and financial affairs.  I am authorized by the Debtor to submit this Declaration in support of its chapter 11 petition and the various first day motions described in this Declaration.

3.      On June 26, 2019, the Debtor's board of directors (the "Board") held a meeting and, by a voice vote, adopted a resolution (the "Resolution") authorizing the filing of the Debtor's

---

[1]      The last four digits of the taxpayer identification number of Springfield Hospital, Inc., are 9437.  11 U.S.C. § 342(c)(1).

bankruptcy petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). This Resolution is or will be filed on the docket in this case on this same day.

4.      Springfield Medical Care Systems, Inc. ("SMCS" and together with the Debtor, the "System") is the single Class B and only voting member of the Debtor. On June 26, 2019, SMCS's board of directors (the "SMCS Board" and together with the Board, the "Boards") held a meeting and, by a voice vote, adopted the resolution (the "Member Resolution") authorizing the filing of the Debtor's bankruptcy petition under chapter 11 of the Bankruptcy Code. The Member Resolution is or will be filed on the docket in this case on this same day.

5.      On June 26, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. That same day, the Debtor also filed the following motions (collectively, the "First Day Motions"):

     (a)    *Motion For Authority To Use Cash Collateral On An Interim Basis And Scheduling A Hearing Authorizing The Use Of Cash Collateral On A Final Basis* (the "Cash Collateral Motion");

     (b)    *Motion For Authority To Pay Pre-Petition Wages, To Maintain Existing Insurance Coverage, And For Related* Relief (the "Payroll Motion");

     (c)    *Motion For Order (A) Authorizing Continued Use Of Existing Business Books, Records, And Bank Accounts; (B) Authorizing And Directing Banks And Financial Institutions To Honor And Process Checks And Transfers; And (C) For Related Relief, Including Permission To Conduct Credit Card, EFT, And ACH Transactions* (the "Cash Management Motion"); and

     (d)    *Emergency Motion To Retain Quorum Health Resources, LLC, To Provide Contracted Management And Consulting Services To The Debtor* (the "Quorum Motion").

6.      This Declaration is submitted in support of these First Day Motions.

7.      All facts set forth in this Declaration are based on my personal knowledge; on information supplied to me by others within the Debtor's organization; upon my review of relevant documents; or on my opinion, based on my experience and knowledge of the Debtor's operations,

financial condition, and present liquidity needs. If I were called to testify, I would testify competently as to the facts in this Declaration.

## I.      **The Debtor's Inception**

8.      The Debtor is a Vermont non-profit business corporation located in Springfield, Vermont. The Debtor first incorporated in 1913 and has a mission "to excel at providing personalized, quality care: Where People Come First."

9.      The Debtor services patients in southeastern Vermont and southwestern New Hampshire (the "Service Area"). Communities within the Service Area include, without limitation, Springfield, Ludlow, Chester, Londonderry, and Bellows Falls, Vermont; and Charlestown, New Hampshire.

10.      The Debtor delivers health care in conjunction with SMCS. SMCS is a Vermont non-profit business corporation that provides certain shared services for the System; operates nine federally qualified health centers (each an "FQHC" and collectively "FQHCs") in the Service Area; and provides other shared services, such as outpatient mental health services. SMCS commenced a chapter 11 case on the Petition Date (the "SMCS Case"). The SMCS Case is pending before this Court.

## II.      **The Debtor's Business And Background Information**

### A.      **Overview Of The Debtor's Business**

11.      The Debtor operates a 25-bed general medical and surgical hospital located in Springfield, Vermont, with approximately 355 employees and 272 full-time equivalent positions. It is devoted to improving the health and quality of life for patients in Springfield and providing the entire Service Area with exceptional patient care that is compassionate, cost effective, and community-based.

