# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

In re:

**SPRINGFIELD HOSPITAL, INC.,**[1]

**Debtor.**

**Chapter 11**

**Case No. 19-10283**

### SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE SECOND AMENDED PLAN OF REORGANIZATION OF SPRINGFIELD HOSPITAL, INC. DATED NOVEMBER 2, 2020

By and through:

**Andrew C. Helman, Esq.**
**Kelly McDonald, Esq.**
**Katie M. Krakowka, Esq.**
**Sage M. Friedman, Esq.**
**MURRAY, PLUMB & MURRAY**
**75 Pearl Street**
**Portland, Maine  04101**
**(207) 773-5651**
**ahelman@mpmlaw.com**

**Attorneys For Springfield Hospital, Inc.**

---

[1]   The last four digits of the taxpayer identification number of Springfield Hospital, Inc., are 9437.  See 11 U.S.C. § 342(c)(1).  The principal office of Springfield Hospital, Inc., is located at 25 Ridgewood Road, Springfield, Vermont. Id.

## <u>TABLE OF CONTENTS</u>

DISCLAIMER ..........................................................................................................................1
I.       INTRODUCTION ........................................................................................................4
II.      DESCRIPTION OF THE DEBTOR'S BUSINESS AND THE REASONS FOR THE
         CHAPTER 11 FILING .................................................................................................5
         A.       The Debtor ......................................................................................................5
         B.       Events Leading To The Debtor's Chapter 11 Filing......................................7
         C.       Summary of the Debtor's Most Significant Indebtedness ..............................8
                  1.       Berkshire Bank...................................................................................8
                  2.       State of Vermont ................................................................................9
                  3.       Centers for Medicare and Medicaid Services ....................................9
                  4.       Pension Claims...................................................................................9
                  5.       Intercompany Claims Between the Debtor and SMCS.....................10
                  6.       Trade Debt ........................................................................................11
III.     THE CHAPTER 11 CASE ..........................................................................................11
         A.       The Employment of Professionals ...............................................................11
         B.       Use of Cash Collateral and Cash Availability During the Case ...................12
         C.       Operational Matters .....................................................................................13
         D.       Exploration of Affiliation and Sale Options and Separation from SMCS.....15
         E.       Exit Funding from Vermont to Facilitate the Debtor's Reorganization ................16
         F.       The Hospital Pension Plan ...........................................................................16
         G.       The 457 Plan .................................................................................................16
         H.       Potential Avoiding Power Causes of Action ................................................17
         I.       Potential Causes of Action Against SMCS...................................................18
         J.       Berkshire's Collateral ..................................................................................18
         K.       Reservation of Rights....................................................................................19
         L.       Establishment of Bar Dates..........................................................................19
         M.       Summary And Notice Of Certain Additional Claim Objections The Debtor May
                  File After The Confirmation Date.................................................................20
IV.      SUMMARY OF THE PLAN ......................................................................................23
         A.       Introduction..................................................................................................24
         B.       Voting Procedures and Confirmation Requirements ....................................24
                  1.       Ballots and Voting Deadlines...........................................................24
                  2.       Parties in Interest Entitled to Vote ...................................................24
                  3.       Definition of Impairment .................................................................25
         C.       Confirmation Procedure................................................................................26
                  1.       Confirmation Hearing .......................................................................26
                  2.       Procedure and Time for Objections ..................................................26
                  3.       Requirements for Confirmation ........................................................27
                  4.       Voting and Acceptance of the Plan...................................................27
                  5.       Best Interests Test.............................................................................27
                  6.       The Feasibility Test...........................................................................28
                  7.       Unfair Discrimination and the Fair and Equitable Test...................28
                  8.       Other Requirements of § 1129 of the Bankruptcy Code..................29
         D.       Classification of Claims and Interests and Their Treatment Under the Plan.........29

|   |   |   | 1. | Classification of Claims | ...............................................................29 |
|   |   |   | 2. | Unclassified Claims | ..................................................................29 |
|   |   | a. | | Allowance of Administrative Claims | ...............................29 |
|   |   |   | i. | Allowance of Non-Ordinary Course Administrative Claims and the SMCS Administrative Claim | ...............................29 |
|   |   |   | ii. | Allowance of Ordinary Course Administrative Claims | .....30 |
|   |   |   | iii. | Allowance of 503(b)(9) Claims | .........................................30 |
|   |   |   | iv. | Allowance of Professional Fee Claims | .............................30 |
|   |   |   | v. | Allowance of Cure Claims | .................................................31 |
|   |   | b. | | Treatment of Administrative Claims | .................................31 |
|   |   |   | i. | Payment of Allowed Non-Ordinary Course Administrative Claims and the SMCS Administrative Claim | ...................31 |
|   |   |   | ii. | Payment of Allowed Ordinary Course Administrative Claims | ................................................................................31 |
|   |   |   | iii. | Payment of 503(b)(9) Claims | ............................................31 |
|   |   |   | iv. | Payment of Professional Fee Claims | .................................32 |
|   |   |   | v. | Payment of Cure Claims | .....................................................32 |
|   |   |   | vi. | Payment of U.S. Trustee Fees | ...........................................32 |
|   |   |   | vii. | Treatment and Payment of Priority Tax Claims | ...............32 |
|   |   |   | 3. | Classified Claims | ......................................................................33 |
|   |   | a. | | Berkshire Claims (Class 1) – Impaired | .............................33 |
|   |   | b. | | State of Vermont (Class 2) – Impaired | ..............................34 |
|   |   |   | i. | Vermont Claims – Class 2-A | .............................................34 |
|   |   |   | ii. | Vermont Claims – Class 2-B | .............................................35 |
|   |   | c. | | CMS Claim (Class 3) – Impaired | .......................................35 |
|   |   | d. | | The 457 Plan Claims (Class 4) – Impaired | .......................36 |
|   |   | e. | | Priority Wage Claims (Class 5) – Unimpaired | .................37 |
|   |   | f. | | Priority Non-Tax Claims, Other Than Priority Wage Claims (Class 6) – Unimpaired | ..............................................................37 |
|   |   | g. | | Patient Refund Claims (Class 7) – Impaired | ....................37 |
|   |   | h. | | General Unsecured Claims (Class 8) – Impaired | ..............38 |
|   |   |   | 4. | General Claim Treatment Provisions | .........................................38 |
| E. | | | | Estimated Range of Potential Recoveries for Impaired Classes of Claims | ..........39 |
| F. | | | | Means for Execution of the Plan | ..................................................................39 |
| G. | | | | Jurisdiction | .........................................................................................41 |
| H. | | | | Treatment of Executory Contracts and Unexpired Leases | ...................................42 |
|   |   |   | 1. | Assumed Contracts | ...................................................................42 |
|   |   |   | 2. | Rejection of Executory Contracts and Leases | ...........................43 |
|   |   |   | 3. | Reservation of Rights with Respect to Assumed or Rejected Contracts | ....44 |
| I. | | | | Effect of Confirmation of the Plan | ...............................................................44 |
|   |   |   | 1. | Binding Effect of Confirmation | ................................................44 |
|   |   |   | 2. | Good Faith | ................................................................................44 |
|   |   |   | 3. | Exculpation and Injunction | .......................................................45 |
|   |   |   | 4. | Injunctions or Stays | ..................................................................45 |
|   |   |   | 5. | Discharge of Debtor | ..................................................................46 |
|   |   |   | 6. | No Admissions | ..........................................................................46 |

J.     Miscellaneous Provisions.................................................................46
       1.     Holders of Claims and Interests as of Record Date ..................46
       2.     Successors and Assigns................................................................46
       3.     Reservation of Rights...................................................................46
       4.     Post-Confirmation Effectiveness of Proofs of Claim ...............47
       5.     Services by and Fees for Professionals.......................................47
       6.     Severability of Plan Provisions ...................................................47
       7.     Governing Law ............................................................................47
       8.     Final Decree .................................................................................48
V.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .48
       A.     Chapter 7 Liquidation .......................................................................48
       B.     Alternative Chapter 11 Plan ..............................................................48
       C.     Dismissal of this Case .......................................................................49
VI.    CERTAIN FEDERAL TAX CONSEQUENCES .........................................49
       A.     General ...............................................................................................49
       B.     U.S. Federal Income Tax Consequences to the Debtor .....................49
       C.     U.S. Federal Income Tax Treatment with Respect to Holders of Allowed
              Claims ................................................................................................50
VII.   RISK FACTORS IN CONNECTION WITH THE PLAN..............................50
       A.     Bankruptcy Considerations................................................................50
       B.     No Duty to Update Disclosures .........................................................51
       C.     Representations Outside this Disclosure Statement............................51
       D.     No Admission .....................................................................................51
       E.     Tax and Other Related Considerations ..............................................51
VIII.  RECOMMENDATION AND CONCLUSION..............................................51

## <u>DISCLAIMER</u>

THIS SECOND AMENDED DISCLOSURE STATEMENT (THE "<u>DISCLOSURE STATEMENT</u>") AND THE DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION OF SPRINGFIELD HOSPITAL, INC. DATED NOVEMBER 2, 2020, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT 1</u> (THE "<u>PLAN</u>"), AND THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH, ARE BEING PROVIDED BY THE DEBTOR[2] TO KNOWN HOLDERS OF CLAIMS PURSUANT TO § 1125 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED BY THE DEBTOR.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, THEN YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTOR, AS PLAN PROPONENT, URGES YOU TO VOTE TO ACCEPT THE PLAN.

EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND § 1125 OF THE BANKRUPTCY CODE. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, ITS PROPERTY, OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATION FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THEN THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

---

[2]      Capitalized terms not otherwise specifically defined in this Disclosure Statement shall have the meaning attributed to them in the Plan. Each definition in this Disclosure Statement is intended to include both the singular and plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH § 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARDING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

HOLDERS OF CLAIMS AND OTHER THIRD PARTIES SHOULD BE AWARE THAT THE PLAN CONTAINS INJUNCTIONS AND RELEASES THAT MAY MATERIALLY AFFECT THEIR RIGHTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSIS PERFORMED BY THE DEBTOR AND ITS PROFESSIONALS. ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTOR CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS THE DEBTOR'S STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

THE DEBTOR RECOMMENDS THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE DEBTOR THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 EST, NOVEMBER 30, 2020, UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF VERMONT.

YOUR VOTE ON THE PLAN IS IMPORTANT.

# I.

# <u>INTRODUCTION</u>

On June 26, 2019, the Debtor, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Vermont. The Case is administered under case number 19-10283.

Since the Petition Date, the Debtor has remained in possession of its Assets and managed its business as a debtor-in-possession under §§ 1107 and 1108 of the Bankruptcy Code. No committee has been appointed in this Case. No trustee has been appointed in this Case.

The Debtor submits this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code in connection with the solicitation of votes to accept or reject the Plan, a copy of which is attached hereto as **<u>Exhibit 1</u>**. The summary of the Plan provided in this Disclosure Statement is qualified in its entirety by reference to the Plan. The Bankruptcy Court will hold hearings on the adequacy of this Disclosure Statement and on Confirmation of the Plan. The Debtor will request that the Bankruptcy Court approve this Disclosure Statement as containing "adequate information," in accordance with § 1125(b) of the Bankruptcy Code, to enable a hypothetical, reasonable investor typical of claimholders in a Class of Claims entitled to vote as set forth in the Plan to make an informed judgment about whether to accept or reject the Plan.

The Disclosure Statement sets forth certain information regarding: (i) the Debtor's prepetition operating and financial history; (ii) the Debtor's need to file for relief under chapter 11 of the Bankruptcy Code; (iii) significant events that have occurred during the Case; (iv) the terms of the Plan; (v) the manner in which Distributions will be made under the Plan; (vi) certain effects of Confirmation of the Plan; (vii) certain risk factors associated with the Plan; and (viii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

The following documents are attached as exhibits to this Disclosure statement:

**<u>Exhibit 1</u>:**     The Plan and all related Exhibits

**<u>Exhibit 2</u>**:     Master Shared Services Agreement

**<u>Exhibit 3</u>:**     Liquidation Analysis

**<u>Exhibit 4</u>:**     Contingent Claim Objections Schedule

The Confirmation Hearing will be held, via Zoom, on at **9:30 a.m. on December 9, 2020**, before the Honorable Colleen A. Brown, United States Bankruptcy Judge, at the Bankruptcy Court located at 151 West Street, Rutland, Vermont. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements for Confirmation under the Bankruptcy Code. Objections, if any, to Confirmation of the Plan must be filed and served so that they are received on or before **4:00 p.m. on November 30, 2020**. The Confirmation Hearing may

be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequently adjourned Confirmation Hearing

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**THE DEBTOR BELIEVES THAT CREDITORS SHOULD VOTE TO ACCEPT THIS PLAN.**

## II.

## DESCRIPTION OF THE DEBTOR'S BUSINESS AND THE REASONS FOR THE CHAPTER 11 FILING

### A.   The Debtor

The Debtor is a non-profit Vermont business corporation. The Debtor operates a 25-bed general medical and surgical hospital located in Springfield, Vermont, with approximately 250 full-time equivalent employees and more than 350 total employees. It is devoted to improving the health and quality of life for patients in southeastern Vermont and southwestern New Hampshire (the "Service Area"). The Service Area includes Springfield, Ludlow, Chester, Londonderry, and Bellows Falls, Vermont, as well as Charlestown, New Hampshire.

Springfield Medical Care Systems, Inc. ("SMCS") is the single Class B and only voting member of the Debtor. SMCS voted to authorize the chapter 11 filing of the Debtor and separately commenced its own chapter 11 case pending before the Bankruptcy Court with a docket number of 19-10285. SMCS is a Vermont non-profit that operates nine federally qualified health centers (each an "FQHC" and collectively "FQHCs") in the Service Area. SMCS has historically provided certain shared services for both companies as they deliver health care in the Service Area and continues to be an important referral source for the Debtor. The chapter 11 cases of the Debtor and SMCS have provided a forum for the two companies to separate certain aspects of their business operations and management so that they can emerge from chapter 11 with operational, financial, and management independence from a governance standpoint, while retaining the benefits of a continued business relationship.

The Debtor provides the following services, among others, to patients in its Service Area: (a) **inpatient services** including end-of-life care, nursing care to support transitions to home ("swing bed" care), and hospitalist services to coordinate inpatient care; (b) **outpatient services** including cardiology testing, emergency department services, lab testing, and outpatient medical procedures (e.g., blood transfusions, injections, would care); (c) a range of **imaging services** including CT scanning, mammography, MRI, and ultrasound; (d) **therapy rehabilitation services** including alternative pain management, occupational therapy, physical therapy, speech therapy; (e) limited **general surgical services** (and providing an operating room to visiting specialists); (f)

5

**primary care services**; (g) numerous types of **specialty care** primarily provided by physicians utilizing the Debtor's facilities; and (h) support for community groups.

In 2019, there were 14,254 emergency department visits and 4,315 total acute inpatient days. The emergency department has 12 beds. It is supported by 24-hour coverage of testing facilities, including laboratory testing and radiology. The Debtor currently has 25 licensed beds and the average daily acute inpatient census is 12 patients. Acute patients are typically discharged within 96 hours. The Debtor also has "swing beds"—essentially beds used for rehabilitative, non-acute care.

The Debtor also provides mental health services at The Windham Center, located at 1 Hospital Court, #12, Bellows Falls, Vermont. The Windham Center currently provides treatment for patients requiring mental health services and who have tested positively for Covid-19. There are 10 beds with an average daily census of 7 patients.