12.     The Debtor provides the following services, among others, to patients in its Service Area: (a) **inpatient services** including end-of-life care, nursing care to support transitions to home ("swing bed" care), and hospitalist services to coordinate inpatient care; (b) **outpatient services** including cardiology testing, emergency department services, lab testing, and outpatient medical procedures (e.g., blood transfusions, injections, would care); (c) a range of **imaging services** including CT scanning, mammography, MRI, and ultrasound; (d) **therapy rehabilitation services** including alternative pain management, occupational therapy, physical therapy, speech therapy; (e) limited **general surgical services** (and providing an operating room to visiting specialists); (f) **primary care services**; (g) numerous types of **specialty care** primarily provided by physicians utilizing the Debtor's facilities; and (h) support for community groups.

13.     In 2018, there were 16,235 emergency department visits and 6,581 total inpatient days.  The emergency department has 12 beds.  It is supported by 24-hour coverage of testing facilities, including laboratory testing and radiology.  The Debtor currently has 25 licensed beds and the average daily inpatient census is 13 patients.  Acute patients are typically discharged within 96 hours.  The Debtor also has "swing beds"—essentially beds used for rehabilitative, non-acute care.

14.     The Debtor also provides inpatient mental health services at The Windham Center, located at 1 Hospital Court, # 12, Bellows Falls, Vermont.  The inpatient census at The Windham Center is currently 7 patients.

15.     The Debtor is the only hospital in Springfield and plays an important role as a hospital required to provide care to patients for most procedures regardless of their ability to pay.  The nearest hospitals are Mt. Ascutney Hospital and Health Center ("Mt. Ascutney), in Windsor,

Vermont (about 22 miles away and a 30-minute drive); and Valley Regional Healthcare ("Valley Regional"), in Claremont, New Hampshire (about 20 miles aware and a 30-minute drive).

16.     Many patients within the Service Area face long travel times—even without inclement weather—to obtain hospital-level services at the Debtor's facility in Springfield.  If the Debtor shuts down, then many patients in the Service Area would face even longer travel times to obtain hospital services.  Increased distances to emergency rooms are correlated with worse health outcomes.  Kelly, C., Hulme, C., Farragher, T., & Clarke, G., *Are differences in travel time or distance to healthcare for adults in global north countries associated with an impact on health outcomes? A systematic review. BMJ open*, *6*(11), e013059. doi:10.1136/bmjopen-2016-013059 (Nov. 24, 2016), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5178808/# (last visited June 3, 2019).

17.     By virtue of the Debtor's rural location, size, and certain services that it provides, it qualifies as and is a critical access hospital under the Medicare and Medicaid programs. Congress created the critical access hospital designation in 1997 in order to reduce the financial vulnerability of rural hospitals while also ensuring that essential health services are available to rural     communities.          *See*     RHIhub,     Critical     Access     Hospitals, https://www.ruralhealthinfo.org/topics/critical-access-hospitals (last visited June 3, 2019).  To meet the designation criteria, a hospital must not be closely located to another nearby hospital, must maintain no more than 25 inpatient beds, and must have 24-hour emergency services.  42 C.F.R. §§ 485.610(c), 485.618(a), 485.620.  The Debtor meets these criteria.

     **B.     Events Leading To The Debtor's Chapter 11 Filing**

18.     The Debtor entered into an affiliation with SMCS approximately 10 years ago.  The two companies share a number of administrative staff members, provide services for one another,

and have, at times, provided financial assistance to one another as needed. This is a novel arrangement and one of only three in the country that I am aware of in which a company operating a FQHC has functioned as a parent entity to a hospital.

19.    It is my understanding that there were numerous business reasons for this arrangement when it was implemented, including the following: First, SMCS is able to provide important primary care services throughout the Service Area. Second, SMCS housed certain specialty care physician practices providing services to patients of the Debtor. This has allowed the System to command higher reimbursement for those services due to regulatory benefits provided to FQHCs while also lowering cost because, among other things, FQHCs are not subject to tort liability. *See* Health Resources & Services Administration, *About The Federal Tort Claims Act (FTCA)*, available at https://bphc.hrsa.gov/ftca/about/index.html (last visited June 3, 2019). Third, the system could share certain administrative costs.

20.    This arrangement was successful for many years. Beginning in 2016, however, the System began to face financial challenges due to, among other things, revenue declines; increased cost for purchased services; increased health care expenses for employees, who participate in a System-level self-funded health plan; and expanded services, some of which were not profitable. The System faced several years of operating losses.