The Debtor is the only hospital in Springfield and plays an important role as a hospital required to provide care to patients for most procedures regardless of their ability to pay. The nearest hospitals are Mt. Ascutney Hospital and Health Center ("Mt. Ascutney"), in Windsor, Vermont (about 22 miles away and a 30-minute drive); and Valley Regional Healthcare ("Valley Regional"), in Claremont, New Hampshire (about 20 miles away and a 30-minute drive).

Many patients within the Service Area face long travel times—even without inclement weather—to obtain hospital-level services at the Debtor's facility in Springfield. If the Debtor shuts down, then many patients in the Service Area would face even longer travel times to obtain hospital services. Increased distances to emergency rooms are correlated with worse health outcomes. Kelly, C., Hulme, C., Farragher, T., & Clarke, G., *Are differences in travel time or distance to healthcare for adults in global north countries associated with an impact on health outcomes? A systematic review*. *BMJ open*, *6*(11), e013059. doi:10.1136/bmjopen-2016-013059 (Nov. 24, 2016), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5178808/# (last visited June 3, 2019).

By virtue of the Debtor's rural location, size, and certain services that it provides, it qualifies as and is a critical access hospital under the Medicare and Medicaid programs. Congress created the critical access hospital designation in 1997 in order to reduce the financial vulnerability of rural hospitals while also ensuring that essential health services are available to rural communities. *See* RHIhub, Critical Access Hospitals, https://www.ruralhealthinfo.org/topics/critical-access-hospitals (last visited Jan. 9, 2019). To meet the designation criteria, a hospital must maintain no more than 25 inpatient beds and have 24 hour emergency services. 42 C.F.R. §§ 485.610(c), 485.618(a), 485.620. There are also requirements that a critical access hospital be at least 35 miles from the nearest hospital. Because of this, the Debtor would not be able to be designated as a critical access hospital if it loses that status due to the proximity of Mt. Ascutney and Valley Regional.

**B.**      **Events Leading To The Debtor's Chapter 11 Filing**

The Debtor entered into an affiliation with SMCS approximately 10 years ago.  The two companies share a number of administrative staff members, provide services for one another, and have, at times, provided financial assistance to one another as needed.  This is a novel arrangement and one of only three in the country that the Debtor's management is aware of in which a company operating FQHCs has functioned as a parent entity to a hospital.

There were numerous business reasons for this arrangement when it was implemented, including the following: First, SMCS is able to provide important primary care services throughout the Service Area.  Second, SMCS housed certain specialty care physician practices providing services to patients of the Debtor.  This allowed for higher reimbursement for those services due to regulatory benefits provided to FQHCs while also lowering cost because, among other things, FQHCs are not subject to tort liability.  *See* Health Resources & Services Administration, *About The Federal Tort Claims Act (FTCA)*, available at https://bphc.hrsa.gov/ftca/about/index.html (last visited June 3, 2019).  Third, the Debtor and SMCS could share certain administrative costs.

This arrangement was successful for many years.  Beginning in 2016, however, SMCS and the Debtor began to face financial challenges due to, among other things, revenue declines; increased cost for purchased services; increased health care expenses for employees, who participate in a combined system-level self-funded health plan; and expanded services, some of which were not profitable.  SMCS and the Debtor, combined, faced several years of operating losses.

Things came to a head in the fall of 2018.  Independent auditors learned during the preparation of the audited financial statements that the Debtor had not paid the third quarter employment taxes and brought this information to the Debtor's board of directors and the board of directors of SMCS.  This led to a change in executive management and selection of Quorum Health Resources, LLC ("QHR") to provide management and consulting services for the Debtor and SMCS.  Management services included providing the Debtor with an interim chief executive officer and an interim chief financial officer shared with SMCS.

Since the retention of QHR, the Debtor and SMCS have approved and management has implemented numerous service line and staffing changes in order to reduce approximately $6.2 million of expenses (as of the Petition Date).  About $4 million of these cuts are attributable to the Debtor, and about $2.2 million are attributable to SMCS.  These changes have included terminating certain services, including birthing services; across-the-board salary reductions, some of which were restored to maintain the Debtor's nursing staff; and other changes to right-size the Debtor.  SMCS has also made significant changes.  The executive leadership team's salaries were reduced at the same time as all other employees.

The goal of these changes—and this chapter 11 case—was to position the Debtor and SMCS to be viable on a go-forward basis once they restructure their balance sheets and implement further changes that include separating business operations.  This restructuring has been challenging for many reasons.

For example, prior to the Petition Date, news of the Debtor's financial condition became public in the fall of 2018 and the fact that the Debtor was considering chapter 11 became public in the winter of 2019 and again in late spring 2019. This prompted some vendors to tighten credit terms, some employees to quit in order to cash out available earned time off, and created a challenging environment with certain key parties.

## C.      Summary of the Debtor's Most Significant Indebtedness

The Debtor provides the following discussion of significant Prepetition and Postpetition Claims that require resolution under the Debtor's Plan. This discussion is not exhaustive.

### 1.      Berkshire Bank

Prior to the Petition Date, the Debtor entered into the following two loans with Berkshire: (a) Revolving Demand Note in the maximum principal amount of **$3,000,000.00** (any and all documents entered into in relation to this loan, the "Revolving Line of Credit Loan Documents" and the loan evidenced by the Revolving Line of Credit Loan Documents, the "Revolving Line of Credit"); and (b) Commercial Term Loan in the original principal amount of **$12,000,000.00** (any and all documents entered into in relation to this loan, the "Term Loan Documents" and the loan evidenced by the Term Loan Documents, the "Berkshire Term Loan"). The total amount outstanding under the Revolving Line of Credit and the Berkshire Term Loan as of the Petition Date (according to the proof of claim filed by Berkshire) equaled **$9,548,235.99**. SMCS is jointly liable on the obligations owed to Berkshire under the Revolving Line of Credit and the Berkshire Term Loan.

In addition, prior to the Petition Date, Berkshire issued a letter of credit to the Debtor and SMCS in the amount of **$95,000.00** for the benefit of MEMIC Indemnity Company (the "Letter of Credit"). The Debtor and SMCS have not drawn on the Letter of Credit

The Revolving Line of Credit and the Berkshire Term Loan are secured by liens on certain property of the Debtor, as modified by the Cash Collateral Order [Dkt. No. 86] (as defined in the Plan). Berkshire claims a security interest in most forms of personal property of the Debtor (any and all personal property of the Debtor, as of the Petition Date, pledged to Berkshire as collateral, the "Berkshire Personal Property Collateral"). Berkshire claims mortgage interests in the Debtor's hospital campus located at 25 Ridgewood Road, Springfield, Vermont. There are adjacent properties owned by the Debtor located at 30 Ridgewood Road, land on Ridgewood Road, and 198 Park Street. The Debtor's property located at 198 Park Street is unencumbered. The Debtor also owns real property located at 55 Vermont Route 11, Chester, Vermont, which is unencumbered.

The obligations of the Debtor and SMCS under the Berkshire Term Loan are guaranteed, in part, by the United States Department of Agriculture, acting through the Office of Rural Development ("USDA").

8

2.      **State of Vermont**

The State of Vermont is one of the Debtor's regulatory agencies and the Debtor's largest creditor.  The Plan seeks to provide treatment for approximately **$9,000,000.00** in Claims held by Vermont.  Vermont's Claims are comprised of Prepetition and Postpetition amounts.  The Prepetition Claim is in the approximate amount of **$3,100,000.00** and includes about **$2,000,000.00** in that Vermont alleges is a Priority Tax Claim, which, if correct, would mean the Claim must be paid before General Unsecured Claims.  Vermont's Claims also include Postpetition amounts comprised of approximately **$4,600,000.00** in unpaid provider taxes (estimated as of December 31, 2020) and the Postpetition Term Loan in the amount of **$1,300,000.00**.

Vermont is also providing the Debtor with a **$4,000,000.00** grant to make certain payments required under the Plan on the Effective Date.  This grant is referred to under the Plan as the "Exit Funding."  Without the Exit Funding and without Vermont's agreement to waive portions of its Claim and its right to payment of not less than **$4,650,000.00** on the Effective Date, to the extent such amount is an Allowed Administrative Claim, the Debtor's reorganization would be extremely difficult and liquidation would be possible.

**The proposed treatment of Vermont's Claims is discussed below.**

3.      **Centers for Medicare and Medicaid Services**

The Debtor is a Medicare provider and a party to several Medicare Provider Agreements with CMS, the federal agency administering the Medicare program.  CMS, in turn, is a regulatory agency and creditor of the Debtor.  CMS filed Proof of Claim 114 on the Claims Register of this Case.  It reflects Prepetition and Postpetition Claims in the approximate amount of **$4,600,000.00** stemming from overpayments to the Debtor.  Of this total amount, CMS alleges that **$1,100,000.00** was paid to the Debtor Postpetition and entitled to allowance as an Administrative Claim entitled to payment in full on the Effective Date.  As discussed elsewhere, the Debtor does not currently have the ability to pay this amount on the Effective Date.

**Treatment of CMS's Claims is discussed below.**

4.      **Pension Claims**

The Debtor maintains a defined-benefit pension plan named the "Springfield Hospital Pension Plan" (the "Pension Plan").  As of the Petition Date, there were approximately 201 participants in the Pension Plan who were currently receiving benefits, and there were approximately 166 employees of the Debtor who may be eligible for benefits under the Pension Plan upon retirement.  No new employees were eligible to enter the Pension Plan after February 28, 2006.

The Debtor explored a distress termination of the Pension Plan under applicable labor and bankruptcy law.  There were risks and uncertainty in connection with doing so—and it would have resulted in the requirement of the Debtor to pay upwards of **$1,500,000.00** in termination costs.  The Debtor does not have sufficient liquidity to do so at this time.  Thus the Debtor intends to maintain

the Pension Plan unaffected by this Case and believes that it has the financial ability to do so for the foreseeable future.

Based on this, Confirmation will result in PBGC withdrawing Proofs of Claim 60, 61, and 62 in the aggregate amount of **$5,286,787.00**.  Participants in the Pension Plan shall retain whatever rights they may have under the Pension Plan.

Confirmation makes no determination on whether SMCS has any liability for costs related to the Pension Plan as a contributing sponsor or member of any controlled group related to the Pension Plan.  PBGC has reserved all of its rights to assert now or in the future that SMCS is a contributing sponsor or member of the Pension Plan's controlled group.  The Debtor has reserved all of its rights in the event that a court of competent jurisdiction determines SMCS has such status or liability.

## 5. **Intercompany Claims Between the Debtor and SMCS**

As discussed above, the Debtor and SMCS have historically operated as part of the same system with overlapping administrative and operational support.  As a result of that interrelatedness, certain intercompany Claims have arisen in which the Debtor and SMCS owe one another for services, both prior to and after the Petition Date, and many of those Claims went unpaid and/or were not reflected as balance sheet liabilities.

After the Petition Date, the Debtor Filed Proof of Claim No. 50 in the chapter 11 case of SMCS asserting a General Unsecured Claim against SMCS in the amount of **$11,295,122.00** based on Prepetition liabilities and transfers to third parties that the Debtor asserted benefited SMCS and other Causes of Action.  SMCS, on the other hand, Filed Proof of Claim No. 93 in this Case asserting a General Unsecured Claim against the Debtor in the amount of **$1,821,012.00** based on Prepetition liabilities.  The Debtor does not intend to pursue litigation based on its Prepetition Causes of Action against SMCS for the reasons discussed in § III(E) of this Disclosure Statement.

However, While the Debtor and the Hospital are not pursuing Prepetition, intercompany Claims, they have reached an agreement regarding the treatment and amount of Postpetition intercompany Claims.  Specifically, during the Postpetition period, the Debtor funded certain costs and expenses relating to the self-funded health and dental plans of the companies (the "Funded Health Claims") on behalf of SMCS from June 26, 2019 through December 31, 2019 (the "Health Claim Funding Period").[3]  SMCS, in turn, funded the costs and expenses of the Debtor relating to certain administrative expenses provided to the Debtor by SMCS (the "Administrative Support Services") during the Health Claim Funding Period.  After the Health Claim Funding Period, the SMCS continued and currently continues to provide the Administrative Support Services to the Debtor, and, effective as of July 31, 2020, the Debtor began to provide and continues to provide certain administrative and other services to SMCS.

---

[3] The Funded Health Claims were calculated by taking the total amount of health claims funded during the Health Claim Funding Period for both the Debtor and SMCS and allocating 43% to SMCS and 57% to the Debtor.  These percentage allocations were driven by the number of participants in the health, pharmacy, and dental plans of each entity.

After accounting for the Funded Health Claims, the Administrative Support Services, and any and all additional intercompany Claims arising after the Petition Date, as of July 31, 2020, the SMCS owed the Debtor **$484,685.00** as an Administrative Expense Claim to be Allowed in SMCS's chapter 11 case (the "Hospital Administrative Claim").   The amount of the Hospital Administrative Claim may adjust between July 31, 2020 and the Confirmation Date (the as-adjusted Hospital Administrative Claim as of the Confirmation Date shall continue to be referred to as the Hospital Administrative Claim).  Any Claims held by SMCS against the Debtor that arose prior to the Petition Date are Classified in the Plan as General Unsecured Claims.

### 6.    Trade Debt

The Debtor's Schedules [Dkt. No. 180] reflect unsecured Claims held by trade creditors and patients who may be owed refunds for services in the approximate amount of **$8,000,000.00**.[4] Patient refunds can arise out of a number of scenarios, however, a common scenario occurs when a patient pays for medical services at or near the date of service, and the Claim ultimately ends up getting paid through insurance coverage at a point after the initial payment.  In such circumstances, the Debtor owes a refund to the patient or guarantor for the claim.  As of the Petition Date, the Debtor owed approximately **$120,000.00** in potential refund Claims to patients (the "Patient Refund Claims").

### III.

### THE CHAPTER 11 CASE

The foregoing events and conditions affecting the Debtor's cash flow, among other things, resulted in a decline in the Debtor's financial condition and led to the commencement of this Case on June 26, 2019.

The following are significant events and issues arising during the Case, including a discussion of certain deadlines that will be set in conjunction with Confirmation of the Plan:

### A.    The Employment of Professionals

During the courts of the Case, the Bankruptcy Court approved the employment of the following professionals:

- Murray, Plumb & Murray, as chapter 11 counsel for the Debtor [Dkt. No. 71];

- Spinglass Management Group, LLC, as financial advisor for the Debtor [Dkt. No. 371];

---

[4] The total amount of claims on Schedule E/F totals about $14 million.  Debtor scheduled a Claim in favor of Vermont in the approximate amount of **$3,000,000.00** and a Claim in favor of CMS in the approximate amount of **$3,100,000.00**.

- Quorum Health Resources, LLC, to provide contracted management and consulting services for the Debtor and shared chief financial officer services for SMCS [Dkt. No. 114];

- Berry Dunn, as accountants for the Debtor, consistent with Prepetition practice [Dkt. No. 323];

- Primmer, Piper, Eggleston & Cramer, P.C., as special counsel for health care matters [Dkt. No. 82];

- Sheehey Furlong & Behm P.C., as special trial counsel, providing defense counsel for certain negligence and malpractice matters brought in the Vermont Superior Court under coverage from the Debtor's insurance policies [Dkt. No. 267];

- Theriault & Joslin, P.C., as special trial counsel, providing defense counsel for certain negligence and malpractice matters brought in the Vermont Superior Court under coverage from the Debtor's insurance policies [Dkt. No. 453]; and

- Ankura Consulting Group, LLC, as valuation professional, providing a formal valuation and appraisal of the Debtor's business enterprise, real property and tangible personal property [Dkt. No. 461].