21.    Things came to a head in the fall of 2018. Independent auditors learned during the preparation of the System's audited financial statements that the Debtor had not paid the third quarter employment taxes and brought this information to the Boards. This led to a change in executive management and Quorum's selection to provide interim chief executive officer services for the Debtor, chief financial officer services for the System, and consulting services.

6

22.    Since the retention of Quorum, the Boards, working with senior leadership of the Debtor and SMCS, have approved and management has implemented numerous service line and staffing changes in order to reduce approximately $6.2 million of expenses.  About $4 million of these cuts are attributable to the Debtor, and about $2.2 million are attributable to SMCS.  These changes have included terminating certain services, including birthing services; across-the-board salary reductions, some of which we have needed to restore to maintain our nursing staff; and other changes to right-size the Debtor.  SMCS has also made significant changes.  The executive leadership team's salaries were reduced at the same time as all other employees.

23.    The goal of these changes is to position the Debtor and SMCS to be able to viable on a go-forward basis once they restructure their balance sheets and implement further operational changes.  This restructuring has been challenging because, among other things, news of the Debtor's financial condition became public in the fall of 2018 and the fact that the Debtor was considering chapter 11 became public in the winter of 2019 and again in late spring 2019.  This prompted some vendors to tighten credit terms, some employees to quit in order to cash out available earned time off, and created a challenging environment with certain key parties.

24.    The following chart summarizes the Debtor's finances and other information for the past several years.  Information for 2019 is unaudited and subject to change.  Notably, in the absence of restructuring, the Debtor projects positive earnings before payment of interest, taxes, depreciation, and amortized debt service ("EBITDA") for the 2020 fiscal year, which commences on October 1, 2019.

| | **2016** | **2017** | **2018** | **2019 (Projected)** | **2020 (Projected)** |
|---|---|---|---|---|---|
| **Total FTEs** | 313.77 | 317.93 | 321.67 | 272 (approximate) | 280.30 |
| **Gross Patient Revenue** | $119,749,195 | $115,366,608 | $121,252,778 | $110,500,604 | $106,879,864 |
| **Deductions from Revenue** | $66,111,072 | $63,399,799 | $68,273,966 | $61,924,832 | $57,990,675 |
| **Net Patient Revenue** | $53,638,123 | $51,966,809 | $52,978,812 | $48,575,772 | $48,889,189 |
| **Operating Expenses** | $55,189,202 | $57,565,238 | $61,860,030 | $56,716,886 | $51,418,019 |
| **Net Income/Loss** | **$380,190** | **($1,778,236)** | **($6,629,573)** | **($15,059,335)** | **($985,156)** |
| **EBITDA** | $2,652,197 | $316,379 | ($4,442,616) | ($12,920,475) | $1,024,153 |

25.    The Debtor has commenced its chapter 11 case in order to continue its restructuring. This will include restructuring its balance sheet and implementing additional operational changes.

### C.    The Debtor's Pre-Petition Secured Debt Structure

26.    The Debtor's pre-petition secured debt structure is described in the following paragraphs.  This description is based on a preliminary investigation.  The Debtor, as debtor and debtor-in-possession, reserves all rights to challenge any of the following loans, transactions, and claims, to the extent permitted under applicable law, following a complete investigation.

### 1.    Berkshire Bank (Lender)/USDA/Rural Development (Guarantor)

27.    Based on a review of relevant documents, it is my understanding that Berkshire Bank ("Berkshire") claims to be a creditor of the Debtor by virtue of the Debtor's execution and delivery of a two promissory notes memorializing a term loan (the "Term Loan") in the original principal amount of $12 million and a line of credit note (the "LOC") with an original maximum available amount of $3 million (collectively, the "Berkshire Notes").  SMCS is jointly liable under the Berkshire Notes.

28.     According to the Debtor's books and records, as of the June 19, 2019, the outstanding principal balance on the Term Loan was **$8,024,112.39** and the outstanding principal balance on the LOC was **$1,214,748.23**.