There was no committee of creditors and no patient care ombudsman ("PCO") appointed in this case. The United States Trustee did not convene a committee. As for appointment of a patient care ombudsman, the Debtor filed a motion seeking a determination that a PCO was not necessary based on the facts and circumstances in this case [Dkt. No. 191] (the "PCO Motion"). The Bankruptcy Court granted the PCO Motion.

**B.**     **Use of Cash Collateral and Cash Availability During the Case**

Companies reorganizing in chapter 11 tend to finance continuing business activities through collections of accounts receivable, post-petition financings, or a combination of both. In this Case, the Debtor initially intended to manage its business and finances without access to a line of credit or debtor-in-possession financing facility. Instead, the Debtor intended to rely on cash, collections of accounts receivable, and any other payments that convert to cash. Together, these types of property are "cash collateral" within the meaning of § 363(a) of the Bankruptcy Code ("Cash Collateral").

A debtor can obtain permission to use Cash Collateral either by obtaining consent of parties who claim an interest in Cash Collateral or over their objection by demonstrating that those parties' interests are adequately protected either by virtue of or notwithstanding the use of Cash Collateral. Here, Berkshire Bank claims an interest in the Debtor's Cash Collateral. Early in the case, Berkshire and the Debtor agreed to general terms for the use of Cash Collateral until Confirmation of a Plan. These terms are set forth in the Bankruptcy Court's Order Granting Emergency Motion For Authority To Use Cash Collateral On An Interim Basis And Scheduling A Hearing Authorizing The Use Of Cash Collateral On A Final Basis [Dkt. 86] (the "First Cash Collateral

<u>Order</u>").  Pursuant to the First Cash Collateral Order, the Debtor was authorized to use Cash Collateral for an initial time period until October 6, 2019, and then for further periods of time by consent of Berkshire and subject to stipulated orders authorizing use of Cash Collateral.  Working cooperatively with Berkshire on use of Cash Collateral likely reduced expense that would have come from contested proceedings regarding use of Cash Collateral.

In March of 2020, the Debtor faced imminent and significant cash availability issues attributable to declining patient volume in the immediate aftermath of Covid-19 due to deferral, cancellation, or rescheduling of elective procedures, outpatient procedures, and office visits at the hospital.  The Debtor generates the majority of its revenue from these types of procedures and office visits.  Thus stay-at-home orders and voluntary deferment of medical care caused the Debtor to create less accounts receivable and, therefore, have less cash for business operations.

To avoid the risk of immediate closure, Vermont provided the Debtor with a **$1,300,000.00** Term Loan secured by the Debtor's interest in various federal payments provided by the U.S. Department of Health and Human Services Public Health and Social Services Emergency Fund (and any other federal agency or instrumentality administering such relief) pursuant to the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, which is known as the CARES Act (the "<u>Federal Payments</u>"), to the extent a security interest could be granted in the Federal Payments.  The Bankruptcy Court authorized this financing on an emergency basis by entry of its Order (A) Granting Emergency Motion to Authorize Post-Petition Financing, (B) Authorizing the Debtor to Obtain Secured, First-Priority, Post-Petition Financing, (C) Granting Related Liens and Superpriority Claims (D) Authorizing the Debtor to Use Cash Collateral, (E) Granting Adequate Protection, and (F) Granting Related Relief [Dkt. No. 355] (the "<u>DIP Order</u>").  A copy of the final, executed loan agreement between the Debtor and Vermont is located at Docket Entry 365.

## C.    <u>Operational Matters</u>

The Debtor made operational changes before and during the start of the Case to optimize services and expenses, in addition to responding to Covid-19.

Operating expenses for the budget year starting October 1, 2020 (FY 2021) are projected to be reduced by $9 million compared to year-end results for the budget ending September 30, 2019 (FY 2018).  Reductions, which include certain operational changes made prior to the start of the Case, include the following:

- Elimination of child birth services, resulting in annual savings of approximately **$860,000.00**.

- Boosting laboratory department staffing productivity and reducing costs, resulting in annual savings of approximately **$400,000.00**.

- Reductions and changes to employee benefits, resulting in savings of approximately **$1,900,000.00** annually.

- Reducing temporary or "locums" staffing and shifting to contracted service from a third-party, resulting in annual savings of approximately **$1,600,000.00**;

- Change the staffing model for the Hospital's hospitalist program, including renegotiated contracts with providers to alter coverage and availability, resulting in annual savings of approximately **$1,000,000.00**;

- Outsourcing anesthesia and reducing the number of procedures offered that require anesthesia (e.g. elimination of childbirth), resulting in an annual savings of approximately **$635,000.00**;

- Reduction of the use of traveling nurses and physicians and locums medical providers, resulting in an annual savings of approximately **$400,000.00**;

- Reduction of third-party management and consulting costs following the exit from chapter 11, which will result in annual savings of approximately **$1,035,00.00**, though the Debtor will incur some additional expense to hire its own permanent management;

- Reduction in physician costs resulting in an annual savings of approximately **$200,000.00**; and

- Increase group purchasing and utilizing more generic prescriptions, resulting in annual savings of approximately **$270,000.00**.

In addition, prior to the start of the Case, the Debtor reduced its workforce and instituted reductions in pay at all levels, including senior executive leadership.  The Debtor subsequently reversed pay reductions for some employees, specifically nursing staff, in order to continue to attract and retain high-quality nursing staff.

Significant operational changes during the Case include the following:

- On or about January 1, 2020, the Debtor changed the third-party administrator for the self-funded employee health care plan to Harvard Pilgrim.  Historically, the third-party administrator has invoiced the Debtor for employee health care Claims of both the Debtor's and SMCS's employees, and the Debtor funded those claims on behalf of both companies.  Moving forward, post-Confirmation, Harvard Pilgrim will continue to invoice the Debtor for Claims of employees of the Debtor and SMCS, but SMCS will pay those claims for its employees on a regular basis as invoices are received.  As a result, although the Debtor and SMCS will continue to benefit from the efficiencies of using the same third-party administrator, each company will fund its own employee health care expenses.

- Effective on July 28, 2020, as part of separating operations, the Debtor and SMCS entered into a Master Shared Services Agreement (the "MSSA") in the form attached hereto as **Exhibit 2**.  The MSSA is intended to ensure that administrative

14

and other employees who provide services primarily to the Debtor are employed by the Debtor, and vice versa as to SMCS. To achieve that goal, certain employees of SMCS were transitioned to the Debtor, with SMCS and the Debtor sharing the services of certain of those employees by agreement. The MSSA provides that to the extent an employee of one company continues to provide services that benefit the other company, the employer will be compensated for those services.

The Debtor has, and continues to, identify and implement other operational changes to achieve its goals of providing high-quality health care services to the community and meeting its obligations under the Plan.

Operational changes and financial improvement do not occur in a vacuum. The Green Mountain Care Board, a regulatory agency of the State of Vermont, approves hospital budgets and rate increases. The Debtor has sought and obtained rate increases for each of the last two years and may need to do so in the future.

**D.      Exploration of Affiliation and Sale Options and Separation from SMCS**

Before and during the Case, the Debtor explored affiliation and sale options with other health providers in the State of Vermont and also actively evaluated an exit from chapter 11 both with and without its current relationship with SMCS.

While pursuing a sale or affiliation, the Debtor, either directly or through its attorneys, communicated with two of the larger health systems in Vermont. Only one expressed interest in engaging in discussions regarding the potential for a transaction in which the Debtor would become a member of the other party's system. For a period of several months, the Debtor and representatives from this other health system invested resources in developing business and financial models to explore business operations if the Debtor joined this system. While this work was initially promising, it was not possible to consummate a transaction. The Debtor was unable to obtain an offer for cash consideration. Moreover, financial uncertainty resulting from Covid-19, generally in the health care sector and in particular with respect to rural hospitals, made a transaction more difficult to consummate.

At the same time, the Debtor explored an exit from chapter 11 on a "stand-alone" basis and in an affiliation with SMCS. The Debtor, in the exercise of its business judgment, ultimately determined that severing formal ties with SMCS would be in the Debtor's best interests. It will require the Debtor—as well as SMCS—to strengthen business operations and maintain fiscal discipline. In the recent past, the Debtor and SMCS accrued intercompany liabilities to one another that were either unpaid or not carried as balance sheet liabilities.

As a final part of effectuating this change, following Confirmation, SMCS will no longer be the Debtor's Class B and sole voting member. SMCS will no longer have veto power over the Debtor's business affairs and transactions. A joint subcommittee of the board of directors for each of the companies (the "Interim Committee") has been meeting weekly since approximately January 2019 to provide additional oversight of the two companies during their initial crisis and

15

restructuring.  The Interim Committee has played an important role in the reorganization of the two companies.

**E.      Exit Funding from Vermont to Facilitate the Debtor's Reorganization**

In order to maintain continuity of health care services in the Springfield region and to facilitate the timely and successful reorganization of the Debtor, Vermont has agreed to provide the Debtor a grant in the amount of **$4,000,000.00**, which is defined in the Plan and herein as the "Exit Funding."  As is set forth in more detail below, the Exit Funding shall be used by the Debtor to fund a settlement and payoff of Berkshire's Allowed Claim, which is Classified in Class 1 of the Plan.  Discussion of the treatment of Vermont's Prepetition and Postpetition Claims, including provision for repayment of a portion of Vermont's Claims, is discussed below.  Vermont has provided funding to SMCS in a lesser amount and subject to different terms.

**F.      The Hospital Pension Plan**

The Pension Plan of the Hospital (the "Pension Plan") may be a tax-qualified defined benefit pension plan covered by Title IV of Employee Retirement Income Security Act of 1974, as amended.  The Pension Benefit Guaranty Corporation ("PBGC") has filed proofs of claim (collectively, the "PBGC Claims") against the Debtor and SMCS for: (a) the Pension Plan's underfunding on a termination basis; (b) unpaid minimum funding contributions; and (c) pension-insurance premiums.  In the event of a termination of the Pension Plan under 29 U.S.C. §§ 1341(c) or 1342, the contributing sponsor and all members of its controlled group, may be jointly and severally liable for the PBGC Claims pursuant to 29 U.S.C. § 1362(a), 26 U.S.C. § 412 and 29 U.S.C. § 1307, all as applicable.

Upon Confirmation of the Plan, the PBGC shall be deemed to have withdrawn with prejudice any proofs of claim filed by PBGC against the Debtor with respect to the Pension Plan, including the PBGC Claims.    Notwithstanding any other provision hereof, nothing in the Plan, the Confirmation Order, or the Bankruptcy Code (including § 1141 thereof) shall be construed as discharging, releasing, or relieving the Debtor or any party, in any capacity, from any liability with respect to the Pension Plan under any law, government policy, or regulatory provision. The PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any Debtor or any party with such liability or responsibility as a result of any provisions for satisfaction, release, injunction, exculpation, and discharge of Claims in the Plan and Confirmation Order.  The Debtor and the PBGC reserve all rights with respect to determining whether SMCS is liable for any obligations relating to the Pension Plan, including determinations relating to whether the Debtor is part of the controlled group associated with the Pension Plan.

**G.      The 457 Plan**

Certain employees and former employees of the Debtor participated in a 457(b) retirement plan sponsored by SMCS (the "457 Plan").  There are no Debtor-paid contributions to the 457 Plan, and it is comprised solely of funds contributed by current or former employees of the Debtor or SMCS.  The Debtor and SMCS have determined that maintaining the 457 Plan under the same

16

terms and conditions as existed prior to the bankruptcy filings, unaffected by the reorganization, is in the best interests of their respective estates. Any proofs of claim filed by participants in the 457 Plan shall be deemed allowed only to the extent allowed and payable under the 457(b) Plan, if SMCS confirms a chapter 11 providing for such treatment of the 457 Plan. Otherwise, such Claims in this Case shall be Allowed as General Unsecured Claims.

**H.      Potential Avoiding Power Causes of Action**

In the 90 days prior to the Petition Date, the Debtor made numerous disbursements to trade creditors and other parties as identified in Schedule 3.1 to its Statement of Financial Affairs, as amended [Dkt. No. 181] (the "90-Day Transfers"). The 90-Day Transfers, which exclude ordinary payroll payments, total approximately **$9.87 million**. Claims to avoid and recover the 90-Day Transfers can only be brought against parties who, in the aggregate, received more than **$6,825.00** in the 90 days before the Petition Date. 11 U.S.C. § 547(c)(9). The Debtor is also required to consider any and all reasonably known defenses the recipients of such transfers may have. These include (A) a bar to recovery to the extent of new value provided after each avoidable transfer or (B) a bar to recovery of any transfer made in the ordinary course of business (either between the parties or in the relevant industry).

When state and federal tax payments, payments for employee health and benefits, payments to parties with known defenses, and payments to parties who will receive cure payments under § 365 of the Bankruptcy Code are removed, the 90-Day Transfers subject to potential avoidance as Avoiding Power Causes of Action total approximately **$3,000,000.00** (the "Potential Preference Transfers"). A schedule of known Reserved Claims, which includes the Potential Preference Claims, is attached to the Plan as **Exhibit E**. Identification of the Potential Preference Claims on such schedule is not a waiver of the right to bring any other Avoiding Power Causes of Action, including those among the 90-Day Transfers or otherwise, if the Debtor determines, in the exercise of its business judgment, that such claim has merit or there are changes to the Debtor's Schedule of Assumed Contracts.

While the Debtor's evaluation of reasonably known defenses to the Potential Preference Claims continues, all parties are hereby on notice that the Debtor intends to seek avoidance and recovery of some or all of the Potential Preference Claims and to use proceeds thereof, less costs of collection, include attorneys' fees, to pay Allowed General Unsecured Claims (Class 8) and to fund the Debtor's payments to Vermont and CMS in accordance with the Allowed Class 2 and Allowed Class 3 Claims of such parties. *See* Plan, § VII(C). As set forth in § VII(C) of the Plan, the Debtor shall have authority and standing to settle, release, liquidate, or otherwise enforce any Avoidance Causes of Action, subject to the discretion of the Debtor to determine that any specific Avoidance Causes of Action should not be brought for any reason, including based on the size of the Avoidance Cause of Action (even if above the jurisdictional limits in § 547(c)(9) of the Bankruptcy Code) or any potential adverse impact to the Debtor's post-Confirmation business operations. The Debtor will have authority, but not the obligation, to assign Avoidance Causes of Action to a trustee for the benefit of the Holders of Allowed General Unsecured Claims in Class 8 and Allowed Claims in Class 2 and Class 3. Such trustee, denominated an "Avoidance Trustee" in the Plan, shall have the same rights, powers, and standing to sue that the Debtor would have

with respect to Avoidance Causes of Action.  All potential defendants to Avoidance Causes of Action are hereby on notice of this.

## I.       Potential Causes of Action Against SMCS

The Debtor may holds Prepetition Causes of Action against SMCS.[5]  This includes the claims set forth in Proof of Claim 50 on the Claims Register of the chapter 11 case of SMCS (Case No. 19-10285) (the "POC").   The POC alleges claims totaling **$11,295,133.00** based on intercompany obligations including transfers to third parties that benefited SMCS for which the Debtor asserts that it did not receive reasonably equivalent value.  These Causes of Action are based on state fraudulent transfer law and federal bankruptcy law, including fraudulent transfer and preference claims under §§ 544, 547, 548, and 550 of the Bankruptcy Code.  The Debtor also may hold claims against SMCS, as the Debtor's Class B member, for negligence or mismanagement resulting in the Debtor's insolvency.