29.     Berkshire may claim a mortgage interest in the Debtor's hospital campus to secure the Berkshire Notes (the "Berkshire Mortgage").  The hospital campus is located at 25 Ridgewood Road, Springfield, Vermont.  There are adjacent properties owned by the Debtor located at 30 Ridgewood Road, land on Ridgewood Road, and 198 Park Street.  It is my understanding that 198 Park Street is unencumbered.

30.     Berkshire may also claim a security interest in, among other things, the Debtor's accounts receivable and other intangible property pursuant to a certain loan agreement between Berkshire, SMCS, and the Debtor (the "Berkshire Loan Agreement").

31.     The Debtor also owns real property located a 55 Vermont Route 11, Chester, Vermont (the "Chester Property").  It is my understanding that the Chester Property is unencumbered by mortgage interests.  It is my understanding that the Chester Property has a tax assessed value of approximately **$774,200.00**.

32.     It is my understanding that the obligations of the Debtor and SMCS under the Berkshire Notes are guaranteed, in part, by the United States Department of Agriculture, acting through the Office of Rural Development ("USDA").

33.     In January 2019, shortly after news articles about the Debtor's financial challenges, Berkshire informed the Debtor that it claimed the right to take possession of the Debtor's endowment fund—approximately $4.3 million in securities at that time—and to apply the value of this property to outstanding indebtedness under the Berkshire Notes.  It is my understanding that

Berkshire was concerned about what appeared to be a deteriorating financial condition of the Debtor and felt insecure in the Debtor's ability to repay its obligations.

34.     The Berkshire Loan Agreement purported to grant Berkshire a security interest in investment property, and Berkshire had a filed financing statement purporting to perfect a security interest in investment property.

35.     At that time, the Debtor and the System as a whole faced serious cash availability challenges.  The Debtor's internal cash projections suggested that the Debtor would be unable to make payroll within a matter of days or weeks.  The State of Vermont agreed to provide the Debtor with an advance of future Medicaid claims up to $1 million.  The State of Vermont conditioned its advance on Berkshire releasing to the Debtor an equal amount of funds from the endowment.  Berkshire agreed to do so provided that the Debtor agree to turn over the balance of its endowment to Berkshire.  Unready to file for relief under chapter 11 and facing no alternatives, the Debtor agreed to do so.

36.     Berkshire has otherwise been cooperative throughout the Debtor's pre-petition restructuring.

### 2.     Capital Leases

37.     There are numerous parties who have filed financing statements with respect to transactions that may be leases or may be disguised financing.  None of these parties claim an interest as original collateral in accounts receivable, cash, or related liquid assets.  The Debtor reserves all rights as to the proper characterization of such transactions.

### D.     Significant Unsecured Obligations

38.     Below is a description of significant unsecured claims against the Debtor.  This description is based on a preliminary investigation only. The Debtor, as debtor and debtor-in-

possession, reserves all rights to challenge any of the following loans, transactions, and claims, to the extent permitted under applicable law, following a complete investigation.

### 1.      One Care Vermont, LLC

39.      Vermont has pursued an innovative model to reduce health care costs and share potential savings among providers through the utilization of accountable care organizations mentioned above and referred to as an "ACO." An ACO brings together providers in a payment system designed to avoid unnecessary care and save health care dollars. One Care Vermont, LLC ("One Care"), is state-level ACO in Vermont with providers serving approximately 172,000 Vermonters whose health services are paid for through the federal Medicare program, state Medicaid program, commercial insurance, and self-insured health plans. Springfield, like many other providers, has entered into one or more agreements with One Care altering the default cost-based payment and reimbursement procedures under the Medicare and Medicaid programs.

40.      Shortly before the Petition Date, One Care withheld payment from Springfield under the Medicare and Medicaid programs for the month of May in the amount of approximately $676,000.00 and proposed withholding a similar amount in June in order to offset amounts received by Springfield in 2018 and 2019 for certain groups of Medicare (but not Medicaid) patients. One Care has communicated that it is the position of the federal Centers for Medicare and Medicaid Services ("CMS") that Springfield, as well as many other providers, was overpaid by Medicare for these Medicare (but not Medicaid) claims through no fault of the providers. I also understand that One Care made similar withholdings from other providers. There were also programmatic payment issues between the parties.