The Debtor has determined, in the exercise of its business judgment, that it is not in the best interests of the Debtor, its estate, or the Debtor's creditors to pursue these Prepetition Causes of Action against SMCS.  There are several reasons for this.  *First* and foremost, pursuing litigation against SMCS could irretrievably harm business relations with SMCS to the detriment of the Debtor.  The Debtor's business requires referrals from primary care physicians.  SMCS has, for many years, been the predominant source of referrals to the Debtor and likely will continue to be the dominant primary care business in the Debtor's Service Area following Confirmation.  *Second*, SMCS has limited cash resources, is not likely able to pay any judgment obtained against it, and insurance proceeds are likely unavailable due to an insured-versus-insured exclusion in the applicable insurance policy.  Thus litigation, which is speculative by its nature, could lead to litigation costs without any real prospect of recovery from SMCS's cash flow.  While SMCS does have certain unencumbered real estate, the value of this property is uncertain, and the Debtor does not believe its interests are served by forcing a judicial sale of SMCS's real estate (assuming the Debtor could obtain a judgment).  *Third*, as a technical matter, the Debtor filed its bankruptcy petition a few hours before SMCS.  It is possible, though far from certain, that SMCS could argue that the claims that the Debtor has—both those that are pre-bankruptcy claims and those that could potentially qualify as Avoiding Power Causes of Action under the Bankruptcy Code—arose prior to the start of SMCS's bankruptcy case.  In that case, the claims would be entitled to the same treatment and distribution as SMCS's other general unsecured creditors.  *Fourth*, it is possible that the Court could subordinate any claims that the Debtor has against SMCS (and vice versa) to the claims of other creditors.  *Fifth and finally*, liability for any negligence-based claims is speculative, and an insured-versus-insured exclusion in applicable insurance policies makes recovery of insurance proceeds unlikely.

## J.       Berkshire's Collateral

There are other, potentially complicated theories that could be employed to try to avoid the impact of facially valid security interests in collections from accounts receivable due to

---

[5]        These are separate from the administrative expense claim that the Debtor holds against SMCS for certain payments that the Debtor has made for SMCS's benefit during the companies' chapter 11 cases.  The Debtor and SMCS have agreed to treatment of that claim.

commingling of funds in deposit accounts.  The Debtor does not believe that such litigation would be a good use of resources or appropriate in light of the proposed treatment of Berkshire's Claims.

## K.    Reservation of Rights

Except as expressly set forth in the Plan, the Debtor reserves and does not release any and all Causes of Action, including claims and defenses of any kind, that it may have.  This includes any claims to collect or defenses to the refusal to pay for services provided to patients from third-party payors including Medicaid, Medicare, and OneCare.  The Debtor further reserves all claims, demands, and causes of action of any kind or nature whatsoever held by, through, or on behalf of the Debtor or the Estate against any other person or entity that have not otherwise been resolved or disposed of, whether or not specifically identified in this Disclosure Statement.

**THIS DISCLOSURE STATEMENT CONSTITUTES NOTICE TO ANY PARTY IN INTEREST THAT THE DEBTOR RESERVES THE RIGHT TO PURSUE ANY AND ALL SUCH CAUSES OF ACTION TO JUDGMENT AND COLLECTION AND THAT THE PROCEEDS OF ALL SUCH CAUSES OF ACTION, IF ANY, MAY BE USED TO HELP FUND CERTAIN OBLIGATIONS UNDER THE PLAN.**

## L.    Establishment of Bar Dates

The bar date for filing a Proof of Claim with respect to any Prepetition Claims, except those of Governmental Units but including a 503(b)(9) Claim, was September 4, 2019 (the "General Bar Date").

The bar date for filing a Proof of Claim based upon the avoidance of a transfer of the Debtor's property shall thirty (30) days after judgment avoiding the relevant transfer.

The deadline for Governmental Units to file Proofs of Claim was December 23, 2019 (the "Governmental Bar Date").

The Plan sets sixty (60) days after the Effective Date as the deadline to seek allowance of what are defined as Non-Ordinary Course Administrative Claims—essentially claims allowable under § 503(b) that are not in the nature of Ordinary Course Administrative Expense Claims.

The Plan sets 60 days after the Effective Date as the deadline to seek allowance of Professional Fee Claims.

Under the Plan, Holders of Ordinary Course Administrative Claims are not required to File any request for payment of such Claims.  The Debtor has paid and continues to pay all Ordinary Course Administrative Claims as they become due.  The Debtor shall identify the parties that the Debtor believes hold Ordinary Course Administrative Claims in a schedule attached to the Notice of the Effective Date (as defined below).  Holders of Ordinary Course Administrative Claim may, but are not required to, File a motion regarding their Ordinary Course Administrative Claim by the Non-Ordinary Course Administrative Bar Date.

The deadline for seeking allowance of a Claim following rejection of an executory contract or lease under § 365 of the Bankruptcy Code shall be thirty (30) calendar days after the later to occur of the Effective Date or the date of entry of an order authorizing rejection of a contract or lease.

**Any Claims that are not timely filed before the applicable bar date will be forever barred from assertion against the Debtor, the Estate, or the Assets, unless such deadline is extended by an Order of the Bankruptcy Court.  The Holder of such a Claim is not entitled to vote on the Plan or to participate in any Distributions in the Case.**

**The Confirmation Order would disallow the following Proofs of Claim as having been filed after the General Bar Date: Proof of Claim 94 (Stryker Endoscopy), Proof of Claim 95 (Stryker Instruments), Proof of Claim 96 (Delta Locum Tenens, LLC), Proof of Claim 97 (Landauer, Inc.), Proof of Claim 98 (Windstream), Proof of Claim 99 (American National Red Cross), Proof of Claim 100 (American National Red Cross), Proof of Claim 101 (Cigna), Proof of Claim 102 (Kleen Laundry & Dry Cleaning), Proof of Claim 106 (Precision Dynamics Corp.), Proof of Claim 108 (Nova Biomedical), Proof of Claim 115 (James Britain/Computer Program & Systems, Inc.), Proof of Claim 117 (Acumed), Proof of Claim 121 (Pitney Bowes, Inc.), Proof of Claim 122 (Pitney Bowes, Inc.), Proof of Claim 128 (Eagle Printing & Publishing), Proof of Claim 129 (Soliant Health), and Proof of Claim 130 (Robert Cochrane).  All other rights and bases for objection to such Claims are reserved to the Debtor, except to the extent set forth herein or by separate Order of the Bankruptcy Court.**

**This list does not include Patient Refund Claims, which are addressed in Class 7 of the Plan.  To the extent the Debtor had an objection to a Patient Refund Claim, that objection has been or will be filed on or before October 23, 2020.  If no objection was filed as of October 23, 3030, then the Patient Refund Claim shall be treated as an Allowed Claim in Class 7 of the Plan.**

**M.     Summary And Notice Of Certain Additional Claim Objections The Debtor May File After The Confirmation Date**

**The Debtor has identified in Exhibit G to the Plan a list of Claims to which the Debtor may object if the Bankruptcy Court confirms a plan of reorganization in this Case under terms different than those in the Plan filed by the Debtor (the "Contingent Claim Objections Schedule").[6]  The Contingent Claim Objections Schedule is attached hereto as Exhibit 4.  If the Bankruptcy Court confirms the Plan as proposed, then the Debtor will not object to the Claims identified in the Contingent Claim Objections Schedule.  To the extent the Bankruptcy Court entered an Order enlarging the Debtor's deadline to object to any Claim on the Contingent Claim Objections Schedule, such rights are hereby reserved as to the Holder of any affected Claim.**

---

[6]     The Contingent Claim Objections Schedule does not include objections to Claims based solely on late-filed proofs of claim.  However, to the extent the Debtor may have additional bases to object to a late-filed proof of claim, those additional bases are identified in the Contingent Claim Objections Schedule.

**ALL CLAIMANTS ARE ADVISED TO REVIEW AND LOCATE THEIR NAME ON THE CONTINGENT CLAIM OBJECTIONS SCHEDULE.  IF A CLAIM IS LISTED ON EXHIBIT G, THEN PLEASE BE ADVISED THAT THE DEBTOR MAY—BUT IS NOT REQUIRED TO—OBJECT TO THAT CLAIM, IN WHOLE OR IN PART, IF THE BANKRUPTCY COURT CONFIRMS A PLAN ON TERMS DIFFERENT THAN THOSE PROPOSED BY THE DEBTOR.  THE IDENTIFICATION OF A CLAIM ON EXHIBIT G DOES NOT GUARANTEE THAT THE DEBTOR, IN ITS DISCRETION, WILL OR WILL NOT OBJECT TO SUCH CLAIM.**

**UNDER § 502(d) OF THE BANKRUPTCY CODE, THE BANKRUPTCY COURT SHALL DISALLOW ANY CLAIM OF AN ENTITY THAT IS A TRANSFEREE OF AN AVOIDANCE CAUSE OF ACTION (AS THAT TERM IS DEFINED HEREIN).  ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR WHO ARE LISTED ON THE DEBTOR'S RESERVED CLAIMS SCHEDULE (AS DEFINED BELOW AND ATTACHED AS EXHIBIT F) UNDER THE SECTION THEREOF ENTITLED "AVOIDANCE CAUSES OF ACTION" ARE HEREBY ON NOTICE THAT THEIR CLAIMS MAY BE DISALLOWED OR OBJECTED TO ON THE BASIS OF § 502(d) OF THE BANKRUPTCY CODE IN THE EVENT IT IS DETERMINED THEY ARE RECIPIENTS OF A TRANSFER SUBJECT TO AVOIDANCE.**

Pursuant to the Court's Order Modifying Claim Objection Procedures And Ballot Format Requirements [Dkt. No. 523] (the "Claims Order"), the Contingent Claim Objections Schedule is reproduced as follows:

| Proof of Claim No./Schedule E/F Line | Creditor | Claim Amount | Basis for Objection |
|---|---|---|---|
| 14 | All Service | $13,548.48 | Disputed amount based on Debtor's records |
| 16 | U.S. Bank, N.A. d/b/a U.S. Bank Equipment Finance | $64,629.60 | Disputed amount based on Debtor's records |
| 25 | Medline Industries, Inc. | $57,447.53 | Disputed amount based on Debtor's records |
| 31 | GreatAmerica Financial Services Corp. | $39,340.27 | Disputed amount based on Debtor's records |
| 33 | Merry X-Ray Corp. | $19,450.87 | Disputed amount based on Debtor's records |

| 37 | Rutland Regional Med. Center | $170,303.55 | Disputed amount based on Debtor's records |
| 39 | Berry Dunn | $89,662.00 | Claim released per retention order, Dkt. No. 323 |
| 55 | ProAct, Inc. | $681,578.84 | Disputed amount based on Debtor's records |
| 64 | Green Mountain Power | $18,552.10 | Disputed amount based on Debtor's records |
| 77 | Ann Bartlett | $82,128.73 | No objection as to amount; reservation as to priority per Dkt. No. 334 |
| 78 | Winthrop Resources Corp. | $26,620.00 | Disputed as to amount based on Debtor's records |
| 81 | Cheshire Medical Center, Inc. | $79,172.11 | Disputed as to amount based on Debtor's records |
| 85 | Mary Hitchcock Memorial Hospital | $536,979.20 | Disputed as to amount based on Debtor's records |
| 87 | Cheshire Medical Center, Inc. | $99,327.89 | Disputed as to amount based on Debtor's records |
| 88 | Mary Hitchcock Memorial Hospital | $510,628.99 | Disputed as to amount based on Debtor's records |
| 115 | Computer Programs & Systems Inc. | $107,152.89 | Disputed as to amount based on Debtor's records |
| 120, 121, 122 | Pitney Bowes, Inc. | $1,035.06, $12,40.47, $21,081.94 | Disputed as to amount based on Debtor's records |
| Schedule E/F Line 3.235 | Carefusion Solutions LLC | $60,660.00 | Disputed as to amount based on Debtor's records |

22

| Schedule E/F Line 3.246 | CBA | $567,566.76 | Disputed as to amount based on Debtor's records/satisfied |
|---|---|---|---|
| Schedule E/F Line 3.301 | Comprehensive Benefits | $559,431.46 | Disputed as to amount based on Debtor's records/satisfied |
| Schedule E/F Line 3.825 | LINA | $40,834.03 | Disputed as to amount based on Debtor's records/satisfied as employee benefit program |
| Schedule E/F Line 3.924 | Medtronic | $12,029.00 | Disputed as to amount based on Debtor's records |
| Schedule E/F Line 3.1023 | Northeast Delta Dental | $12,668.83 | Disputed as to amount based on Debtor's records/satisfied as employee benefit program |
| Schedule E/F Line 3.1104 | Pentax Medical Co. | $13,546.15 | Disputed as to amount based on Debtor's records |
| Schedule E/F Line 3.1287 | Siemens Healthcare Diagnostics | $91,178.79 | Disputed as to amount based on Debtor's records |
| Schedule E/F Line 3.1391 | T Systems Technologies Ltd | $72,456.15 | Disputed as to amount based on Debtor's records |
| Schedule E/F Line 3.1477 | U.S. Nuclear Regulatory Comm. | $13,900.00 | Disputed as to amount based on Debtor's records |

## IV.

## SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN.  IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.  THIS SUMMARY

**DOES NOT PURPORT TO BE COMPLETE.  CREDITORS ARE URGED TO READ THE PLAN IN FULL.**

A.   <u>Introduction</u>

Pursuant to the Plan, the Debtor proposes to effectuate a reorganization and to complete a balance sheet restructuring that will aid in the Debtor's viability.  On the Effective Date, the Estate's interest in all Assets shall vest in the Debtor free and clear of any and all Claims, Interests, or defenses (including recoupment) with respect to any Claims, whether known or unknown, asserted or unasserted, or contingent or fixed.  Allowed Claims shall receive certain Distributions discussed in the Plan and below.

B.   <u>Voting Procedures and Confirmation Requirements</u>

1.   <u>Ballots and Voting Deadlines</u>

Accompanying this Disclosure Statement is a Ballot for acceptance or rejection of the Plan. The Bankruptcy Court has directed that, to be counted for voting purposes, Ballots for acceptance or rejection of the Plan **MUST BE SERVED ON THE DEBTOR'S COUNSEL** listed immediately below by no later than **4:00 p.m., prevailing Eastern time, on November 30, 2020** (the "<u>Voting Deadline</u>"):

Andrew C. Helman<br>
Murray, Plumb & Murray<br>
75 Pearl Street<br>
Portland, Maine  04101<br>
ahelman@mpmlaw.com<br>
(207) 523-8290

**BALLOTS NOT ACTUALLY RECEIVED BY THE VOTING DEADLINE MAY NOT BE COUNTED, AND BALLOTS THAT DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.  BALLOTS MAILED TO THE CLERK OF THE BANKRUPTCY COURT MAY <u>NOT</u> BE COUNTED.**

Even if you do not vote to accept the Plan, you may still be bound by it if it is accepted by the requisite Holders of Claims and confirmed by the Bankruptcy Court.

2.   <u>Parties in Interest Entitled to Vote</u>

Pursuant to provisions of the Bankruptcy Code, only Holders of Allowed Claims in Classes of Claims that are Impaired are entitled to vote to accept or reject the Plan.  In addition, any Claim to which an objection has been Filed is not entitled to vote unless the Bankruptcy Court, upon application of the Holder of the Claim, temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan.  Any such application must be heard and determined by the Bankruptcy Court on or before the Voting Deadline.  A vote may be disregarded

24

if the Bankruptcy Court determines, after notice and a hearing, that the vote was not solicited or procedure in good faith or in accordance with the provisions of the Bankruptcy Code.