41.      These events had a significant and material impact on the Debtor's financial position and hastened its chapter 11 filing. The Debtor communicated this to One Care.

42.     Shortly before the Petition Date, the parties reached a settlement that resulted in an agreement that certain payments be made to the Debtor pre-petition and post-petition.  This agreement provided needed cash to the Debtor.

### 2.     Medicare

43.     The Debtor also receives payments from Medicare, both directly and through One Care.  The Medicare program is administered by the federal CMS with the assistance of a fiscal intermediary—in this case, National Government Services.  The Debtor anticipates that it may soon be notified of a substantial overpayment by CMS.  It is not uncommon for critical access hospitals to be overpaid by CMS in real time with "true up" payments at later points in time following annual reconciliation audits.

### 3.     Trade Payables

44.     The Debtor has significant unpaid obligations to many of its vendors.  The Debtor's books and records reflect that the total amount of unpaid trade payables totals approximately $6.7 million (as of June 25, 2019).  This amount does not include Employee health claims, claims involving One Care, tax claims involving the Internal Revenue Service, or any overpayment that may exist to Medicare.

## III.   The Necessity For Filing

45.     The Debtor's bankruptcy was necessary for several reasons, in addition to those discussed above.  First, many rural hospital patients often have no commercial insurance or are underinsured and use emergency room services in lieu of primary care providers.  The Debtor is required to treat these patients, often with no reimbursement or pay in return.  Second, Medicare and Medicaid reimbursement margins have fallen in recent years, so even reimbursement through

these channels has resulted in reduced income.  Third, the Debtor is generally not paying all of its debts as they become due because it lacks the ability to do so.

46.     There are hundreds of vendors who may be owed money as of this filing.  There are also hundreds of current or former patients who may be owed refunds following reconciliation of payments from their respective insurers or health plans.  It is difficult, if not impossible, to negotiate with a large body of creditors outside of chapter 11.

47.     The Debtor desires to propose and confirm a plan to restructure its balance sheet while also implementing further operational changes to boost earnings.  I do not believe that it is possible to restructure the Berkshire Notes with a reduction in the principal balance outside of chapter 11.

48.     Health care services provided by the Debtor are critical not only to Springfield, but also to all of the people living in and visiting the Service Area.  The Debtor's closure could lead to worse patient health outcomes for some patients.

49.     The Debtor's goal in filing for bankruptcy is to restructure its balance sheet to enable it to stay open, continue providing services to the Service Area, and make further operational changes to ensure the delivery of high-quality hospital services.  If it is unable to successfully navigate restructuring, it may be forced to close.  Such a closure would significantly and negatively impact the Town of Springfield and the entire Service Area.

## IV.     **The First Day Motions**

50.     I have reviewed each of the First Day Motions, including related exhibits, and believe that the relief sought in each of the First Day Motions is necessary to avoid irreparable harm to the Debtor and are necessary to successfully exit from chapter 11 protection.  A failure to

grant them would likely lead to cessation of business operations or a forced liquidation in state court. The Debtor does not consent to conversion of this case to one under chapter 7.

        A.     **The Cash Collateral Motion**

51.     Capitalized terms not defined herein and used during the following discussion of the Cash Collateral Motion shall have the meaning ascribed to them in the Cash Collateral Motion.

52.     In preparation for this filing, the Debtor and its advisors examined the Debtor's options for liquidity and debt restructuring, but it did not appear that there was any feasible out-of-court restructuring alternative to chapter 11.

53.     During these months, the Debtor and its advisors also analyzed its cash flow and determined that the business is capable of operating under the terms of the Cash Plan, including payment of applicable expenses and fees, without any diminution in the value of Cash Collateral during the Relevant Period. The ending balance of the Debtor's Cash Collateral at the end of the Relevant Period is projected to be equal to or greater than the starting balance of Cash Collateral at the beginning of the Relevant Period. The Relevant Period ends on or about October 6, 2019, and the Debtor's budget for the following fiscal year, which commences on October 1, 2019, projects a positive EBITDA of approximately **$1,024,153.00**, in the absence of restructuring.