### 3.   Definition of Impairment

Under § 1124 of the Bankruptcy Code, a Class of Claims is impaired under a plan unless, with respect to each Claim of such Class, the plan:

(1)   Leaves unaltered the legal, equitable, and contractual rights of the holder of the claim or equity interest; or

(2)   Notwithstanding any contractual provision or applicable law that entitles the holder of a claim or equity interest to demand or receive accelerated payment of such claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default:

   (A)   Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in § 365(b)(2) of the Bankruptcy Code;

   (B)   Reinstates the maturity of such claim or interest as it existed before such default;

   (C)   Compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law;

   (D)   If such claim or such interests arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to § 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for actual pecuniary loss incurred by such holder as a result of such failure; and

   (E)   Does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

The Debtor has classified Claims as follows:

| Class | Type of Claim | Impaired/Unimpaired | Entitled to Vote (Yes/No) |
|-------|---------------|---------------------|---------------------------|
| Class 1 | Berkshire Secured Claims | Impaired | Yes |
| Class 2 | Vermont | Impaired | Yes |
| Class 3 | CMS Claim | Impaired | Yes |
| Class 4 | 457 Plan | Impaired | No |
| Class 5 | Priority Wage Claims | Unimpaired | No |
| Class 6 | Priority Non-Tax Claims, other than Priority Wage Claims | Unimpaired | No |
| Class 7 | Patient Refund Claims | Impaired | Yes |
| Class 8 | General Unsecured Claims | Impaired | Yes |

## C.    Confirmation Procedure

### 1.    Confirmation Hearing

A hearing before the Honorable Colleen A. Brown, United States Bankruptcy Judge, has been scheduled for **9:30 a.m. on December 9, 2020**, via Zoom.  Any person who intends to participate in the hearing on Confirmation of the Plan must contact the courtroom deputy by **10:00 a.m. on December 8, 2020**, at **jody_kennedy@vtb.uscourts.gov or (802) 657-6404**, to give her the screen name s/he will be using on the device used to connect to the hearing.  For security reasons, failure to provide this information in advance of the hearing may result in exclusion from the hearing.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement made at the Confirmation Hearing or such continued Confirmation Hearing.

### 2.    Procedure and Time for Objections

Any objection to Confirmation of the Plan must be made in writing and specify in detail the name and address of the objecting party and all grounds for the objection.  **Any objection must be Filed with the Bankruptcy Court and served on counsel for the Debtor by 4:00 p.m. on November 30, 2020.  You may file your response by e-mailing it to efiling@vtb.uscourts.gov; by mailing the response to U.S. Bankruptcy Court, District of Vermont, P.O. 1663, Burlington, VT  05402-1663; by hand-delivering the response to the Clerk of the Court at 151 West Street, Rutland, VT  05701 or 11 Elmwood Avenue, Room 200, Burlington, VT 05401; or by filing via the Bankruptcy Court's CM/ECF filing system.**  Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court.  While not required, it would assist parties if the amount of the Claim and the number of any Filed Proof of Claim held by the objecting party is identified in such objection.

### 3.     Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the requirements of § 1129 of the Bankruptcy Code.  Among the requirements for Confirmation are that the Plan be: (a) accepted by all Impaired Classes of Claims that are entitled to vote or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; (b) feasible; and (c) in the "best interests" of Creditors Impaired under the Plan who have not voted to accept the Plan.  The Bankruptcy Court must also find that:

- The Plan has classified Claims in a permissible manner;

- The Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

- The Plan has been proposed in good faith.

### 4.     Voting and Acceptance of the Plan

Except as otherwise provided in the Bankruptcy Code, as a condition to Confirmation of the Plan, the Bankruptcy Court requires each Class of Impaired Claims entitled to vote on the Plan to vote to accept the Plan.  The Bankruptcy Code defines acceptance of a plan by a Class of Creditors as acceptance by Holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) number of those Claims in that Class.  Holders of Claims who fail to vote may be deemed to have accepted the Plan.  A vote, moreover, may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that it was not made or solicited in good faith.

Classes of Claims that are not Impaired under the Plan are conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote.  Classes of Claims that receive no Distribution under the Plan are conclusively presumed to have rejected the Plan and are not entitled to vote.

### 5.     Best Interests Test

The "best interests" of Impaired creditors test requires that each Holder of a Claim that has not voted to accept the Plan and belongs to an Impaired Class receive or retain under the Plan property of a value that is not less than the value such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  To determine what members of each impaired Class of Claims would receive if the Debtor were liquidated, the Bankruptcy Court must determine the dollar amount that a liquidation of the Debtor's Assets would generate in the context of a chapter 7 liquidation.  The amount available for satisfaction of Claims would consist of the proceeds resulting from the liquidation, reduced by the costs and expenses of the liquidation and the Claims of secured creditors to the extent of the value of their collateral.

As a non-profit business corporation, the Debtor's Case cannot be converted to one under chapter 7 of the Bankruptcy Code.  11 U.S.C. § 1112(c).  Moreover, the Debtor does not consent to conversion to chapter 7.  Thus, no liquidation under chapter 7 is possible at this time.  For this

reason, any amount received under the Plan is more than is possible for Distribution under chapter 7.[7]

Notwithstanding the Debtor's position with respect to a forced liquidation under chapter 7, the Debtor has prepared a "liquidation analysis" for a hypothetical liquidation under chapter 7. The Debtor's liquidation analysis is attached hereto as **Exhibit 2**.  As set forth therein and as discussed in the section of this Disclosure Statement reviewing alternatives to Confirmation, the Debtor believes that each Impaired Class of Claims would receive under the Plan property of a value that is not less than the value that they would receive if the Debtor were to be liquidated under chapter 7.

6.      **The Feasibility Test**

The "feasibility" test requires the Bankruptcy Court to find that Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of the Debtor.  The Debtor believes that the Cash Flow Projections filed as **Exhibit A** to the Plan demonstrate that the Debtor is viable and will continue to be viable.  In other words, the Debtor does not believe that liquidation or further reorganization is likely to be needed.  The Debtor's business is likely to continue in what could be characterized as a "steady state" into the future.

7.      **Unfair Discrimination and the Fair and Equitable Test**

If any Impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan despite such non-acceptance under the "cram down" provisions set forth in § 1129(b) of the Bankruptcy Code. To obtain a Confirmation under those circumstances, the Debtor must show, among other things, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to each Impaired Class of Claims that has rejected the Plan.

Under § 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" to a class of claims or equity interests if, among other things, the plan provides: (i) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of a plan, equal to the allowed amount of such claim; and (ii) with respect to unsecured claims and equity interest, that the holder of any claim or equity interest that is junior to the claims or equity interest of such class will not receive or retain on account of such junior claim or equity interest any property at all unless the senior class is paid in full.  A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its claim or interest.  The Debtor believes that these requirements will be met here.

**AS THE HOLDERS OF CLAIMS IN CERTAIN CLASSES ARE IMPAIRED AND MAY REJECT THE PLAN, ALL PARTIES ARE ADVISED THAT THE DEBTOR MAY SEEK CONFIRMATION OF THE PLAN UNDER THE "CRAM DOWN" PROVISIONS OF § 1129(b) OF THE BANKRUPTCY CODE.**

---

[7]     This is not an admission that a hypothetical liquidation value cannot be determined under § 547 of the Bankruptcy Code.

### 8.    Other Requirements of § 1129 of the Bankruptcy Code

The Debtor believes that the Plan meets all of the other technical requirements of § 1129 of the Bankruptcy Code, including that the Plan has been proposed in good faith.

**D.    Classification of Claims and Interests and Their Treatment Under the Plan**

### 1.    Classification of Claims

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim in a particular Class only if such Claim is substantially similar to the other Claims in that Class. The Debtor believes the Plan's classifications place substantially similar Claims in the same Class and, thus, meet the requirements of § 1122 of the Bankruptcy Code.  The specific classifications and treatments of Classified Claims through the Plan are discussed further below and in the Plan.

### 2.    Unclassified Claims

Under the Plan, certain types of Claims are not placed into Classes.  Instead, such Claims are Unclassified Claims.  Unclassified Claims are Unimpaired, and Holders of Unclassified Claims do not vote on the Plan because they are automatically entitled to specific treatment provided for Unclassified Claims in the Bankruptcy Code or the Claim treatment has been agreed upon by the Debtor and a particular Claimant.  Descriptions of the Unclassified Claims, and the allowance and treatment of such Unclassified Claims under the Plan, are discussed next.

#### a.    Allowance of Administrative Claims

##### i.    Allowance of Non-Ordinary Course Administrative Claims and the SMCS Administrative Claim

Unless otherwise expressly provided in the Plan, Non-Ordinary Course Administrative Claims shall be Allowed Claims only if: (i) on or before the Non-Ordinary Course Administrative Claim Bar Date, the Person holding such Non-Ordinary Course Administrative Claim both Files with the Bankruptcy Court a motion requesting allowance of the Non-Ordinary Course Administrative Claim and serves the motion on counsel for the Debtor and the U.S. Trustee; and (ii) a Final Order is subsequently entered by the Bankruptcy Court allowing the Non-Ordinary Course Administrative Claim.

**THE NON-ORDINARY COURSE ADMINISTRATIVE BAR DATE IS SIXTY (60) CALENDAR DAYS AFTER THE EFFECTIVE DATE.  Notice of the actual date upon which the Non-Ordinary Course Administrative Claims Bar Date falls shall be set forth in the Notice of the Effective Date of the Plan that shall be served on parties-in-interest within fourteen (14) calendar days after the Effective Date (the "Notice of the Effective Date"). Persons holding Non-Ordinary Course Administrative Claims that do not File and serve a request for payment on or before the Non-Ordinary Course Administrative Claim Bar Date shall be forever barred from asserting those Claims against the Debtor, the Estate, and/or**

the Assets.  **The Debtor or any other party-in-interest may File an objection to any motion requesting allowance of a Non-Ordinary Course Administrative Claim in accordance with the Bankruptcy Code and/or any applicable Bankruptcy Rules.**

The SMCS Administrative Claim is an Unclassified Non-Ordinary Course Administrative Claims that shall be treated in accordance with the Plan, as is described further below.

### ii.    Allowance of Ordinary Course Administrative Claims

Under the Plan, Holders of Ordinary Course Administrative Claims shall not be required to File any request for payment of such Claims.  The Debtor has paid and continues to pay all Ordinary Course Administrative Claims as they become due.  Any party seeking express allowance of an Ordinary Course Administrative Claim may File a motion by the Non-Ordinary Course Administrative Bar Date or forever waives the right to do so.  The Debtor shall identify the parties that the Debtor believes hold Ordinary Course Administrative Claims in a schedule attached to the Notice of the Effective Date.

### iii.    Allowance of 503(b)(9) Claims

Holders of 503(b)(9) Claims were required to File proofs of claim by the General Bar Date, which was September 4, 2019 for most Creditors.  A 503(b)(9) Claim shall be an Allowed 503(b)(9) Claim if: (i) no objection, motion, or other proceeding to estimate, equitably subordinate, reclassify, set off, or otherwise limit the recovery thereon has been asserted before the expiration of the Claims Objection Deadline, which is ninety (90) days after the Effective Date, unless upon motion of the Debtor, the Bankruptcy Court extends such deadline; or (ii) any objection, motion, or other proceeding to estimate, equitably subordinate, reclassify, or set off has been resolved by agreement between the Claimant and the Debtor or by Final Order of the Bankruptcy Court.

### iv.    Allowance of Professional Fee Claims

Each Professional seeking approval by the Bankruptcy Court of a Professional Fee Claim,[8] which includes compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date, must (in light of such Claims constituting Non-Ordinary Course Administrative Claims): (i) File its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by no later than the date that is **sixty (60) days after the Effective Date.**  Any objection to such Professional Fee Claims shall be Filed on or before the date specified in the notice of the application for final compensation.  All such requests for payment of such Professional Fee Claims shall be subject to the authorization and approval of the Bankruptcy Court.

**Persons holding Professional Fee Claims who do not timely File a final fee application shall be forever barred from asserting those Claims against the Debtor, the Debtor's Estate,**

---

[8]     Professional Fee Claims do not include Claims either under § 503(b)(4) of the Bankruptcy Code for compensation for professional services rendered or under § 503(b)(3)(D) of the Bankruptcy Code for expenses incurred in making a substantial contribution to the Estate, which Claims are Non-Ordinary Course Administrative Claims and are subject to the Non-Ordinary Course Administrative Claims Bar Date.

**or the Assets, unless otherwise ordered by the Bankruptcy Court.   To the extent not paid in full prior to the Effective Date, the Debtor shall remain liable for Professional Fee Claims Allowed by the Bankruptcy Court.**

### v.    Allowance of Cure Claims

A Cure Claim shall become an Allowed Cure Claim when the assumption of the affected unexpired lease or executory contract is effective, pursuant to a Final Order of the Bankruptcy Court addressing assumption of the applicable unexpired lease or executory contract and the amount of the Cure Claim is quantified by that Final Order.  Assumption and rejection of unexpired leases and executory contracts is discussed below and in § V of the Plan.

### b.    Treatment of Administrative Claims

### i.    Payment of Allowed Non-Ordinary Course Administrative Claims and the SMCS Administrative Claim

Except to the extent that any Person entitled to payment of a Allowed Non-Ordinary Course Administrative Claim agrees to a different treatment, under the Plan, each Holder of an Allowed Non-Ordinary Course Administrative Claim shall receive in full satisfaction, discharge, exchange, and release thereof, Cash in an amount equal to such Allowed Non-Ordinary Course Administrative Claim on the later of: (i) the Effective Date; or (ii) the date that is fourteen (14) calendar days after such Non-Ordinary Course Administrative Claim becomes an Allowed Non-Ordinary Course Administrative Claim, or, in either case, as soon thereafter as is practicable.

By agreement, the SMCS Administrative Claim shall be Allowed in the amount of **$0.00**. SMCS's chapter 11 plan provides for payment over a period of twenty-four (24) months of the Hospital Administrative Claim in SMCS's chapter 11 case.

### ii.    Payment of Allowed Ordinary Course Administrative Claims

Each Ordinary Course Administrative Claim, unless disputed by the Debtor, shall be satisfied by the Debtor, under the terms and conditions of the particular transaction (including historic practice between the parties) giving rise to that Ordinary Course Administrative Claim, without any further action by the Holder of such Ordinary Course Administrative Claim.

### iii.    Payment of 503(b)(9) Claims

Except to the extent that any Holder of a 503(b)(9) agrees to a different treatment, each Holder of a 503(b)(9) Claim, if any, shall receive in full satisfaction, discharge, exchange, and release thereof, Cash in an amount equal to the Allowed amount of the 503(b)(9) Claim on the later of: (i) the Effective Date; or (ii) the date that is fourteen (14) days after such 503(b)(9) Claim becomes an Allowed Claim or, in either case, as soon thereafter as is practicable.

### iv.    Payment of Professional Fee Claims

Holders of Professional Fee Claims, to the extent approved by the Bankruptcy Court, are to be paid, in full satisfaction, discharge, exchange, and release thereof, Cash in such amounts as are Allowed by the Bankruptcy Court on the date such Professional Fee Claim becomes an Allowed Claim, or as soon thereafter as is practicable.   **To the extent not paid in full prior to the Effective Date, the Debtor shall remain liable for Professional Fee Claims Allowed at that time or subsequently Allowed by the Bankruptcy Court.**

### v.    Payment of Cure Claims

Each Holder of a Cure Claim shall receive, in full satisfaction, discharge, exchange, and release thereof, payment of such Cure Claim pursuant to the terms of any agreement between the Holder of the Cure Claim and the Debtor or pursuant to the terms of any Final Order of the Bankruptcy Court establishing the Cure Claim.  Assumption and rejection of executory contracts and unexpired leases is discussed further below and in § V of the Plan.