54.     Without access to the use of Cash Collateral in chapter 11, the Debtor would be unable to pay its general operating expenses immediately, including, without limitation, employee payroll and other benefits, payments for necessary medical supplies, and for the various other items reflected in the Proposed Budget. Upon the Debtor's inability to pay these expenses, it would have to immediately cease operations, which would result in the destruction of substantial value that would otherwise inure to the benefit of the Debtor's creditors. The human cost of such a closure

would also be significant and adverse health consequences to patients in the Service Area are highly likely.

55.     I believe that the proposed disbursements that the Debtor seeks to make between the Petition Date and the date of a final hearing on the Cash Collateral Motion are reasonable and necessary to maintain medical operations and avoid irreparable harm to the Debtor.  I also believe that the Debtor would suffer irreparable harm if it is unable to use its Cash Collateral until the date of a final hearing on the relief requested in the Cash Collateral Motion.

56.     I further believe that each of the disbursements in the Cash Plan is reasonable and necessary in order to continue the provision of appropriate health care services to the patients of the Debtor without harming the value of the Debtor as a going concern and for the Debtor to fulfill its obligations while in chapter 11 throughout the Relevant Period.  The proposed disbursements may vary from actual disbursements as medical supply needs vary from week to week.  Receipts may also vary based on patient volume.

57.     In addition, the Debtor requires use of its Cash Collateral to have adequate time to formulate and propose a chapter 11 plan of reorganization.

58.     As of the Petition Date, the Debtor had a number of deposit accounts and a marketable securities account with funds in them.  These accounts and the sources of funds in them are summarized in **Exhibit A** to this Declaration.  I understand that several of these accounts are comprised of commingled payments from different sources, some of which may not be collateral of any party because they include donations and prospective interim payments that may not be earned when paid or ever.

15

59.     I believe the allegations in paragraphs 7, 8, 11, 13, 15, 16, 17, 18, 19, and 20 (final sentence) of the Cash Collateral Motion are true and accurate to the best of my knowledge and belief.

**B.     The Payroll Motion**

60.     Capitalized terms not defined herein and used during the following discussion of the Payroll Motion shall have the meaning ascribed to them in the Payroll Motion.

61.     I understand that by the Payroll Motion, the Debtor seeks authorization to pay certain accrued wages, salaries, and payroll-related expenses, to make payments to certain insurance companies, and to authorize all applicable banks or financial institutions to receive, process, honor, and pay any and all checks drawn on the Debtor's accounts in relation to amounts authorized to be paid under the Payroll Motion.

62.     Based on the payroll period ending June 1, the net pre-petition compensation attributable to the period from June 16, 2019, through the Petition Date for Employees will be approximately **$400,000.00**, plus applicable employment taxes and withholdings in the approximate amount of **$179,000.00**, which includes employer- and employee-paid taxes.  Due to the timing of the Debtor's chapter 11 filing and the nature of the Debtor's business, these are estimated numbers.  Actual hours worked by specific Employees may vary from what is projected.

63.     I believe any delay in paying compensation and contributions to employee benefit programs will damage the Debtor's relations with Employees, cause irreparable harm to morale, and harm the value of the Debtor's business, property, and assets.  As a medical facility, the Debtor's operations require skilled, carefully trained, and often highly educated employees to maintain the requisite levels of medical care and other services provided to patients.  Given the Debtor's location in Springfield, Vermont, the Hospital expends significant effort and cost training

and retaining its current employees and recruiting medical providers. If Employees were to terminate their employment with the Debtor because they are not promptly paid and benefit programs are not maintained, then it would be difficult to find replacement employees. The Employees' skills, knowledge, and understanding of the Debtor's business and operations are essential to the effective operation of the Debtor's business, including delivery of high quality medical care to patients, and to a successful reorganization of this business in a fashion that maximizes the return to creditors and other parties-in-interest.