### vi.    Payment of U.S. Trustee Fees

When due in the ordinary course, all U.S. Trustee Fees payable under 28 U.S.C. § 1930 shall be paid in Cash, in full.  Nothing in the Plan alters or modifies any obligation of the Debtor to pay fees required under 28 U.S.C. § 1930 or to File reports required by the U.S. Trustee.

### vii.    Treatment and Payment of Priority Tax Claims

In accordance with § 1129(a)(9)(C) of the Bankruptcy Code, except as otherwise agreed by the Debtor and the applicable Claimant, and except as to the Priority Tax Claim held by the IRS, each Holder of an Allowed Priority Tax Claim shall receive deferred Cash payments over a period not to exceed five (5) years from the Petition Date.  Payments shall be made in equal, annual installments, and each installment shall include simple interest accrued on the unpaid portion of such Allowed Priority Tax Claim at the Federal Judgment Rate in effect as of the Effective Date per annum from and after the Effective Date; provided, however, that the Debtor reserves the right to pay any Allowed Priority Tax Claim, or any remaining principal balance of such Allowed Priority Tax Claim, in full, at any time on or after the Effective Date and before the expiration of the five-year period without premium or penalty.

The only Priority Tax Claims known to the Debtor are as follows: (A) the Priority Tax Claim filed by the IRS in the amount of $12,729.38 (Proof of Claim No. 13); and (B) the Priority Tax Claim filed by the State of Vermont ("Vermont") in the amount of $2,046,353.95 (Proof of Claim 126, which also includes other amounts allegedly owed to Vermont).  **The Debtor and Vermont have reached agreement on the treatment of Vermont's Priority Tax Claim.  Treatment of such Claim shall be discussed below in the section of this Plan addressing Vermont's Class 2 Claims.  The Debtor shall pay the Priority Tax Claim of the IRS in the amount of $12,729.38 on or before the Effective Date in accordance with an agreement between the Debtor and the IRS.**

32

3.      **Classified Claims**

The Bankruptcy Code requires certain types of claims to be placed into Classes. The following describes the Plan's classification of such Claims:

a.      **Berkshire Claims (Class 1) – Impaired**

Class 1 consists of Berkshire's Claims.

On the Effective Date, Berkshire's Class 1 Claim shall be an Allowed Secured Claim in the amount of **$2,000,000.00**, with payment, in full, to be made on the Effective Date or as soon as is reasonably practicable thereafter from the Exit Funds. Berkshire shall also receive an additional **$2,000,000.00** on the Effective Date or as soon as is reasonably practicable thereafter from a non-Debtor source, with the expectation being that such additional funds shall be paid by or on behalf of SMCS. Upon (i) Distribution of **$2,000,00.00** to be paid from the Exit Funding in satisfaction in full of Berkshire's Allowed Claims; (ii) termination of the Letter of Credit with no liability to Berkshire; and (iii) Distribution of the additional **$2,000,000.00** to Berkshire by or on behalf of SMCS, all mortgages, liens, security interests, or other interests of Berkshire against any property of the Debtor or its estate, including all Assets and any Berkshire Collateral, shall be fully released and discharged, and all of the right, title, and interests of Berkshire with respect to such mortgages, liens, security interests, or other interests shall revert to the Debtor and its successors and assigns, and the Letter of Credit shall immediately terminate if not terminated previously, without any further approval or Order of the Bankruptcy Court and without any action or filing being required to be made by Berkshire or the Debtor. Notwithstanding the foregoing, Berkshire shall, not later than thirty (30) calendar days after payment hereunder record discharges or releases of all mortgages, liens, security interests, or other interests against any property of the Debtor or its estate.

Berkshire's Plan treatment represents results of negotiation between and among the Debtor, SMCS, Vermont, and Berkshire pursuant to which Berkshire, subject to certain conditions, will accept a total of **$4,000,000.00**, with **$2,000,000.00** each from the Debtor and SMCS, in Cash on the Effective Date, or as soon as is reasonably practicable thereafter, and the termination of the undrawn Letter of Credit with no liability to Berkshire, in full satisfaction of Berkshire's Claims against the Debtor and SMCS. The Letter of Credit in the amount of **$95,000.**00 has not been drawn upon and shall be terminated upon satisfaction of the conditions in the Plan. **The Debtor reserves all of its rights in the event the conditions are not satisfied.**

If Berkshire does not receive a $**4,000,000.00** payment on the Effective Date, or as soon as is reasonably practicable thereafter, and if the Letter of Credit has not been terminated, then (A) Berkshire reserves all liens, rights, and remedies under the Term Loan Documents, the Revolving Line of Credit Loan Documents, the Cash Collateral Order, and the Bankruptcy Code, and (B) the Debtor reserves all of its rights and remedies available under the Bankruptcy Code and Cash Collateral Order.

Upon (A) payment of **$4,000,000.00** to Berkshire, (B) termination of the Letter of Credit with no liability to Berkshire thereunder, and (C) the release of Berkshire liens, all as provided for

in this Plan, the Debtor releases all claims against Berkshire and shall not assert a claim against Berkshire under any provision of the Plan or the Bankruptcy Code. Further, upon fulfillment of each of the conditions of the immediately preceding sentence, the Debtor releases any and all claims related to the Revolving Line of Credit, the Term Loan, or the Letter of Credit against Berkshire's directors, officers, shareholders, employees, agents, and attorneys.

**Resolution of any disputed issues with Berkshire could impact Confirmation.**

### b.    State of Vermont (Class 2) – Impaired

Class 2 consists of the Claims of Vermont in the aggregate amount not less than **$9,092,281.44** (the "Vermont Claims"). The Vermont Claims represent the amounts that the Debtor is estimated to owe to Vermont up to and including the Effective Date. The Vermont Claims are comprised of (i) Prepetition Claims in an amount not less than **$3,138,742.19**, including not less than **$2,046,353.95** attributable to provider taxes; and (ii) Postpetition Claims in an amount not less than **$5,953,539.25**, which includes the Term Loan and approximately **$4,600,000.00** in provider taxes.

The proposed treatment of the Vermont Claims represents (i) a settlement of Vermont's administrative, priority, and superpriority Claims that would otherwise be required to be paid in full on the Effective Date and (ii) consideration for a **$4,000,000.00** grant that Vermont is contributing to the Debtor upon the Effective Date and referred to herein as the Exit Funding, subject to and conditioned upon the terms of this Plan. This grant is in addition to a **$2,000,000.00** grant Vermont is providing SMCS for payment to Berkshire Bank. Absent the substantial value and consideration created by the Vermont settlement and Exit Funding, the Debtor would not have sufficient liquidity to fund this Plan and to emerge from bankruptcy.

Class 2 is divided into two sub-classes subject to the following treatment:

### i.    Vermont Claims – Class 2-A

On the Effective Date, Vermont's Class 2-A Claim shall be Allowed in the amount of **$5,000,000.00**. In full and final satisfaction, settlement, release, and discharge of Vermont's Allowed Class 2-A Claim, on the Effective Date or such other date as the Debtor and Vermont shall agree, the Debtor shall execute and deliver to Vermont two promissory notes, as well as mortgages, security agreements, and other documentation needed to grant Vermont a first priority security interest and mortgage in all of the Debtor's Assets, including but not limited to the Berkshire Collateral (the "Vermont Security Documentation"). There shall be an "A Note" in the original principal balance of **$2,000,000.00** and a "B Note" in the original principal balance of **$3,000,000.00**. The A Note and the B Note shall be secured by all of the Debtor's assets, including but not limited to the Berkshire Collateral, pursuant to the Vermont Security Documentation.

Pursuant to the A Note, the Debtor shall pay **$2,000,000.00** amortized over 20 years at an interest rate of 2% per annum payable in 120 equal monthly payments of **$10,118.00** with a balloon payment on the Maturity Date (as defined in this paragraph). The first monthly payment under the A Note shall be due on or before the twenty-first (21st) calendar day of the thirteenth (13th) month

after the Effective Date, with the monthly payment to be made on or before the same day of each subsequent month. A final balloon payment with respect to the A Note shall be made on the tenth anniversary of the first monthly payment under the Plan (for the purpose of this section of the Plan, the "Maturity Date").

The B Note shall be in the original principal amount of **$3,000,000.00** and be payable in full, on or before the Maturity Date. The B Note shall accrue interest at the rate of 2% per annum, but such interest shall not be due and payable until the Maturity Date. In the event the principal balance of the B Note is paid in full on or before the Maturity Date, the balance of the interest accrued thereon shall be forgiven.

The Debtor shall have thirty (30) calendar days to cure any payment defaults under the A Note or the B Note, after receipt of written notice of the same from Vermont.

The A Note and the B. Note shall contain customary default and acceleration provisions in a form acceptable to Vermont. The Vermont Security Documentation shall likewise be in a form acceptable to Vermont.

### ii.       **Vermont Claims –Class 2-B**

On the Effective Date, Vermont's Class 2-B Claim shall be Allowed as a General Unsecured Claim in the amount of **$4,092,281.44** subject to the treatment provided for in Class 8. On the Effective Date, Vermont shall be deemed to have forever waived and released any right to payment on account of its Allowed Class 2-B Claim.

### c.       **CMS Claim (Class 3) – Impaired**

Upon the occurrence of the Effective Date, the Class 3 Claims shall be Allowed in the amount of **$4,000,000.00** subject to the terms of § IV(D) of the Plan. These terms provide: In full and final satisfaction, settlement, release, and discharge of CMS's Allowed Class 3 Claim, the Debtor shall enter into an Extended Repayment Schedule ("ERS"), as provided for under Chapter 4 of the Medicare Financial Management Manual in existence as of the Effective Date (the "Manual") and other applicable Medicare statutes, rules, or documents (the "Medicare Laws and Rules"). Repayment of CMS's Allowed Class 3 Claim shall be pursuant to an ERS containing the following payment terms: the Debtor shall pay CMS **$4,000,000.00** amortized over 5 years (60 months) (the "CMS Repayment Term") in equal monthly payments at a fixed rate of 2% interest per annum, with the first monthly payment to be delivered on or before the later of (A) the first calendar day of the first month after the Effective Date or (B) January 1, 2021, or such other date as the Debtor and CMS agree in the ERS. The final monthly payment shall be due on the five year anniversary of the date the first monthly payment was due (the "CMS Maturity Date"), or such other date as the Debtor and CMS agree.

Pursuant to Chapter 4, § 10.2 of the Manual, in the absence of a payment default, during the CMS Repayment Term, neither CMS nor any fiscal intermediary shall withhold payments or funds to recover or otherwise recoup with respect to CMS's Allowed Class 3 Claim, except as set forth in § IV(D) of the Plan, the Manual, or as agreed to by the Debtor. Pursuant to Chapter 4, §

50(A)(11) of the Manual, the Debtor's payments under the ERS shall not be late if received within thirty (30) days of the date due.  Pursuant to Chapter 4, § 50(A)(12) of the Manual, the Debtor shall have the right to request to reinstate the ERS in the event of a payment default that is not cured within any applicable time periods provided for in the Manual.  The provisions of the paragraph in the Plan corresponding to this paragraph are intended to provide the Debtor and CMS with rights available to each party under an ERS pursuant to the Manual in existence as of the Effective Date.

Under the Plan, the following additional provisions shall apply to treatment of CMS's Allowed Class 3 Claim:

- CMS shall, either directly or through a fiscal intermediary, enter into the ERS on terms consistent with the treatment provided for herein without the need for further application or approval.  During the Case, the Debtor has provided or CMS has obtained all relevant information necessary to accept and approve a request to enter into the ERS consistent with 42 C.F.R. § 401.607 and Chapter 5, § 50 of the Manual.

- The Debtor asserts that it was underpaid for cost report years 2018 and/or 2019 and entitled to payment in amounts asserted in cost reports filed for such years (the "Pre-Confirmation Cost Reports").  CMS shall use its best efforts, and direct any applicable fiscal intermediary to use its best efforts, to expedite review of all Pre-Confirmation Cost Reports, in an effort to complete desk reviews on or before January 31, 2021.  CMS shall cause any underpayment identified or determined to exist with respect to the 2018 and 219 Pre-Confirmation Cost Reports to be offset against the principal balance with respect to CMS's Allowed Class 3 Claim, less any payments received and interest accrued by such date (the "Reduced CMS Principal Balance"), and amortize the Reduced Principal Balance over the remaining months left in the CMS Repayment Term without adjusting the interest rate or CMS Maturity Date, except by consent of the Debtor.

The Debtor shall have no payment obligations on account of CMS's Claim alleged in Proof of Claim 114, which includes the CMS Administrative Claim, except as expressly set forth herein, and any further payment obligations above **$4,000,000.00** shall be discharged and released as of the Effective Date.

### d.     The 457 Plan Claims (Class 4) – Impaired

Class 4 consists of the Claims of current or former employees of the Debtor who are participants in a 457(b) retirement plan sponsored by SMCS (the "457 Plan").  As of the Effective Date, the Class 4 Claims shall be allowed as General Unsecured Claims.  If SMCS obtains confirmation of a chapter 11 plan that maintains the 457 Plan under the same terms and conditions as existed prior to the Petition Date, then Allowed Class 4 Claims shall retain whatever rights they may have had in the 457 Plan as of the Petition Date unaffected by this chapter 11 Case and be deemed to have forever waived, released, and discharged any and all claims against the Debtor or its estate on account of their Allowed General Unsecured Claims.  If SMCS does not obtain confirmation of a chapter 11 plan that maintains the 457 Plan under the same terms and conditions

as existed prior to the Petition Date, then Allowed Class 4 Claims shall be treated the same as Allowed General Unsecured Claims in Class 8 and such treatment shall be in full and final satisfaction of such Claims.  Proofs of Claim on the Claims Register of the Debtor's Case asserting claims in and to the 457 Plan are Claim 50 (Tim Ford), Claim 51 (Robert Cochrane), and Claim 77 (Ann Bartlett).  The Holders of these Claims comprise Class 4 Claims.

### e.      Priority Wage Claims (Class 5) – Unimpaired

Class 5 consists of Priority Wage Claims, which are Prepetition Unsecured Claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay and certain benefits as described in §§ 507(a)(4) and (5) of the Bankruptcy Code.  Priority Wage Claims are limited in amount to **$13,650.00** per individual.   On June 26, 2019, the Debtor filed that certain Emergency Motion for Authority to Pay Pre-Petition Wages, to Maintain Existing Insurance Coverage, and for Related Relief [Dkt. No. 3] (the "Payroll Motion").  Pursuant to the Order granting the Payroll Motion [Dkt. No. 87] (the "Payroll Order"), the Debtor paid employees all Prepetition wages that they may have been owed in the ordinary course of business.  The Payroll Order also authorized the Debtor to honor paid time off (sick and vacation) in the ordinary course of business but capped payouts at **$13,650.00**, less any payments to such employee for Prepetition wages already made.  All outstanding Claims of employees in Class 5 will be satisfied by the Debtor honoring its prepetition policies in the ordinary course of its business, subject to the limitations of the Payroll Order.  Any Priority Wage Claims exceeding the statutory cap shall constitute General Unsecured Claims.