64.     To maintain and preserve the morale of any continuing labor force while restructuring occurs, I believe that it is essential that the Debtor be permitted to pay Employees the compensation and deductions accrued prior to the Petition Date and that Employees be permitted to utilize PTO in the manner requested in the Payroll Motion. I believe that if the Debtor reduces or eliminates these benefits, then the likelihood of losing Employees increases.

65.     Absent the relief requested in the Payroll Motion, I believe that the Debtor's Employees will suffer undue hardship and, in many instances, suffer financial difficulties because these sums are needed to enable them to meet their own personal obligations. I believe that many Employees would seek other employment if not paid and that the Debtor could lose critical Employees who would be difficult to replace. I believe that the loss of these Employees would jeopardize the Debtor's continuing business operations and its ability to reorganize. Moreover, I understand that applicable state law may require payment of wage-related claims upon the termination of such Employees.

66.     I believe the factual allegations in the following paragraphs of the Payroll Motion are true and accurate to the best of my knowledge and belief: 7, 8, 9, 11, 12, 13, 14, 15, 17, 19, 21, 22, 24, 25, 26, 27 (first sentence), 28, 29, 30, 31, 34 (second sentence), 36, 37, 38, 39 (first three

17

sentences),  40 (final sentence), 41, 42, 43, 44, 45, 46 (first sentence), 47, 49, 50, 51, 52, 53, 54, and 55.  Based on that, no Employee will receive, in the aggregate, payment of pre-petition payroll in an amount greater than **$13,650.00**.  There are three Employees whose wages may potentially exceed this amount.  The Debtor will cap their payments for this time period at **$13,650.00**. Further, unless authorized by the Court, no payments will be made on account of any employee benefit plan in excess of the amount allowed under § 507(a)(5) of the Bankruptcy Code.

### C.    **The Cash Management Motion**

67.    Capitalized terms not defined herein and used during the following discussion of the Cash Management Motion shall have the meaning ascribed to them in the Cash Management Motion.

68.    I understand that by the Cash Management Motion the Debtor seeks authority to continue its pre-petition cash management system (the "Cash Management System") and to use pre-petition bank accounts and business forms.  The Debtor also seeks authority to continue to use any pre-petition credit cards it may have as well as permission to use electronic funds transfers and automatic clearinghouse transactions for purchases with vendors.  I believe this relief is critical to avoid disruption to the Debtor's operations and irreparable harm to the Debtor.  The Cash Management System includes several accounts located at several different banks and investment accounts described in **Exhibit A**.  It is my understanding that opening new bank accounts could cause significant delays in the Debtor's receipt of electronic payments, which is the predominate form of payment to the Debtor from its payors.  This would cause irreparable harm to the Debtor due to the fact that, absent continued payments on the current schedule, the Debtor would lack sufficient funds to maintain operations.

69.     The Debtor also uses a variety of business forms.  The Debtor requests permission to use its existing business forms, such as checks that it prints on stock.  The Debtor will identify its status as a debtor-in-possession on all checks, to the extent that it is required to do so.

70.     The Debtor has a complex accounting system that is tailored to its business needs.  Opening new books would be disruptive to accounting functions.  The Debtor's accounting system is capable of delineating between pre- and post-petition transactions.

71.     I believe that changing the Cash Management System would result in needless disruption of the Debtor's business and impede the Debtor's ability to seamlessly transition into chapter 11.

72.     I believe the factual allegations in the following paragraphs of the Cash Management Motion are true and correct to the best of my knowledge and belief: 7, 8, 9, 10, 15 (excluding final sentence), 16 (excluding final sentence), 17 (third and seventh sentences), and 18 (excluding first sentence).

**D.     The Quorum Motion**

73.     Capitalized terms not defined herein and used in the following discussion of the Quorum Motion shall have the meaning ascribed to them in the Quorum Motion.

74.     By the Quorum Motion, the Debtor seeks authority to continue its pre-petition engagement with Quorum, which provides management and consulting services to the Debtor and the System.  This includes providing chief executive officer and chief financial officer services as well as financial and operational consulting services unique to the health care industry.