### f.      Priority Non-Tax Claims, Other Than Priority Wage Claims (Class 6) – Unimpaired

Class 6 consists of Priority Non-Tax Claims, Other Than Priority Wage Claims.  To the extent any Priority Non-Tax Claims, other than Priority Wage Claims exist, and unless otherwise mutually agreed upon by the Holder of an Allowed Priority Non-Tax Claim that is not a Priority Wage Claim and the Debtor, each such Holder of an Allowed Priority Non-Tax Claim that is not a Priority Wage Claim shall receive Cash in an amount equal to the Holder's Allowed Claim on the later of the Effective Date and the date such Priority Non-Tax Claim other than Priority Wage Claim becomes an Allowed Claim pursuant to a Final Order, or, in either event, as soon thereafter as is practicable.

### g.      Patient Refund Claims (Class 7) – Impaired

Class 7 consists of the Patient Refund Claims.  In order to maintain its reputation and to adhere to best business practices, the Debtor shall pay refund claims in full no later than the 180th day after the Effective Date.  For the purposes of the Plan: Any Patient Refund Claim (i) identified in the Schedules or in a proof of claim, and (ii) not subject to an objection on or before October 23, 2020, shall be classified as an Allowed Class 7 Claim.  To the extent a Patient Refunds Claim is not an Allowed Claim on or before the 180th day after the Effective Date, the Debtor shall fund such Patient Refund Claim as soon as practicable after such Claim becomes an Allowed Claim through an agreement between the Debtor and the Holder of a Patient Refund Claim or through a Final Order.  The Debtor shall have the right to apply any Patient Refund Claim to amounts owed

37

by such patient or guarantor to the Debtor and to remit only the net amount, if any, owed to such patient or guarantor.

### h.    General Unsecured Claims (Class 8) – Impaired

Class 8 consists of Unsecured Claims that are not Unclassified Claims or provided for under any other Class, and Class 8 Claims include any deficiency Claim arising from operation of § 506 of the Bankruptcy Code.  Any and all Claims of SMCS relating to the time period before the Petition Date shall constitute Class 8 Claims.

Under the Plan, in full and final satisfaction, settlement, release, and discharge of any Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive Cash Distributions equal to a pro rata share of all GUC Avoidance Recoveries, as provided for in § VII(C) of the Plan.  Class 8 Claims shall not accrue interest.

**Please be advised that adjudications of the issues with respect to treatment of any Class could impact Confirmation.**

### 4.    General Claim Treatment Provisions

Except as may otherwise be provided for in the Plan, the failure of any party to object to any Claim in the Case shall be without prejudice to the rights of the Debtor to contest, object to, or otherwise defend against such Claim if and when such Claim is sought to be enforced by the Holder of such Claim.  Notwithstanding § 1141(c) or any other provision of the Bankruptcy Code, all Prepetition liens on Assets of the Debtor held with respect to any Allowed Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms or statutory provisions until such Allowed Secured Claim is satisfied, at which time such lien shall be released, shall be deemed null and void, and shall be unenforceable for all purposes*; provided, however*, that the Debtor may condition delivery of any final payment upon receipt of an executed release of the lien.  Any and all liens securing any Secured Claim that is not an Allowed Claim shall be released, shall be deemed null and void, and shall be unenforceable for all purposes. Nothing in the Plan shall preclude the Debtor from challenging the validity of any alleged lien, including a mortgage, security interest, or other charge, on any Asset or the value of the Asset that secures any alleged lien, and all such rights are expressly preserved.

The Debtor, pursuant to §§ 502(b)(1) and 558 of the Bankruptcy Code and applicable non-bankruptcy law, may set off against any Allowed Claim, and the Distributions to be paid under this Plan, the claims, rights, and Causes of Action of any nature that the Debtor may have against the Holder of such Allowed Claim, including any surcharge rights under § 506(c) of the Bankruptcy Code; provided, however, that neither the failure to effect such a setoff, nor the allowance of any Claim under this Plan, shall constitute a waiver or release by the Debtor of any such claims, rights, and Causes of Action that the Debtor may have against such Holder.

**E.**     **Estimated Range of Potential Recoveries for Impaired Classes of Claims**

The estimated potential range of recovery to holders of Allowed Claims in the Classes of Impaired Claims is set forth in the chart below.  Matters arising during Confirmation or in the process of allowance of a particular Claim could impact any Distributions.

| Class | Type of Claim | Estimated Recovery | Entitled to Vote (Yes/No) |
|-------|---------------|--------------------|--------------------------|
| Class 1 | Berkshire Secured Claim | Paid $2 million or the value of Berkshire's Collateral | Yes |
| Class 2 | Vermont | $5 million | Yes |
| Class 3 | CMS Claim | $4 million | Yes |
| Class 4 | 457 Plan | Retention of rights in 457 Plan or Distributions with Class 8 | Yes |
| Class 5 | Priority Wage Claims | Paid in full, excepting possibly paid time off | No |
| Class 6 | Priority Non-Tax Claims, other than Priority Wage Claims | Paid in full | No |
| Class 7 | Patient Refund Claims | Paid in full upon written request by patient | No |
| Class 8 | General Unsecured Claims | Potential pro rata payment based on GUC Avoidance Recoveries | Yes |

**F.**     **Means for Execution of the Plan**

The source of funds for payments that the Debtor shall be required to make (or reserve for) on the Effective Date, which does not include deferred Cash payments, is the Debtor's Cash on hand as of the Effective Date and the Exit Funding.  The sources of funding for deferred Cash payments under the Plan shall be the Cash generated by the on-going operations of the Debtor, including recoveries on Causes of Action, and any subsequent grant or borrowing by the Debtor, as may be approved by the Bankruptcy Court, to the extent such approval is required, including related to the federal Paycheck Protection Program and the Debtor's pending adversary proceeding against Jovita Carranza, as administrator of the U.S. Small Business Administration (Adv. No. 20-1004).

The Confirmation Order grants the Debtor express authority to sell, convey, transfer, and/or assign any or all of the Assets in order to make payments under the Plan and/or to operate (and make operational changes to) the Debtor`s businesses. Additionally, after the Confirmation Date, the Debtor shall be authorized to take all actions necessary to prosecute or not prosecute, as the Debtor deems appropriate, any and all Causes of Action.

Except as may otherwise be provided in the Plan, on and after the Confirmation Date, all Assets shall vest in the Debtor free and clear of all Claims, liens, charges, other encumbrances, interests, or defenses (including recoupment) of any Holder of a Claim to the maximum extent permitted under § 1141 of the Bankruptcy Code.

The Debtor shall remain a Vermont non-profit business corporation. Through Confirmation of SMCS's plan, SMCS shall divest itself of the Class B Membership through execution of the corporate resolution attached thereto. Additionally, effective as of the Effective Date, the Bylaws of the Debtor shall be amended and restated to reflect the elimination of SMCS as its Class B member.

The officers and directors of the Debtor on the Confirmation Date shall be as identified on **Exhibit D** to the Plan. The officers and directors on the Confirmation Date are expected to be the same officers and directors that existed during the course of the Case, provided, however, two (2) additional directors may be added to the Board of Directors of the Debtor at the request of Vermont. The Debtor shall continue to contract with QHR after the Confirmation Date. QHR will assist the Debtor with recruitment of a chief executive officer and chief financial officer to assume duties ninety (90) days after the Effective Date, unless otherwise agreed.

The individuals who shall serve as officers and directors of the Debtor on the Confirmation Date are identified on **Exhibit D** to the Plan. The officers and directors on the Confirmation Date are expected to be the same officers and directors that existed during the course of the Case, except that two additional directors shall be added to the Board of Directors of the Debtor, with the qualifications and selection of those additional directors to be subject to review and approval by Vermont. One such director has not yet been identified. The Debtor shall continue to contract with QHR after the Confirmation Date. Following the Confirmation Date, and in consultation with its Board of Directors and QHR, the Debtor will recruit and retain a Chief Executive Officer and Chief Financial Officer, with the qualifications and selection of these officers to be subject to review and approval by Vermont. The officers will be approved and retained in sufficient time to assume their positions no later than ninety (90) days after the Effective Date, unless otherwise agreed by the Debtor and Vermont. Any additional officers appointed by the Debtor following the Confirmation Date will be subject to review and approval by Vermont. The rights of review and approval set forth herein are a condition of the exit financing and grants to be provided by Vermont in connection with this Plan and shall remain in place for three (3) years after the Confirmation Date.

As a further condition of the exit financing to be provided by the State of Vermont, Vermont shall have the right to review the Debtor's operations and compliance with its Plan obligations. Such review will be conducted on a quarterly basis in the first year after the Confirmation Date and on a semi-annual basis thereafter. Such review shall be conducted by an

external audit firm selected by Vermont, with the expense of such audit to be paid by the Debtor. To the extent this semi-annual review and reporting reveals deficiencies or defaults in connection with the Debtor's operations and Plan performance, the Debtor shall propose a plan of correction subject to approval by Vermont, and the Debtor shall comply with such plan.  Vermont's semi-annual review rights shall remain in place for as long as amounts are owing by the Debtor under the Plan and the Vermont Security Documentation.

There are additional provisions in the Plan regarding the means for executing the Plan. You are encouraged to read them.

## G.    <u>Jurisdiction</u>

The Plan proposes that the Bankruptcy Court retain jurisdiction to the full extent permitted by law, including:

A.      Resolution of any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear, determine, and if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendments, if any, of the Plan after the Effective Date, and to add or delete any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed;

B.      Entry of such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

C.      Determination of any and all motions, adversary proceedings, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Debtor after the Effective Date;

D.      Ensuring that Distributions to Holders of Allowed Claims are accomplished as provided for under the Plan;

E.      Hearing and determining any timely objections to Administrative Claims or to proofs of claim Filed, both before and after the Confirmation Date, including any objections to the classification of any Claim and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of secured or unsecured status of any Claim, in whole or in part;

F.      Entry and implementation of such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, revoked, modified, reversed, or vacated;

G.      Issuance of orders in aid of execution of the Plan, to the extent authorized by § 1142 of the Bankruptcy Code;

H.    Consideration of any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

I.    Hearing and determining all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

J.    Hearing and determining disputes arising in connection with, or relating to, the Plan or the interpretation, implementation, or enforcement of the Plan, or the extent of any Person's obligations incurred in connection with or released or exculpated under the Plan;

K.    Issuance of injunctions or other orders as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

L.    Determination of any other matters that may arising in connection with, or are related to, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan;

M.    Hearing and determining matters concerning state, local, and federal taxes in accordance with §§ 346, 505, and 1146 of the Bankruptcy Code;

N.    Hearing any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

O.    Entry of a final decree closing the Case; and

P.    Interpreting and enforcing Orders entered by the Bankruptcy Court.

If the Bankruptcy Court abstains from exercising jurisdiction or is without jurisdiction over any matter, then this section shall not effect, control, prohibit, or limit the exercise of jurisdiction by any other court that has jurisdiction over that matter.

**ALL CREDITORS THAT FILED PROOFS OF CLAIM IN THE CASE SHALL BE DEEMED TO HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ALL PURPOSES WITH RESPECT TO SUCH CLAIMS.**

## H.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Assumed Contracts

Under the Plan, any and all executory contracts or unexpired leases that: (i) have not expired by their own terms on or prior to the Effective Date; (ii) have not been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court or by operation of law prior to the Effective Date; (iii) are not the subject of a motion to assume or assume and assign pending as of the Effective Date; or (iv) are not Rejected Contracts (as defined below), are assumed by the Debtor as of the Effective Date (collectively, the "Assumed Contracts").

42

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumption as of the Effective Date, pursuant to §§ 365(a) and 1123 of the Bankruptcy Code. Attached as **Exhibit B** to the Plan is a schedule of Assumed Contracts specifically identified by the Debtor (there may be additional Assumed Contracts that are subject to assumption by the terms of this section that are not specifically identified on **Exhibit B**), as well as the cure amounts with respect to the Assumed Contracts (the "Schedule of Assumed Contracts").

The Plan further provides that, to the extent § 365 of the Bankruptcy Code is applicable to Medicare and/or Medicaid Provider Agreement(s) (the "Provider Agreements"), the Confirmation Order shall be an order authorizing the Debtor to assume the Provider Agreements, including all benefits and burdens, identified therewith.  The Provider Agreements are not identified on the Schedule of Assumed Contracts.  The Debtor and the counterparties to the Provider Agreements reserve all rights in relation to a determination as to whether or not the Provider Agreements are the subject of § 365 of the Bankruptcy Code.

Any party to an Assumed Contract that disputes: (i) the cure amount (or lack thereof); (ii) the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of § 365 of the Bankruptcy Code) under the applicable Assumed Contract; or (iii) any other matter pertaining to assumption of an Assumed Contract, including the credit terms proposed, if any, must file an objection on or before the deadline to object to Confirmation of the Plan. Failure to file an objection to the assumption of an Assumed Contract within the applicable timeframes set forth herein, shall be deemed consent to the cure amount (or lack thereof) on the Schedule of Assumed Contracts and payment terms for the same.  Certain of the cure payment amounts and terms as reflected on the Schedule of Assumed Contracts are the result of agreements reached between the Debtor and the counterparty to the Assumed Contract.  The Confirmation Order shall constitute approval by the Bankruptcy Code for the Debtor to enter into such compromises.  A dispute regarding the Debtor's assumption of any Assumed Contract shall be subject to the jurisdiction of the Bankruptcy Court.

**2.        Rejection of Executory Contracts and Leases**

Under the Plan, unless identified as an Assumed Contract on the Schedule of Assumed Contracts, all executory contracts or unexpired leases are rejected as of the Confirmation Date (the "Rejected Contracts").

**IF THE REJECTION OF AN EXECUTORY CONTRACT OR UNEXPIRED LEASE RESULTS IN DAMAGES TO THE OTHER PARTY OR PARTIES TO SUCH CONTRACT OR LEASE, THEN ANY CLAIM FOR SUCH DAMAGES, IF NOT PREVIOUSLY EVIDENCED BY A FILED PROOF OF CLAIM, SHALL BE FOREVER BARRED AND SHALL NOT BE ENFORCEABLE AGAINST THE ESTATE, THE DEBTOR, ITS ASSETS OR AGENTS, OR SUCCESSORS OR ASSIGNEES, UNLESS A PROOF OF CLAIM IS FILED WITH THE BANKRUPTCY COURT AND SERVED UPON COUNSEL FOR THE DEBTOR ON OR BEFORE THIRTY (30) CALENDAR DAYS AFTER THE LATER TO OCCUR OF: (A) THE CONFIRMATION DATE; OR (B) THE DATE OF ENTRY OF AN ORDER BY THE BANKRUPTCY COURT AUTHORIZING REJECTION OF A PARTICULAR EXECUTORY CONTRACT OR**

**UNEXPIRED LEASE.  REJECTION DAMAGES CLAIMS SHALL BE CLASSIFIED AS GENERAL UNSECURED CLAIMS AND SHALL BE TREATED AS CLAIMS IN CLASS 10 UNDER THE PLAN.**

      **3.**      <u>**Reservation of Rights with Respect to Assumed or Rejected Contracts**</u>

Under the Plan, the Debtor reserves the right to add or delete contracts from the Schedule of Assumed Contracts until fourteen (14) days prior to the date of the Confirmation Hearing.  The Debtor, on the same day that such addition or deletion is filed or as soon as is reasonably practicable thereafter, shall notify the non-Debtor counterparty of the Assumed Contracts.  If the change is to the Schedule of Assumed Contracts, then the notice shall contain an explanation of the counterparty's right to object to the cure amount or the assumption of the Assumed Contract for other reasons.  Such notice shall be delivered by facsimile, electronic mail, or, if neither of those methods is available, by overnight delivery.