75.     It is my belief that the Debtor requires the services described in the Quorum Motion in order to successfully function at this time and that the Debtor would suffer irreparable harm if the Quorum Motion is not granted on an emergency basis.

E.      **The Need For Emergency Hearings**

76.     Due to the nature of the relief sought by certain of the First Day Motions, the Debtor seeks expedited or emergency hearings on them, as appropriate in light of the relief requested and the Court's availability, as soon as possible after the Petition Date.

77.     The Debtor seeks immediate relief with respect to the Cash Collateral Motion. Without immediate authority to continue to use Cash Collateral, the Debtor will be unable to operate its business going forward.  The ability to operate its business is essential to the Debtor's ability to preserve value as a going concern—and to keep patients in the Service Area safe and healthy.  Without the ability to use Cash Collateral, the Debtor would be unable to buy basic medical supplies necessary to keep patients healthy or to pay payroll.  The Debtor would simply be unable to operate.  This would jeopardize the Debtor's reorganization.

78.     The Debtor's ability to continue its operations depends, to a significant extent, on its ability to retain its Employees.  If the Payroll Motion is not heard on an expedited or emergency basis, then the Debtor will not be able to pay its Employees in an ordinary and timely manner. That inability would almost certainly lead to a loss of employees at the time when the Debtor needs them most.  This would jeopardize the Debtor's continuing business operations and ability to reorganize.

79.     The Debtor also seeks immediate authority to maintain its existing Cash Management System, bank accounts, and business forms in order to make a seamless transition into chapter 11 and avoid disruptions in receipt of revenue.  The Debtor relies upon its existing Cash Management System for important business functions, including the payment of payroll and applicable state and federal payroll taxes and lacks meaningful cash reserves to withstand a protracted lapse in payment should that arise.

20

80.     The Debtor requires immediate authority to continue its professional relationship with Quorum.  In the absence of Quorum, the Debtor would have no senior executive leadership and would not have needed assistance with operational consulting unique to the health care industry.

## V.     Information Provided In Compliance With Rule 1007-1(h)-(i) Of The Vermont Local Bankruptcy Rules (the "Local Rules" or a "Local Rule")

81.     Information required under Local Rule 1007-1(h)(1) is provided herein.

82.     This case was not filed under any other chapter.  Local Rule 1007-1(h)(2).

83.     No committee was organized prior to the order for relief.  Local Rule 1007-1(h)(3).

84.     The Debtor is a Vermont non-profit business corporation and has no shares of stock, debentures, or securities that are publicly held.  Local Rule 1007-1(h)(4).

85.     With the exception of proceeds of the Debtor's endowment transferred to Berkshire, there is no property of the Debtor in the possession of another party and no court proceeding related thereto is pending.  Local Rule 1007-1(h)(5).

86.     The Debtor's former chief executive officer has threatened to bring a wrongful termination suit against the Debtor, SMCS, certain members of the Boards, and Quorum.  Local Rule 1007-1(h)(6).

87.     The Debtor's hospital campus is located at 25 Ridgewood Road, Springfield, Vermont, and the Debtor's inpatient mental health facility is located at 1 Hospital Court, # 12, Bellows Falls, VT  05101.  The Debtor owns additional real property located in Springfield and Chester, as discussed herein.  Local Rule 1007-1(h)(7).

88.     The projected amount of payroll and related expenses for the 30-day period following the Petition Date is listed in the Cash Plan.  This amount is approximately $1.62 million.

Local Rule 1007-1(i)(1).  This amount does not include proposed disbursements on account of Employee benefits.

89.    The Cash Plan contains projected cash receipts and disbursements for more than 90 days following the Petition Date.  The Debtor's projections are structured to provide projected receipts and disbursements on a weekly basis rather than in 30-day increments.  The Debtor has prepared a summary in approximately four-week increments.  It would have been a significant amount of additional work to split certain weeks into 30-day increments and was not possible to do so within the time constraints of this chapter 11 filing.  Local Rule 1007-1(i)(2).

90.    Collectively attached to this Declaration as **Exhibit B** are copies of proof of insurance for the System.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: June 26     , 2019

Michael Halstead