**I.**      <u>**Effect of Confirmation of the Plan**</u>

These are important provisions located in § X of the Plan.  You are encouraged to read them closely, including provisions not restated in this Disclosure Statement, as they alter or impact the rights of parties bound by the Plan.  The following is a summary of certain provisions contained in § X of the Plan:

      **1.**      <u>**Binding Effect of Confirmation**</u>

Confirmation will bind the Debtor, all Creditors, and any other party in interest to the provisions of the Plan.  If the Plan is confirmed by the Bankruptcy Court, then the treatment of Claims set forth in the Plan supersedes and replaces any agreements or rights the Holders of Claims have in or against the Debtor and/or the Estate and/or the Assets.

      **2.**      <u>**Good Faith**</u>

Confirmation of the Plan shall constitute a finding that the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code.  The Debtor is a non-profit, and thus there is no offer, issuance, sale, or purchase of any security under the Plan.  To the extent a Court concludes otherwise, Confirmation of the Plan shall constitute a finding that such offer, issuance, sale, or purchase has been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

Under the Plan, as of the Effective Date, the Debtor and each of its advisors and attorneys that were employed as of the date the Plan was Filed shall be deemed exculpated by Holders of Claims against and Interests in the Debtor and other parties in interest to the Case (including, without limitation, the Debtor and/or the Estate), from any and all claims, causes of action, and other assertions of liability (including, without limitation, breach of fiduciary duty), arising out of or relating to the Debtor, the Estate, the Case or the exercise by such entities of their functions as members of, advisors to or attorneys for the Debtor or otherwise under applicable law in connection with or relating to the Debtor, the Estate, or the Case, including, without limitation, the formulation,

44

negotiation, preparation, dissemination, Confirmation, and consummation of the Plan and any agreement, instrument, or other document issued hereunder or relating hereto; provided, however, that neither the Plan, nor the Confirmation Order, shall have any effect on liability for any act or omission of the Debtor or its respective advisors or attorneys to the extent that such act or omission constitutes gross negligence, fraud, or willful misconduct.

3.      **Exculpation and Injunction**

According to the Plan, on or after the Effective Date, the Debtor, the Debtor's officers and directors, and the Debtor's advisors and attorneys that were employed as of the date the Plan was Filed (collectively, the "Exculpated Parties") shall not have or incur any liability for, and are expressly exculpated, released, and discharged from any claim or any past or present actions taken or omitted to be taken under or in connection with, related to, effecting, or arising out of: (i) the Debtor's operations between the Petition Date and the Confirmation Date; (ii) the Case; (iii) the administration of the Debtor's Cash and real and personal property after the Petition Date; (iv) the pursuit of Confirmation; (v) the formulation, preparation, dissemination, implementation, administration, confirmation, or consummation of the Plan; (vi) any other act taken or omitted to be taken in connection with the Debtor's business during the Case; or (vii) any contract, instruction, release, or other agreement entered into or created in connection with the foregoing, except only for actions or omissions to act to the extent determined by a court of competent jurisdiction (with such order becoming a final, non-appealable order) to be by reason of such party's gross negligence, willful misconduct, or fraud, and in all respects, such party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; it being expressly understood that any act or omission with the approval of the Bankruptcy Court shall be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud, unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation (collectively, the "Released Acts").

As of the Confirmation Date, but subject to the occurrence of the Effective Date, and except as otherwise expressly provided in the Plan, all past or present Holders of Claims or Interests, directly or indirectly, shall release, and be deemed to forever release and discharge, the Exculpated Parties from the Released Acts and shall be precluded and permanently enjoined from: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a right of subrogation of any kind against any debt, liability, or obligation due to the Debtor and/or the Estate; and (v) commencing or continuing any action, in any manner or in any place, against the Exculpated Parties that does not comply with or that is inconsistent with the provisions of the Plan.

4.      **Injunctions or Stays**

Unless otherwise provided, all injunctions or stays arising under or entered during the Case under §§ 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

5.     **Discharge of Debtor**

Except as may otherwise be provided herein: (i) the rights afforded under the Plan and the treatment of all Claims and Interests therein, shall be in exchange for and in complete satisfaction, discharge, and release of Claims (and any defenses thereto or based upon such Claims, including recoupment) and Interests of any nature whatsoever against the Debtor, the Estate, and/or any of the Assets; (ii) on the Effective Date, all such Claims provided for under the Plan against the Debtor, the Estate and/or the Assets shall be satisfied, discharged, and released in full, as provided for under the Plan as well as any defenses based upon such Claims, including recoupment; and (iii) all Persons and entities shall be precluded from asserting against the Debtor, the Estate, their successors, or the Assets any Claims (or defenses arising therefrom) based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date, except as may be specifically authorized under the Plan with respect to Claims for which further proceedings are permitted under the Plan.  Entry of the Confirmation Order shall provide the Debtor the full effect of the discharge provided for under § 1141(d) of the Bankruptcy Code.

6.     **No Admissions**

Except as specifically provided in the Plan, nothing contained in the Plan or this Disclosure Statement shall be deemed or construed in any way as an admission by the Debtor and/or the Estate with respect to any matter set forth in the Plan, including the amount or allowability of any Claim, or the value of any Assets.  Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the Effective Date does not occur, then the Plan shall be null and void, and nothing contained in the Plan shall: (i) be deemed to be an admission by the Debtor and/or the Estate with respect to any matter discussed in the Plan, including liability on any Claim or the propriety of any Claim's classification; (ii) constitute a waiver, acknowledgement, or release of any Claims, Interests, or any claims held by the Debtor and/or the Estate; or (iii) prejudice in any manner the rights of the Debtor and/or the Estate in any further proceedings.

J.     **Miscellaneous Provisions**

1.     **Holders of Claims and Interests as of Record Date**

All Distributions under the Plan shall be tendered to the entity that is the Holder of the Allowed Claim as of the Record Date unless the Debtor receives a notice of a change of address.

2.     **Successors and Assigns**

The rights, benefits, and obligations of any Person or entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or entity.

3.     **Reservation of Rights**

The Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, except as expressly set forth herein.  The filing of the Plan, the statements or provisions

herein, or the taking of any action by the Debtor with respect to the Plan shall not be, or shall not be deemed to be, an admission or waiver of any rights of the Estate or the Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### 4.   Post-Confirmation Effectiveness of Proofs of Claim

Except as may otherwise be provided in the Plan, Proofs of Claim shall, upon the Effective Date, represent only the right to participate, to the extent the Proofs of Claim become Allowed Claims, in the Distributions contemplated by the Plan and otherwise shall have not further force or effect.

### 5.   Services by and Fees for Professionals

Fees and expenses for the Professionals retained by the Debtor for services and costs incurred after the Petition Date and prior to the Confirmation Date, as well as fees and expenses incurred by those Professionals for the preparation of their final fee applications, shall be fixed by the Bankruptcy Court after notice and a hearing, and such fees and expenses shall be paid (less deductions for any and all amounts thereof already paid to such Professionals) after approval by the Bankruptcy Court, to the extent so approved and as provided in the Plan.

### 6.   Severability of Plan Provisions

If, before Confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, then the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible, consistent with the original purpose of that term or provision.  That term or provision will then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, or impaired, or invalidated.

The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this section, is valid and enforceable under its terms.   Should any provision in the Plan be determined to be unenforceable after Confirmation, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

### 7.   Governing Law

The rights and obligations under the Plan and any agreements, contracts, documents, or instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Vermont without given effect to Vermont's conflict-of-laws principles, unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy rules); or (ii) an express choice-of-law provision in any document provided for or executed under or in connection with, the Plan.

8.      **Final Decree**

Once the Plan has been substantially consummated, the Debtor shall, as soon as is reasonably practicable, File a motion with the Court to obtain a final decree to close the Case.

**V.**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Debtor believes that the Plan is in the best interests of Creditors and Holders of Claims and that it should be accepted and confirmed. If the Plan as proposed, however is not confirmed, then the following alternatives may be available to the Debtor: (A) liquidation under chapter 7 of the Bankruptcy Code; (B) the Debtor or another party could propose an alternative chapter 11 plan; or (C) the Case could be dismissed.

A.      **Chapter 7 Liquidation**

The Debtor is a non-profit business corporation. This Case cannot be converted to one under chapter 7 without the Debtor's consent. 11 U.S.C. § 1112(c). The Debtor does not currently consent to conversion. Thus the Debtor does not believe that liquidation under chapter 7 is a viable alternative to consider and also does not believe that potential recoveries under a hypothetical liquidation are relevant because this could not happen non-consensually.

Nevertheless, the Debtor believes that, if required, a liquidation under chapter 7 in accordance with the priority rules of the Bankruptcy Code would result in smaller Distributions being made to Creditors than those provided for under the Plan because: (1) the wind-down costs of the Debtor, as a hospital, would be significant and materially impact distributions; and (2) liquidated recoveries would likely yield less than maintaining the Debtor as a going concern. The Debtor's liquidation analysis is set forth in **Exhibit 2** to this Disclosure Statement.

While no liquidation could occur without the Debtor's consent, the Debtor believes that Confirmation will provide Holders of Allowed Claims with a recovery that is not less than would be available under chapter 7 of the Bankruptcy Code.

B.      **Alternative Chapter 11 Plan**

If the Plan is not confirmed, the Debtor may propose a different plan, which might involve an alternative means for the reorganization or liquidation of the Assets. However, it is difficult to speculate on or assess the terms and potential treatment of Allowed Claims under any such alternative plan. Furthermore, for the Debtor or Creditors to formulate, solicit and confirm any such alternative plan would likely require the Estate to incur additional administrative and other expenses, may substantially delay Distributions to Creditors, and may result in lower recoveries to Creditors than the proposed Plan. The Debtor believes that the terms of the Plan, in conjunction with the timing of the Plan, provide the realization of the most value for Holders of Claims against the Debtor's Estate.

48

**C.**     **Dismissal of this Case**

Dismissal of the Debtor's chapter 11 Case would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*.  Upon dismissal of the Debtor's chapter 11 Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Debtor, and possibly resulting in costly and protracted litigation in various jurisdictions.

Dismissal would also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtor.  The Debtor believes that these actions could lead ultimately to the liquidation of the Assets under chapter 7 of the Bankruptcy Code or a state law receivership.  Therefore, the Debtor believes that dismissal of the chapter 11 Case is not a preferable alternative to the Plan.

**VI.**

**CERTAIN FEDERAL TAX CONSEQUENCES**

**A.**     **General**

This discussion is intended only as a summary of certain tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional.  This discussion is for informational purposes only and is not tax advice.  The tax consequences of the Plan may be uncertain or vary depending on particular facts and circumstances.

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT ADVISOR.**

**B.**     **U.S. Federal Income Tax Consequences to the Debtor**

The Debtor is a non-profit business corporation that is exempt from federal income taxation under § 501(c)(3) of the Internal Revenue Code.  It is intended that nothing in the Plan shall adversely affect this status.  The Debtor does not expect the implementation of the Plan to have any adverse federal income tax consequences on the Debtor before or after the Effective Date.  If the tax-exempt status of the Debtor would terminate, then the Debtor may be subject to tax on its income.

49

C.      **U.S. Federal Income Tax Treatment with Respect to Holders of Allowed Claims**

Holders of Allowed Claims as of the Effective Date are encouraged to seek independent tax advice about the tax consequences of the Plan and participation in Distributions thereunder. The tax consequences could vary based on the facts and circumstances of a particular Holder's Claim, the extent to which payment of the same is on account of interest or principal, or other factors. The Debtor does not, and its Professionals do not, intend that the Plan or Disclosure Statement provide tax advice to any party.

## VII.

## RISK FACTORS IN CONNECTION WITH THE PLAN

The Holders of Claims against the Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together with this Disclosure Statement or thereafter) before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

A.      **Bankruptcy Considerations**

Although the Debtor believes that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction of the conditions precedent set forth in the Plan, and there can be no assurance that such conditions will be satisfied. In the event the conditions precedent described in the Plan have not been satisfied as of the Effective Date, then the Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all Holders of Claims will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

**AS TO EACH IMPAIRED CLASS THAT HAS NOT ACCEPTED THE PLAN, THE PLAN MAY BE CONFIRMED IF THE BANKRUPTCY COURT DETERMINES THAT THE PLAN "DOES NOT DISCRIMINATE UNFAIRLY" AND IS "FAIR AND EQUITABLE" WITH RESPECT TO THESE CLASSES. THE DEBTOR BELIEVES THAT THE PLAN SATISFIES THESE REQUIREMENTS. NEVERTHELESS, THERE CAN BE NO ASSURANCE THAT THE BANKRUPTCY COURT WILL REACH THE SAME CONCLUSION.**

**B.**      **No Duty to Update Disclosures**

The Debtor has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtor is required to do so pursuant to an order of the Bankruptcy Court.  Delivery or service of this Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

**C.**      **Representations Outside this Disclosure Statement**

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court.  Please be advised that any representations or inducements made outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims that are entitled to vote to accept or reject the Plan.

**D.**      **No Admission**

The information and representations contained herein and in the Plan shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan or the Debtor. To the extent they include settlement proposals as to certain parties, such proposals are subject to the protection of Rule 408 of the Federal Rules of Evidence.

**E.**      **Tax and Other Related Considerations**

A discussion of potential tax consequences of the Plan is set forth in this Disclosure Statement. However, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice.  Holders of Claims should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

## VIII.

## RECOMMENDATION AND CONCLUSION

The Debtor believes that the Plan provides the best available alternative for maximizing the recoveries that Creditors may receive from the Estate.  Therefore, the Debtor recommends that all Creditors that are entitled to vote on the Plan vote to accept the Plan.

**SPRINGFIELD HOSPITAL, INC.**

Dated: November 2, 2020

/s/ Andrew C. Helman
Andrew C. Helman
Kelly W. McDonald
Katie Krakowka
Sage Friedman
MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, Maine  04104-5085
(207) 773-5651

Attorneys For Springfield Hospital, Inc.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

In re:

**SPRINGFIELD HOSPITAL, INC.,**

      **Debtor.**

**Chapter 11**

**Case No. 19-10283**

## BALLOT FOR ACCEPTING OR REJECTING SECOND AMENDED PLAN OF REORGANIZATION OF SPRINGFIELD HOSPITAL, INC. DATED NOVEMBER 2, 2020

**Filed By (Name of Creditor):**_____

**Creditor's Contact Person:**_____

**Creditor's Mailing Address:** _____

**Creditor's Telephone and Facsimile Number:** _____

**Creditor's E-Mail Address:** _____

**Date Ballot Submitted:** _____

The Second Amended Plan of Reorganization of Springfield Hospital, Inc. Dated November 2, 2020 (the "Plan") can be confirmed by the Bankruptcy Court and made binding on you if it is accepted by the holders of two-thirds in amount and more than one-half in number of claims in each impaired class voting on the Plan.  If the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if it finds the requirements of 11 U.S.C. § 1129(b) have been satisfied.  **If you want your vote to count, you must complete and return this ballot to Murray, Plumb & Murray, attn: Andrew Helman, Esq., 75 Pearl Street, P.O. Box 9785, Portland, ME  04104-5085 (ahelman@mpmlaw.com), so that it is received no later than November 30, 2020  at 4:00 p.m.**

*BALLOT*:          The undersigned, a creditor of Springfield Hospital, Inc., in the unpaid amount of:

      **$_____ [Fill in Amount of Creditor's Claim]**

      [*Check the appropriate box*]

      **[   ]    Accepts the Plan**

      **[   ]    Rejects the Plan**

                **CREDITOR:**_____

                **BY:**_____

                **TITLE:**_____